Frank D. RODRIGUEZ, Petitioner,

v.

Aristedes ZAVARAS, Executive Director of Colorado Department of Corrections, Respondent.

No. Civ.A. 96–D–2559.

United States District Court, D. Colorado.

April 1, 1999.

David A. Lane, Miller, Lane & Killmer, L.L.P., Denver, CO, David Lindsey, Denver, CO, for petitioner.

Robert Petrusak, Paul Wolfe, Attorney General's Office, Denver, CO, for respondent.

## MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

### I. *INTRODUCTION*

THIS MATTER is before the Court on the Petition for Writ of Habeas Corpus filed by Frank D. Rodriguez ("Petitioner" or "Rodriguez") on January 27, 1997, which seeks to have his death sentence overturned. This Court's review of the state courts' decisions in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA" or "the Act"), Pub.L. No. 104 – 132, 110 Stat. 1214 (1996). The AEDPA governs my review of this case since the petition was filed after April 24, 1996, the effective date of the Act.

This Court granted Petitioner's motion to stay execution by Order dated November 14, 1996. The Court also granted Petitioner's motion to proceed under 28 U.S.C. § 1915. Petitioner filed his opening brief on January 27, 1997. The government filed its response on March 7, 1997, and a reply was filed on April 4, 1997. The parties filed additional briefs in connection with the standard of review and Petitioner's claim that he is entitled to an evidentiary hearing.[1] A hearing was held on May 30, 1997. In order to complete this opinion, the Court conducted independent legal research on the proper interpretation of the AEDPA and its effect on the standard of review, as well as the substantive issues raised by the petition. Also,

the Court spent considerable time reviewing the voluminous record generated during the state court proceeding.

In rendering an opinion on the merits of the petition, I first discuss the pertinent facts of the case, the applicable standard of review, Petitioner's constitutional objections to the standard of review adopted by me and, finally, my decision on the merits of each argument raised by the petition.

### II. *FACTUAL BACKGROUND*

Petitioner's death sentence was pronounced following his conviction of first-degree murder, first-degree felony murder, first-degree sexual assault, first-degree aggravated motor vehicle theft, second-degree kidnapping, aggravated robbery, conspiracy to commit first-degree murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit first-degree aggravated motor vehicle theft in December, 1986, by a jury in the District Court for the City and County of Denver, Colorado. Record on Appeal, v. 32, pp. 2–6.[2] These convictions resulted from the kidnapping, rape, and murder of Lorraine Martelli ("Martelli") on November 14, 1984.[3]

The evidence presented at trial was that Petitioner, his brother Chris Rodriguez, David Martinez and Patricia Thomas kidnapped Martelli in her own car after she left her work place. They drove Martelli around for several hours during which Petitioner sexually assaulted, raped, beat, sodomized and eventually stabbed her 28 times with a knife, resulting in Martelli's death. Martelli also sustained shallow

---

1. Petitioner's request for an evidentiary hearing is denied in a separate opinion issued this same date.

2. Hereinafter, the Court will refer to the Record on Appeal as "ROA" and the Amended Record of Appeal as "AROA". The particular volume or volumes of the record cited are referred to as "v." or "vv.", the pages as "p." or "pp.", and the lines as "I." or "II."

3. Prior to the trial, Petitioner filed an original proceeding before the Colorado Supreme

Court to resolve the question of whether he could waive a conflict of interest and be represented by the Colorado State Public Defender's Office when that office also represented an individual who would testify at trial as a prosecution witness. The Colorado Supreme Court held that Petitioner could waive such a conflict. *Rodriguez v. District Court*, 719 P.2d 699, 705–09 (Colo.1986) (*Rodriguez I*). The Public Defender's Office subsequently represented Petitioner at trial.

knife cuts around her neck and face, indicating that she was tortured. Before the killing, Martelli pled for her life and asked what would become of her. Chris Rodriguez said they would probably let her go, but Petitioner said that Martelli had seen their faces and that they had to kill her.

Chris Rodriguez was convicted of first-degree murder and other charges, and was sentenced to life imprisonment. David Martinez was convicted of second-degree kidnapping and sentenced to 20 years. Patricia Thomas was granted immunity in exchange for her testimony and was not charged. A more detailed statement of the facts of the case is contained in the opinions issued by the state court, particularly, *People v. Rodriguez*, 794 P.2d 965 (Colo.1990), *cert. denied*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).

After the conclusion of the guilt phase of the trial, the state district court conducted a habitual criminal proceeding in which the jury, on December 13, 1986, adjudicated Petitioner a habitual offender on the basis of three (3) prior felony convictions pursuant to Colo.Rev.Stat. § 16–13–103 (1984 Supp.). ROA, v. 33, p. 63, II. 6–24.[4] Petitioner's previous felony convictions subjected him to mandatory life imprisonment on the basis of a conviction for any of the several felonies committed against Martelli. *See* Colo.Rev.Stat. § 16–13–101 (1986).

The matter then proceeded to the penalty phase where the state sought the death penalty. Of the seven (7) separate aggravating factors which were alleged pursuant to Colo.Rev.Stat. § 16–11–103, the jury found six (6) proven beyond a reasonable doubt. These included: (1) intentionally killing a kidnap victim (ROA, v.52, p. 746); (2) intentionally causing the death of Martelli in furtherance of a class 3 or greater felony (*id.* at p. 748); (3) agreeing with others to kill Martelli and intentionally killing her in furtherance of this agree-

ment (*id.* at p. 749); (4) committing murder while under a sentence of imprisonment for a prior class 3 felony (*id.* at p. 750); (5) committing murder for the purpose of avoiding or preventing a lawful arrest or prosecution (*id.* at p. 751); and (6) committing murder in an especially heinous, cruel, or depraved manner (*id.* at p. 752). *See also id.* at v. 43, pp. 3–4. The sole aggravating factor that was not found by the jury to be established beyond a reasonable doubt was the allegation that the murder was committed for pecuniary gain. *Id.* at v. 52, p. 747.

In addition to the aggravating factors that were given to the jury to consider, the jury was instructed that it could consider certain factors in mitigation. They included the roles of Petitioner and his co-defendants in the crimes, the co-defendants' sentences, and any other non-specific mitigating factor which constituted a reason for not imposing a death sentence. *Id.* at v. 52, p. 778. The jury returned a verdict on December 17, 1986, finding that the mitigating factors did not outweigh the aggravating factors and that a sentence of death was appropriate. *Id.* at v. 52, p. 753. Petitioner was sentenced to death on January 28, 1987. He also serves five (5) consecutive life sentences for convictions arising out of the same incident.

Petitioner, through the Colorado State Public Defender's Office, then filed a direct appeal of his death sentence to the Colorado Supreme Court. Defense counsel received four (4) extensions of time to file the opening brief on this appeal. The brief was filed on February 1, 1989, nearly two (2) years after the case was docketed in the State Supreme Court. The opening brief, entitled "Partial Opening Brief," contained 138 pages of text and raised 9 separate issues. AROA, v. 18, pp. 1–151. An appendix was attached to the brief which

---

4. These prior felony judgments were a 1975 conviction for attempted burglary, a 1979 conviction for second-degree burglary, and a 1979 conviction for aggravated robbery. ROA, v. 1, p. 6. Petitioner entered pleas of guilty or no contest to each of these offenses. His 1979 plea to aggravated robbery represented a negotiated disposition of a crime in which the victim, Judy Archuleta, had also been kidnapped and raped. *Id.* at v. 34, pp. 59, 88.

listed 102 additional issues, including issues about the guilt phase, which counsel indicated he wanted to raise but could not because of the purportedly "unreasonable time limitations placed on the filing of the Opening Brief" and the "inadequate" record on appeal. *See* Partial Opening Brief, AROA, v. 5, pp. 1219–1231. On April 7, 1989, defense counsel attempted to file a second partial opening brief. *Id.* at v. 52, p. 1232. This was disallowed by the Colorado Supreme Court.

After oral argument on the direct appeal, the prosecution learned of the existence of confidential material which could be deemed exculpatory. The prosecution requested a limited remand to determine whether this evidence needed to be disclosed. *People v. Rodriguez*, 786 P.2d 1079 (Colo.1989) ("*Rodriguez II*"). After a remand to trial court, the Colorado Supreme Court ruled that the material had to be disclosed to Petitioner. *People v. Rodriguez*, 794 P.2d 964, 965 (Colo.1990) ("*Rodriguez III*").

On May 29, 1990, the Colorado Supreme Court issued its decision on the direct appeal which affirmed the trial court on a 4–3 vote. *People v. Rodriguez*, 794 P.2d 965 (Colo.1990) ("*Rodriguez IV*"). The three Justices who wrote dissents, Quinn, Lohr, and Kirshbaum, each concluded that legal errors required a reversal of the death sentence. *Id.* at 998–1006. Petitioner sought certiorari from the United States Supreme Court which was denied in January, 1991. *Rodriguez v. Colorado*, 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).

Petitioner next filed motions for postconviction relief in the state district court pursuant to Colo.R.Crim.P. 35. One of the motions was over 700 pages long and raised 319 separate unnumbered claims. AROA, vv. 11, 12. The district court appointed separate counsel, Richard Hostetler, to handle the allegations of ineffective assistance of counsel. These claims were denied by the state trial court in a written order issued on October 7, 1993. *See* Respondent's Brief, Appendix ("App.") A.

On February 14, 1994, the state trial court issued an order denying all of Petitioner's remaining postconviction claims except those dealing with the felony murder and conspiracy convictions and newly discovered evidence. The district court ultimately vacated Petitioner's convictions for first-degree felony murder, conspiracy to commit second-degree kidnapping, and conspiracy to commit first-degree aggravated motor vehicle theft on the grounds they were duplicitous with his convictions for first-degree deliberated murder and conspiracy to commit first degree murder. Further, the district court conducted a hearing on the claims of newly discovered evidence on March 17, 1994 and denied those claims in a ruling from the bench. ROA, v. 67, pp. 171–184.

The trial court's orders on the postconviction claims were appealed to the Colorado Supreme Court. Petitioner was represented by counsel, Nora Kelly, on the ineffective assistance of counsel claims as well as a claim of state interference with Petitioner's direct appeal which asserted that the record was inadequate. *See* Respondent's Brief, App. B. Petitioner was also represented in this appeal by Michael Heher, who filed a separate brief. *See* Respondent's Brief, App. C. The prosecution appealed the trial court's decision to vacate the three lesser offenses.

In an opinion dated March 11, 1996, the Colorado Supreme Court affirmed in part, reversed in part, and remanded in part. *People v. Rodriguez*, 914 P.2d 230, 246 (Colo.1996) ("*Rodriguez V*"). Specifically, Rodriguez' conviction for first-degree sexual assault as a class 2 felony was remanded to the trial court with directions to vacate that judgment and enter a judgment for the lesser included offense of first-degree sexual assault as a class 3 felony. The Colorado Supreme Court affirmed the district court's denial of Petitioner's postconviction claims in all other regards, including the denial of his ineffective assistance of counsel claims, and affirmed the vacating of the duplicitous

convictions and the refusal to vacate the sentence of death. Petitioner then instituted this federal court habeas proceeding seeking review of the state court's actions.

### III. STANDARD OF REVIEW

28 U.S.C. § 2254, as amended by the passage of the AEDPA, governs the standard of review in this case. In pertinent part, it provides as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual matter made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The amendments to the AEDPA, which took effect on April 24, 1996, substantively changed the standard of review applicable to federal habeas cases filed subsequent to the Act. Prior to the amendments, the court reviewed questions of law and mixed questions of law and fact on a de novo basis and accepted factual findings unless they were clearly erroneous. *See, e.g., Houchin v. Zavaras,* 107 F.3d 1465, 1469 (10th Cir.1997). Now, the parties agree that the statute requires the court to:

> (1) consider only issues that have been adjudicated on the merits in state court proceedings;

> (2) review the state court's decision as the focal point of the inquiry, rather than conduct the review as if the state court had not issued its opinion;
>
> (3) review state court opinions based on federal law as determined by the Supreme Court, not as determined by other federal court decisions; and
>
> (4) review state court opinions on the basis that the factual determinations are presumed to be correct, unless rebutted by "clear and convincing evidence."

*Id.* Further, if the petitioner challenges the sufficiency of the evidence adduced in the state court proceeding to support the determination of a factual issue made therein, the petitioner, if able, shall produce that part of the record pertinent to that issue.

The parties' primary disagreement is how § 2254, as amended, should be interpreted with respect to legal questions and mixed questions of law and fact. Petitioner argues that § 2254(d) requires this Court to give procedural deference only to qualifying state court legal decisions, *i.e.,* that the Court treat the state court's decision on both the law and fact as dispositive unless the petitioner demonstrates that it is incorrect or "contrary to … federal law." He further argues that the amendments to § 2254(d) do not require this Court to defer to decisions of the state court in any substantive way but, instead, require the exercise of the Court's best legal judgment, *i.e.,* plenary review. Substantive deference should be given only to factual questions.

Petitioner asserts that to read § 2254(d) to require substantive deference on the law would be contrary to its plain language, legislative history and prior interpretations by courts, and would offend several provisions of the Constitution, including the requirement of an independent judiciary and the Due Process and Suspension Clauses.[5] Rodriguez concludes that the "contrary to law" portion of

---

**5.** I address Petitioner's constitutional arguments in the next section of this opinion.

§ 2254(d)(1) applies to both legal questions and mixed questions of law and fact, *e.g.*, when the outcome is attacked. Further, he concludes that the "unreasonable application" portion of § 2254(d)(1) applies to the state court's process of deciding what is attacked, *e.g.*, the state court's refusal to consider an argument for procedural reasons.

Respondent disagrees with the distinction between procedural and substantive deference. It argues that the plain language of the statute does not provide for plenary review. Instead, a federal court may review questions of law by determining whether the state court decision was contrary to clearly established Supreme Court law. As to mixed questions of law and fact, the court must conduct a deferential review to determine whether the state court's application of federal law was "reasonable."

I conclude that Petitioner's arguments are not consistent with the majority of other federal courts that have considered the issue. The Tenth Circuit has not directly addressed this issue. In *Houchin*, the Tenth Circuit stated as follows:

> The AEDPA amended the standards for reviewing state court judgments in § 2254 proceedings. Section 2254(e), like the prior § 2254(d), provides that a state court's determination of a factual issue "shall be presumed to be correct." The amended § 2254(e), goes further, however, and states that the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." In addition, § 2254(d) now sets forth the deference to be afforded the state's legal determinations. . . .
>
> . . . . .
>
> *Thus, the AEDPA increases the deference to be paid by the federal courts to the state court's factual findings and legal determinations.*

*Id.* at 1470 (emphasis added). *See also McCarty v. Dorsey*, 113 F.3d 1246 (Table, Text in WESTLAW), Unpublished Disposition, No. 96–2132, 1997 WL 259444, at *1 n. 2 (10th Cir.), `cert. denied,` —— U.S. ——, 118 S.Ct. 313, 139 L.Ed.2d 242 (1997) (referring to "(stricter) provisions" of the AEDPA as compared with prior standard).

There is a split among the circuit courts as to the meaning and interpretation of the amendments to § 2254(d). The Sixth Circuit's recent opinion in *Nevers v. Killinger*, 169 F.3d 352, 358–62 (6th Cir.1999) provides a comprehensive summary of the various approaches adopted by the circuit courts. The Fifth Circuit holds that the "contrary to . . . clearly established federal law" portion of 2254(d)(1) applies to legal questions and the "unreasonable application of clearly established federal law" portion of 2254(d)(1) applies to mixed questions of law and fact. *See Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107(997), 117 S.Ct. 1114, 137 L.Ed.2d 315; *Carter v. Johnson*, 110 F.3d 1098, 1103 (5th Cir.), *cert. granted and judgment vacated on other grounds*, —— U.S. ——, 118 S.Ct. 409, 139 L.Ed.2d 313 (1997). The Seventh and Ninth Circuits have adopted a similar approach. *Lindh v. Murphy*, 96 F.3d 856, 868–71 (7th Cir.1996), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Moore v. Calderon*, 108 F.3d 261, 265 n. 3 (9th Cir.), *cert. denied*, 521 U.S. 1111, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997).[6]

The Eleventh Circuit's approach is articulated in *Neelley v. Nagle*, 138 F.3d 917 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999). It first requires the court "to ascertain the federal law applicable to the petitioner's claim that is 'clearly established' by the Supreme Court at the time of the state court's adjudication." *Id.* at 924. Second, "the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court case law. . . ." *Id.* Finally, "[i]f the state court's decision is not contrary to law, the reviewing court must then determine

---

**6.** It is undisputed that sections 2254(d)(2) and (e)(1) collectively apply to fact questions.

whether the state court unreasonably applied the relevant Supreme Court authority." *Id.* In that regard, the court stated that "[b]y its very language, 'unreasonable application' refers to mixed questions of law and fact, ... when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Id.*

Even though the Fifth, Seventh, Ninth and Eleventh Circuits appear to agree on the general standard, they differ in its application. As to the court's review of questions of law under the "contrary to ... clearly established federal law" standard, some courts hold that it is de novo while other courts hold that it is a little more deferential. *See Lindh,* 96 F.3d at 868–69 ("[F]ederal courts are free to express an independent review on all legal issues in the case.... Section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails."); *Pitsonbarger v. Gramley,* 103 F.3d 1293, 1297 (7th Cir.1996) (de novo review), *cert. granted, judgment vacated on other grounds,* —— U.S. ——, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997); *Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997) (de novo review); *Neelley,* 138 F.3d at 923–924 (two situations render decision "contrary to" Supreme Court law—when the state court failed to apply the proper Supreme Court precedent or because the state court reached a different conclusion on substantially similar facts); *Perez v. Marshall,* 946 F.Supp. 1521, 1532 (S.D.Cal. 1996), *aff'd,* 121 F.3d 716, 1997 WL 469645 (9th Cir.1997) (holding that the AEDPA does not allow de novo review of either legal or mixed legal-factual claims, "the language of the new § 2254(d)(1), on its face, clearly expresses the congressional intent, to create a more deferential standard of review").

However, these Circuits all agree that the review of mixed questions of law and fact under the "unreasonable application ... of clearly established federal law" is deferential, requiring "more than ... simple disagreement with the state court's decision." *Drinkard v. Johnson,* 97 F.3d at 768. The definition of "unreasonable application" varies. The Fifth Circuit holds that:

> an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.

*Id.* at 769. *See also Brown v. Cain,* 104 F.3d 744, 749 (5th Cir.), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997); *Neelley,* 138 F.3d at 924–25; *Carter v. Johnson,* 110 F.3d at 1103 n. 4. The Fifth Circuit has characterized this standard as "a somewhat hybrid standard of review that is probably most closely akin to the traditional 'clearly erroneous' standard than to any other established standard of review." *Mata v. Johnson,* 99 F.3d 1261, 1267 (5th Cir.1996), *vacated in part on other grounds,* 105 F.3d 209 (5th Cir.1997).

Other courts have adopted different definitions. *See Lindh,* 96 F.3d at 870–71; [7] *Mata,* 99 F.3d at 1268 (5th Cir.1996) ("reasonable, good faith application of Supreme Court precedent will immunize the state

---

7. The Court held that Section 2254(d)(1) tells federal courts:

> Hands off, unless the judgment in place is based on an error grave enough to be called 'unreasonable'.... For current purposes it is enough to say that when the constitutional question is a matter of degree, rather than concrete entitlement, a 'reasonable' decision by the state court must be honored. By posing the question whether the state court's treatment was 'unreasonable.' § 2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject.

court conviction from federal habeas reversal, even if federal courts later reject that view of the applicable precedent"); *Childress v. Johnson*, 103 F.3d 1221, 1225 (5th Cir.1997) (same); *Sweeney v. Parke*, 113 F.3d 716, 718 (7th Cir.1997) (declaring that "criterion for assessing the reasonableness of a state court's application of Supreme Court caselaw ... is 'whether the determination is at least minimally consistent with the facts and circumstances of the case' ") (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997)); *Porter v. Gramley*, 112 F.3d 1308, 1313 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998) (stating that an unreasonable application of clearly established federal law "means ... 'a responsible, thoughtful answer reached after a full opportunity to litigate' ") (quoting Lindh, 96 F.3d at 871).

The Fourth Circuit adopted a slightly different approach in *Green v. French*, 143 F.3d 865 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999), holding:

> If a state court decision is in square conflict with a precedent (supreme court) which is controlling as to law and fact, then the writ of habeas corpus should issue; if no such controlling decision exists, the writ should issue only if the state court's resolution of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts.

*Id.* at 870.

The Fourth Circuit further stated, "a decision is 'contrary to' precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue."

A decision "represents an 'unreasonable application of' precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when the decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it ...." ) *Id.*

The First Circuit criticized the "bifurcated standard" adopted by the Fifth and Seventh Circuits that distinguished between "questions of law" and "mixed questions of law and fact" as being inconsistent with the statute and its legislative history. *O'Brien v. Dubois*, 145 F.3d 16, 22 (1st Cir.1998). It has adopted the following approach:

> A federal habeas court charged to weigh a state court decision must undertake an independent two-step analysis of that decision. First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is 'contrary to' the governing standard. In the absence of a governing rule, the 'contrary to' clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent.

*Id.* at 24. With respect to the "contrary to" standard, "a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Id.* at 24–25. To obtain relief under the "unreasonable application" standard, "the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that

it is outside the universe of plausible, credible outcomes." *Id.* at 25.

■ The Tenth Circuit, although not definitively addressing this issue, decided in a case subject to the AEDPA that a mixed question of law and fact that involved primarily considerations of legal principles, ineffective assistance of counsel, was subject to a de novo analysis. *Miller v. Champion,* 161 F.3d 1249, 1254 (10th Cir. 1998). Because the Tenth Circuit failed to explain what it meant by a "de novo" standard, I am left with the task of determining what standard should be applied. Given the Tenth Circuit's limited statement in *Miller,* I conclude that the most rationale approach with respect to the standard of review is the one adopted by the First Circuit. The Tenth Circuit's holding does not appear to lend itself to the Fifth and Seventh Circuits' holding that questions of law are reviewed under the "contrary to" law standard while mixed questions of law and fact are reviewed under the "unreasonable application" of law. Further, I find that the First Circuit approach, with minor modifications, is most consistent with the actual language of the statute and its legislative history.

■ Accordingly, the standard of review used in this case includes these factors. I will first analyze whether the state court's decision is contrary to law under a de novo standard. If the decision is not contrary to law, I will then determine whether the state court's decision is an unreasonable application of law, as defined by the First Circuit. Finally, I note in connection with the standard of review that federal habeas corpus review is unavailable based on errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

## IV. *CONSTITUTIONAL ISSUES RAISED BY RODRIGUEZ*

I next address Petitioner's arguments that interpreting § 2254, as amended, to require more deference to mixed questions of law and fact would be unconstitutional as violating Article III's requirement of an independent judiciary, the Due Process Clause and the Suspension Clause. I adopt the Seventh Circuit's well reasoned opinion in *Lindh* which rejected these arguments.

■ First, as to the Suspension Clause, *Lindh* held that an argument that the amendment to § 2254 violates that clause was "feckless", stating

[I]f the new § 2254(d) "suspends" the Great Writ, it does so no less for cases filed on April 25, 1996, than for cases pending on April 24. Yet to alter the standards of writs issue is not to 'suspend' the privilege of writ.

96 F.3d at 867. *Lindh* further discussed the history of the writ and concluded, "[a]ny suggestion that the Suspension Clause forbids every contraction of the powers bestowed by Congress in 1885, and expanded by the 1948 and 1966 amendments to § 2254, is untenable. The Suspension Clause is not a ratchet." *Id.* at 868.

I agree with this analysis, and further note that *Lindh's* holding is supported by the Supreme Court's opinion in *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). There, the Supreme Court recognized that the AEDPA "codifies some of the preexisting limits on successive petitions and further restricts the availability of relief to habeas petitioners." *Id.* at 664, 116 S.Ct. 2333. Nonetheless, the Supreme Court held that " 'the power to award the writ by any of the courts of the United States, must be given by written law' " and that "judgments about the proper scope of the writ are normally for Congress to make." *Id.* (quotations omitted). Accordingly, it held that the new restrictions on successive petitions (another amendment to the AEDPA) "are well within the compass of this evolutionary process, and ... they do not amount to a 'suspension of the writ contrary to Article I, § 9' ". *Id.* I think this holding is equally applicable to the other restrictions on habeas relief, including the amendments to § 2254(d). *See also Perez v. Marshall,* 946

F.Supp. 1521, 1531–32 (S.D.Cal.1996), *aff'd,* 121 F.3d 716, 1997 WL 469645 (9th Cir. 1997).

■ With respect to Rodriguez' argument that the amendments to § 2254(d) violate Article III's requirement of an independent judiciary, the Seventh Circuit in *Lindh* stated that this argument "neglect[s] a basic distinction ...: Congress cannot tell courts how to decide a particular case, but it may make rules that affect classes of cases." 96 F.3d at 872. The Seventh Circuit further stated:

> Regulating relief is a far cry from limiting the interpretative power of the courts, however, and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed.... This distinction between rights and remedies is fundamental. Every day, courts decline to disturb judgments that they know are wrong. This is the principal function of the law of judgments.

*Id.*

The Seventh Circuit concluded:

> Th[e] expression of the longstanding distinction between unlawful custody, which supported a writ of habeas corpus, and unlawful procedure in the course of a trial, which did not, reflected the law of the United States until 1953. Congress has elected to move back in that direction—but hardly very far, preserving independent federal review on pure questions of law, and subjecting mixed questions of law and fact to review for reasonableness. We would have to cast history to the winds to say that this decision, which respects fully-litigated judgments unless the state court has gone seriously wrong, transgresses constitutional limitations.

*Id.* at 873. I think that this reasoning is sound and rely upon it to reject Petitioner's Article III argument. *See also Perez,* 946 F.Supp. at 1531.

■ Finally, the Seventh Circuit rejected Petitioner's argument that interpreting § 2254 to require deference to state court opinions violates the Due Process Clause because plenary review is a fundamental right. In doing so, it stated as follows:

> Th[e] summary of collateral review in Part I.D of this opinion, and Learned Hand's assessment of the state of the law in 1949, should disabuse any observer of the belief that plenary federal review of state criminal judgments is so firmly rooted in American tradition that any alteration has passed beyond legislative power. The Constitution contains an express limit on the power of Congress over the writ of habeas corpus—the Suspension Clause. It is not an appropriate exercise of the "judicial Power" to supplement the Suspension Clause with a rule that enhancements of the 20th Century cannot be altered.

*Lindh,* 96 F.3d at 874. Again, I believe that this reasoning is sound, and reject Petitioner's argument that the standard as adopted by this Court violates the Due Process Clause. *See also Perez,* 946 F.Supp. at 1531.

## V. *ANALYSIS OF THE MERITS OF THE HABEAS PETITION*

### 1. *Claims Which Were Procedurally Defaulted In State Court That Will Not Be Considered Here*

■ Respondent argues that a number of arguments asserted by Petitioner are barred because they were procedurally defaulted in the state court proceedings. 28 U.S.C. § 2254(b)(1) provides that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State." Thus, in order to obtain habeas corpus relief, a state prisoner must normally establish that he has exhausted state remedies, *i.e.,* that he has " 'fairly presented' to the state courts the 'substance' of his federal claim." *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982).

■ Further, federal courts "will not review a question of federal law decided by

a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* at 729–30, 111 S.Ct. 2546. The Supreme Court stated:

> When the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, an additional consideration comes into play. This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims.

*Id.* at 731, 111 S.Ct. 2546. This is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Id.*

■■■ If the petitioner fails to present his claims to the state court in a timely manner or otherwise procedurally defaults the claims in state court, "federal habeas review is barred unless [the petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. "Cause" must be "something external to the petitioner, something that cannot fairly be attributed to him." *Id.* at 753, 111 S.Ct. 2546. The failure to establish cause eliminates the need to consider actual prejudice. *See Engle v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

■■■ In this case, the Colorado Supreme Court found that Petitioner procedurally defaulted on several claims raised by the habeas petition herein. First, it found that certain issues were inadequate-

ly raised in the Rule 35 motion to the state district court and on appeal in that these issues failed to inform the court "both as to the specific errors relied upon and as to the grounds, supporting facts and authorities therefor." *Rodriguez V,* 914 P.2d 230, 250 (Colo.1996). It further held:

> [O]ur consideration of such issues on appeal of the district court's order would effectively grant Rodriguez a successive 35(c) motion without also burdening him with the harsher standard of review appropriate to a successive motion.... We decline to grant Rodriguez this deference and, instead, uphold the district court's dismissal of these claims, regardless of the adequacy of their presentation upon this appeal. We refuse to review the[se] ... issues because of Rodriguez' failure to adequately specify the errors and legal grounds for relief at the district court level.

*Id.* at 251.

The Colorado Supreme Court also noted that the district court disallowed 191 claims which were "available for appeal" but which were not properly raised in the direct appeal. *Id.* at 252. In that regard, the court held that Petitioner had waived all of the alleged errors: "(1) that do not rise to the level of constitutional error; or (2) which Rodriguez does not reassert on this appeal." *Id.* at 254.

The Colorado Supreme Court held that the following issues pertinent to the habeas petition herein were procedurally defaulted (as numbered by the Colorado Supreme Court): Issue 24 (alleging discovery violations in connection with the trial court's refusal to provide discovery regarding Joseph Council); Issue 32 (alleging discovery violations which allegedly resulted in the denial of due process); Issue 43 (challenging the admissibility of the prosecution's evidence concerning the cuts on David Martinez' hands); Issue 48 (alleging unreasonable restrictions on voir dire); Issues 52 and 78 (alleging trial court error in refusing to excuse for cause prospective jurors who knew of Chris Rodriguez' conviction and sen-

tence); Issue 58 (alleging defects in procedure on the first day of jury selection); Issue 59 (alleging inadequate voir dire of one jury panel due to defense counsel's inexperience); Issue 63 (alleging defective jury summoning and selection); Issue 64 (alleging undue limitations on voir dire); Issue 66 (alleging limitations on voir dire concerning the commutation of death row inmates in New Mexico); Issue 77 (alleging improper excusal of potential jurors for cause due to their death penalty views); Issue 86 (alleging error in the exclusion of evidence of David Martinez' physical condition after arrest); Issue 98 (alleging inadequate representation on the first day of jury selection); and Issue 102 (alleging the trial court's failure to comply with a Supreme Court order regarding the first day of jury selection). *Id.* at 250–52, 255 n. 24.

With respect to each of the above enumerated issues, I find that federal habeas review is barred. The Colorado Supreme Court decided that these issues are procedurally barred, thus providing a state law ground that is independent of the federal question and adequate to support the judgment. Further, I find that Petitioner has not shown cause for these procedural defaults or that he has suffered actual prejudice. Finally, Petitioner has not shown that failure to consider his defaulted claims will result in a miscarriage of justice.

### 2. *Ineffective Assistance Of Counsel Claims*

#### A. *Whether Petitioner was Denied the Assistance of Counsel during the Direct Appeal Process and Post-Conviction Proceedings Based upon the Admitted Fact that the State Intercepted Communications with his Lawyers in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments*

Petitioner asserts that from the commencement of his incarceration on death row at Centennial Correctional Facility ("CCF"), he has been the victim of a systematic pattern of constitutional rights deprivations inflicted upon him by the State of Colorado. Petitioner states that he repeatedly sought relief in the Colorado courts from intentional incursions into his right to counsel by the State, all to no avail. These efforts are detailed in his Opening Brief at pp. 13–17. On March 3, 1992, Petitioner filed a civil lawsuit in this Court against the Department of Corrections ("DOC") for violating his constitutional rights, captioned *Rodriguez v. Zavaras et al.*, Civil Action No. 92–N–425 (hereinafter referred to as "the civil action") before Judge Nottingham. On January 17, 1997, pursuant to agreement of the parties, a judgment was entered against Defendants.[8] Petitioner argues that, by accepting judgment, the State admitted to intentionally violating his constitutional rights during the direct appeal and postconviction proceeding. This admission, according to Petitioner, must result in the vacating of the death penalty.

Specific to the Sixth Amendment claim of the denial of assistance of counsel, Petitioner argues that the State intentionally opened and read his legal mail, denied him access to a telephone with which to contact counsel and/or monitored the calls, thereby violating the Sixth and Fourteenth Amendments. Further, Petitioner alleges that he suffered Sixth Amendment violations during visits by his attorney, either by being denied access to the attorney or by having his visits monitored by audio and/or video tape. Petitioner asserts that the State conceded in its pleadings filed in the civil suit that it used one or more video cameras to monitor attorney visits until February 1994, that it thereafter used audio tapes, and that the communications were not confidential. This forms part of the judgment in the civil suit. Further, it is argued that the State's intentional inter-

---

8. The final judgment in 92–N–425 was entered October 2, 1998, and addressed the issue of an award of attorneys' fees and costs. The case is currently on appeal in connection with the issue of fees only, Case No. 98–1418 in the Tenth Circuit Court of Appeals.

ference with the attorney-client privilege deprived Petitioner and his counsel, Michael Heher ("Heher"), from being able to effectively communicate regarding the substance of the issues Heher desired to raise on direct appeal and in the postconviction proceedings in violation of the Sixth Amendment.

Petitioner asserts that the violation of the Sixth and Fourteenth Amendments is apparent from even a cursory reading of the Colorado Supreme Court's denial of relief to Petitioner in the appeal from his Rule 35(c) motion. The Colorado Supreme Court in *Rodriguez V* allegedly repeatedly criticized defense counsel for having inadequately represented Petitioner. Given the nature of the Colorado Supreme Court's decision in *Rodriguez V*, Petitioner contends it is clear that the requirements of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) are met. In that regard, Petitioner points to the court's finding that his counsel attached an appendix to the "Partial Opening Brief" that listed 102 additional issues that he wanted to raise, but claimed that he could not because of unreasonable time limitations and an inadequate record on appeal. *Rodriguez V*, 914 P.2d 230, 247 (Colo.1996). Petitioner argues that appellate counsel's failure to properly present these issues is ineffective assistance of counsel.

Petitioner also points to other statements by the Colorado Supreme Court which allegedly show that counsel was ineffective, including, but not limited to, (i) a conclusion that Petitioner's failure to specifically reassert in the Rule 35(c) proceeding claims which the district court disposed of as previously litigated on the direct appeal was a conscious relinquishment of those claims (*id.* at 249 and 254); (ii) a finding that the postconviction motion raised many issues that were inadequately raised or presented (*id.* at 250–52); (iii) a finding that certain claims were waived by Rodriguez' counsel (*id.* at 252); and (iv) a finding that Rodriguez "exploits this statutory right [to bring postconviction proceedings] through his exceedingly long and dis-

jointed presentation of his case..." (*id.* at 253).

Petitioner further asserts that his counsel failed to raise numerous issues in the 35(c) proceeding for no strategic reason, and that this was criticized by the Colorado Supreme Court. Other examples of ineffective assistance of counsel according to Petitioner are the failure to certify the record; the failure to state sufficient facts in a 35(b) motion to justify a reduction in the death sentence, even though abundant facts existed; making inadequate investigation in the Rule 35(c) proceeding to justify to the Court why funds for an investigator should have been expended for a new mitigation investigation; and the failure to adequately present evidence of mental illness. He asserts that counsel's failure to make any showing at the Rule 35(c) proceeding that he suffered actual prejudice from trial counsel's failure to present evidence of mental illness is a prime example of ineffective assistance of counsel. *See id.* at 297.

Petitioner argues that at the time the Colorado Supreme Court made its findings criticizing counsel, it was not even aware that the State of Colorado would soon concede that it had embarked upon a premeditated course of conduct designed to impair his counsel's ability to adequately represent Petitioner. Whether the ineffectiveness resulted from the State's interference or simple ineffectiveness is unknown. Nor, given the law which presumes prejudice in the face of Sixth Amendment violations, does it matter. Petitioner argues that he is not responsible for the shortcomings of his court-appointed attorney, and that he may forfeit his life because his state appointed attorney did such a poor job of representing him that his meritorious claims were never presented. This defect must be laid squarely at the door of the State of Colorado for its repeated intrusions into his right to counsel.

Turning to the authority upon which Petitioner relies, he argues that courts

have consistently held that violations of the Sixth Amendment of a lesser magnitude than this case can impair the validity of the proceeding to such an extent that extreme relief must be granted. Among other cases, Petitioner relies on *Shillinger v. Haworth,* 70 F.3d 1132, 1142 (10th Cir. 1995) for the proposition that the Tenth Circuit finds a per se violation of the Sixth Amendment when there are intentional intrusions by the state into the attorney-client relationship. Petitioner also relies on *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), holding that "nominal representation on an appeal ... does not ... make the proceedings constitutionally adequate," and *United States v. DiDomenico,* 78 F.3d 294, 299 (7th Cir.), *cert. denied,* 519 U.S. 1006, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996), where the court allegedly referred to the sort of violations at issue here as "totalitarian-style" breaches of the Constitution.

In summary, Petitioner asserts that he was precluded from consulting with his attorney in confidence during the pendency of his direct appeal and the post-conviction proceedings. He contends that the Sixth Amendment intrusions were pervasive and ongoing, and were admitted through the form of judgment entered in favor of Rodriguez in the civil action before Judge Nottingham of this Court. Petitioner alleges that the intentional violations of the Sixth Amendment should result in one of several remedies. He argues that he should be given the right to a new direct appeal, and should be given a hearing to determine whether a new appeal is feasible in light of the passage of time. Similarly, Petitioner requests that the Court hold that all of the prior post-conviction proceedings were a "nullity" since he was unable to consult meaningfully with his counsel. Alternatively, Petitioner requests that the death sentence be vacated.

The Colorado Supreme Court, in reviewing this issue, characterized the issue as one of control of internal procedures by the correctional institutions. In that regard, it stated that "[t]he supervision and management of the internal procedures of correctional institutions is within the discretion of institutional officials and is not subject to judicial review absent exceptional circumstances." *Rodriguez V,* 914 P.2d 230, 290 (Colo.1996). It further noted that the State Public Defender's Office had brought an action in the Eleventh Judicial District on behalf of Rodriguez and another inmate and that the district court was correct in its analysis that it could not properly review another judicial district's action. *Id.* at 290–91. Finally, the Colorado Supreme Court rejected Petitioner's assertion that the district court's denial of his motions on this issue without a hearing constituted reversible error, holding that "the district court properly found that Rodriguez' claims lacked merit and did not warrant a hearing." *Id.* at 291.

Regarding my findings on this issue, it is somewhat unclear from the Petitioner's Opening Brief whether this is a claim for ineffective assistance of counsel or a claim for intentional intrusions into the attorney-client relationship, or both. In his reply, however, Petitioner clarifies that this claim relates to the denial of counsel and is not a claim for ineffective assistance of counsel. Accordingly, I will treat this issue as one for denial of counsel through intentional interference with the attorney-client relationship. Issues concerning ineffective assistance of counsel are addressed in the following section of this Order. I next discuss the standard of review applicable to this type of claim.

In *Strickland v. Washington,* the Supreme Court, while primarily focusing on a claim for ineffectiveness of counsel, did recognize that in certain Sixth Amendment contexts, prejudice is presumed. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, it held:

> Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. See *United States v. Cronic,* 466 U.S. at [648] 659, and n.

25[, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)].... Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.

*Id.* at 692, 104 S.Ct. 2052; *see also Perry v. Leeke,* 488 U.S. 272, 280, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989).

■ I find that this situation does not involve one where Petitioner was deprived of counsel altogether so that prejudice can be presumed. It is undisputed that, even despite the alleged interference with the attorney-client relationship, counsel was able to and did represent Petitioner in the direct appeal and in the postconviction proceeding. Counsel filed lengthy briefs in both forums. Further, although Petitioner argues that the state at times denied him the right to see or call his counsel, he does not allege that he was completely denied the right to see or speak with his counsel or that he was denied the right to counsel during some critical stage of the appeal.

■ I find the Colorado Supreme Court's analysis of when a denial of counsel can be found, and prejudice presumed, to be an accurate statement of the law and adopt it herein. There, the court found that a denial of counsel occurs "only when counsel was either totally absent or altogether prevented from assisting the defendant during a critical stage of the proceeding." *Rodriguez V,* 914 P.2d at 299–300. This appears to be the correct analysis. *See Jackson v. Johnson,* 150 F.3d 520, 524–25 (5th Cir.1998), *petition for cert. filed* (Jan. 20, 1998) (No. 98–7812) ("[t]he Supreme Court has held that when a criminal defendant receives no meaningful assistance at all from his court-appointed lawyer, he is constructively denied his Sixth Amendment rights to counsel ... [a] constructive denial of counsel ... occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all"). Petitioner does not cite any Supreme Court or other authority for the argument that the type of interference at issue herein arises to the level of a denial of counsel. The only case cited by Petitioner on this issue, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), dealt with a denial of counsel altogether, which is clearly not the situation here.

Accordingly, I find that the controlling legal authority deals, not with denial of counsel, but with the state's interference in the attorney-client relationship. Since this case involves an admitted interference with the attorney-client relationship, at least in part, through the judgment in Civil Action No. 92–N–425, the overriding issue is whether Petitioner needs to show prejudice in order to obtain relief in this proceeding. The government claims that prejudice is required to be proven, relying primarily on *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), while Petitioner claims that prejudice must be presumed, relying primarily on *Shillinger v. Haworth,* 70 F.3d 1132 (10th Cir.1995).[9]

*Weatherford* is the seminal case on this issue. It dealt with attorney-client conversations that were overheard by a government informant. The Supreme Court rejected the Fourth Circuit's adoption of a per se rule of a violation of the Sixth Amendment in this context, without any showing of prejudice. In so doing, it dis-

9. The cases cited by the parties, and discussed in detail in this Order, all deal with state monitoring of attorney-client conversations, rather than interference with legal mail, telephone calls, or restrictions on visits with attorneys. In fact, Petitioner has cited no authority whatsoever addressing these other issues. Accordingly, I have no way of knowing what Supreme Court law Petitioner claims was allegedly violated or unreasonably applied by the Colorado Supreme Court in connection with these other issues. Accordingly, I will address the issue from the same framework as counsel for the parties, in reliance on the cases dealing with interference with the attorney-client relationship from a standpoint of monitoring.

tinguished two electronic surveillance cases relied on by the Fourth Circuit, *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) and *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), holding that these cases did not establish such a per se rule. 429 U.S. at 551–52, 97 S.Ct. 837. In fact, it stated, "[i]f anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel are overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, either directly or indirectly, any of the evidence offered at trial." *Weatherford*, 429 U.S. at 552, 97 S.Ct. 837. The Supreme Court went on to state that the Sixth Amendment was not violated unless the petitioner showed that the informant "communicated the substance of the ... conversations and thereby created at least a realistic possibility of injury to [petitioner] or benefit to the State." 429 U.S. at 558, 97 S.Ct. 837.

The Tenth Circuit further addressed government monitoring of attorney-client conversations in *Shillinger*. In that case, a deputy sheriff was present during several pretrial preparatory sessions between defense counsel and his client. Although defense counsel was paying the deputy sheriff, and told him to consider himself an employee of defense counsel during the sessions, it later became apparent that the deputy sheriff had communicated to the prosecutors the substance of some of the conversations.

The Tenth Circuit reviewed the cases in which state interference with the right to counsel has been held to violate a defendant's Sixth Amendment rights per se (none of which circumstances are presented in the case at hand) after which it fashioned the following rule for intentional intrusions into the attorney-client relationship:

> [W]e hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a

prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that '[p]rejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.'

*Id.* at 1142, citing *Strickland v. Washington*, 466 U.S. at 692, 104 S.Ct. 2052.

However, the Tenth Circuit stated that "this case presents a situation unlike Weatherford in that the intrusion here was not only intentional, but also lacked a legitimate law enforcement purpose." *Id.* at 1139. In *Shillinger*, the "state's interest in effective law enforcement" was not at issue; instead, "the prosecutor, by his own admission, proceeded for the purpose of determining the substance of [the defendant's] conversations with his attorney, and attorney-client communications were actually disclosed." *Id.* at 1141. The Tenth Circuit further made clear that where this type of situation does not exist, *i.e.*, where the state has a legitimate law enforcement purpose for its intrusion, the per se analysis does not apply and the petitioner must present "proof of 'a realistic possibility of injury to [the defendant] or benefit to the State' in order to constitute a violation of [petitioner's] Sixth Amendment rights.'" *Id.* at 1142.

■ Thus, contrary to Petitioner's argument, the Tenth Circuit does not support a finding that all intentional intrusions into the attorney-client relationship require a per se finding of a violation of the Sixth Amendment. Instead, the Tenth Circuit looks to whether there was some improper motive of the law enforcement officials.

■ In the case at hand, Petitioner argues by implication that the fact that the defendants in the civil action made an Offer of Judgment which was accepted by Petitioner means that they admitted they had an improper motive in monitoring Petitioner's conversations with his counsel.

Petitioner presents no evidence or argument as to what was the improper motive.

I have reviewed the Judgment and the Offer of Judgment in Civil Action No. 92–N–425.[10] Contrary to Petitioner's assertion, the Judgment is not an admission of liability by the state defendants. Instead, the Offer of Judgment upon which the Judgment is based states only that defendants "will allow judgment to be taken against them in the form of an order requiring the defendants to destroy all videotapes of attorney-inmate visits and enjoining defendants from videotaping visits between plaintiffs and their attorneys at the Colorado State Penitentiary ("CSP") ..., and requiring CSP correctional officers to refrain from observing the contents of documents and to avoid overhearing normal conversation levels during plaintiffs' attorney-client visits, with reasonable and appropriate costs...." *See* Offer of Judgment in 92–N–425. At most, this is an admission that there was some interference with the attorney-client relationship, not that this interference was based on an improper motive or violated Petitioner's constitutional rights. Indeed, throughout the proceedings in that case, the state maintained that the interference was conducted for a legitimate penological interest.

Accordingly, I find that Petitioner has not shown that the prison officials had an improper motive for interfering in his attorney-client relationship, *i.e.*, one based on something other than a law enforcement purpose. Therefore, both *Shillinger* and *Weatherford* require a showing that the state benefitted in some way from the interference before prejudice will be presumed. This is consistent with the decisions from other Circuits that have considered this issue. *See Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir.), *cert. denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977); *Sinclair v. Schriber*, 916 F.2d 1109, 1112–13 (6th Cir. 1990); *Clark v. Wood*, 823 F.2d 1241, 1250 (8th Cir.), *cert. denied*, 484 U.S. 945, 108 S.Ct. 334, 98 L.Ed.2d 361 (1987); *United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987).[11]

Although I conclude that prejudice should not be presumed here, I acknowledge that circumstances may exist where state interference with the attorney-client relationship could chill communication between the client and his counsel. Indeed, as the Supreme Court recognized in *Weatherford*, there is a distinction between electronic surveillance and an informant overhearing conversations between defense counsel and his client. *Id.*, 429 U.S. at 554 n. 4, 97 S.Ct. 837. In both situations there is an "inhibition of free exchanges between defendant and counsel because of the fear of being overheard." *Id.* However, "a fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping, because the former intrusion may be avoided by excluding third parties from defense meetings or refraining from divulging defense strategy when third parties are present at those meetings." *Id.*

The Seventh Circuit recognized this in *United States v. DiDomenico*, 78 F.3d 294 (7th Cir.1996), when it gave the following example:

> The government adopts and announces a policy of taping all conversations between criminal defendants and their lawyers. It does not turn the tapes over to the prosecutors. It merely stores them in the National Archives. The govern-

---

**10.** Although the Offer of Judgment was not part of the record or provided by the parties, it is a matter of public record in this Court.

**11.** *See also Riddick v. Baker*, No. Civ.A. 96–1144, 1997 WL 221133, at *2–3 (E.D.Pa. 1997), aff'd, 159 F.3d 1353 (3rd Cir.1998); *United States v. Noriega*, 764 F.Supp. 1480, 1488–89 (S.D.Fla.1991); *People v. Dehmer*, 931 P.2d 460, 463 (Colo.App.1996), *cert. denied* (Feb. 18, 1997).

ment's lawyer took the position that none of the defendants could complain about such conduct because none could be harmed by it, provided the prosecutors never got their hands on the tapes. We are inclined to disagree, although . . . we need not attempt to resolve the issue definitively. The hypothetical practice . . . would, because of its pervasiveness and publicity, greatly undermine the freedom of communication between defendants and their lawyers, and with it the efficacy of the right to counsel, because knowledge that a permanent record was being made of the conversations between the defendants and their lawyers would make the defendants reluctant to make candid disclosures. (Totalitarian-style continuous surveillance must surely be a great inhibitor of communication). And yet it would be impossible in any given case to show that the outcome had been changed by the practice.

*Id.* at 299. Conversely, the Seventh Circuit noted that "ad hoc governmental intrusion into the relation between a criminal defendant and his lawyer falling far short of continuous surveillance" requires a showing of harm to the defense, "because the bare fact of the intrusion does not create a high probability that communication between lawyer and client or between client and lawyer was disrupted." *Id.* at 299–300.

In this case, I am not persuaded that the record before the Court shows the type of continuous monitoring that the Seventh Circuit contemplated in *DiDomenico* which requires that the Court presume

prejudice. Further, the clear weight of authority, including *Weatherford,* holds that a showing of prejudice is required in order to prevail on a claim under the Sixth Amendment for state interference with counsel, so long as the petitioner has not shown an improper motive by law enforcement officials. If a change in this law is warranted, based on the facts of this case, it is up to the federal appellate courts to make such a change.

■ Since I conclude that Petitioner must establish prejudice, I now examine the record to determine if prejudice has been established.[12] I agree with the government that Petitioner has not established that the monitoring of his attorney-client relationship and/or interference with same prejudiced his ability to litigate in state criminal proceedings. He does not allege that any prosecutor involved in the postconviction litigation received information from the monitoring and/or that the state received any benefit from same. Further, Petitioner fails to show how the interference by state officials burdened counsel's performance on the direct appeal, in postconviction litigation or otherwise prejudiced him. I also tend to agree with the government that complaints of attorney-client interference are belied by the fact that Petitioner did not reveal the highly embarrassing information concerning child abuse and his childhood until during the time frame that Petitioner complains of, *i.e,* while he was housed at the state facilities during the direct appeal and/or the postconviction proceeding. *See* Appendix B to Answer and Brief in Opposi-

**12.** I note that Petitioner argued prejudice in his Opening Brief, but then in his Reply Brief stated that he did not need to establish prejudice prior to an evidentiary hearing in this matter, citing *Johnson v. Puckett,* 929 F.2d 1067, 1070 (5th Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991) and *Pringle v. Court of Common Pleas,* 778 F.2d 998 (3rd Cir.1985). Since I had not yet ruled whether Petitioner was even entitled to an evidentiary hearing, and in fact by Order dated this same date conclude that he is not so entitled, Petitioner took a big risk in its

reply by refusing to brief the issue of prejudice. I do not find that *Johnson* or *Pringle* support his argument. Those cases held that the initial petition for writ of habeas corpus itself need not cite all the legal authority to be relied on. That is far different from the situation here where after the petition was filed, the parties were required to brief the issues. In any event, Petitioner cannot complain that he had no opportunity to argue prejudice since it is apparent that he did argue prejudice in his initial Opening Brief.

tion to Petition for Writ of Habeas Corpus; Petitioner's Opening Brief, Argument X.

Another problem with Petitioner's argument, even if I assume that he could show a violation of the Sixth Amendment, is that it appears that the state interference with the attorney-client relationship affected only the postconviction proceedings. The opening brief on the direct appeal was filed on February 1, 1989. AROA v. 18, p. 1. Defense counsel for Petitioner attempted to file a second partial opening brief on April 7, 1989, which was disallowed by the Colorado Supreme Court. Oral argument was held in October, 1989. After a limited remand to the state district court regarding some potentially exculpatory material, the Colorado Supreme Court issued its opinion affirming the judgment of conviction and sentence of death on May 29, 1990.

The first four of the motions that Petitioner filed with the state court, the earliest of which was not dated until December 27, 1989, was filed well after oral argument had been heard on the direct appeal. It did not raise any issues regarding interference in connection with the direct appeal, only interference with the motions that were remanded back to the state court regarding exculpatory evidence. AROA v. 2, p. 315–16, 365, 374 and 377. The remaining motions, the first of which was dated August 30, 1991, were filed well after the direct appeal was decided and dealt with alleged interference of counsel related to the postconviction proceeding under Rule 35(c).

 As to the postconviction proceeding, Petitioner does not even have a federal constitutional right to assistance of counsel. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Further, he has only a limited right under state statute to such assistance. *People v. Hickey*, 914 P.2d 377, 378 (Colo.App.), *cert. denied* (Sep. 5, 1995). Petitioner was afforded full and final litigation in *Rodriguez V* of whether the inter-

ference with counsel under state law violated his rights. The state district court denied relief and the Colorado Supreme Court dismissed the appeal.

Petitioner acknowledges that no federal right exists for an attorney in the postconviction proceeding, but argues that this court should not give deference to state court proceedings that occurred without Petitioner being able to adequately consult with his attorney. Further, he argues that this Court is not bound by state court findings when that court refused to permit an evidentiary hearing, citing *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). However, since the right to counsel in the first instance is controlled by state law, and since the state court found that Petitioner's rights had not been violated in connection with his relationship with counsel, it does not appear that he can obtain relief from this Court in connection with state interference that occurred during the postconviction proceeding. *See Coleman*, 501 U.S. at 752–53, 111 S.Ct. 2546.

In light of the above, I find that the Colorado Supreme Court's opinion denying Petitioner relief on this ground was not contrary to, or an unreasonable application of, any Supreme Court law. I recognize that the state court analyzed this issue as one involving discretion in the internal procedures of correctional institutions which allows for judicial scrutiny only where "exceptional circumstances" exist. *Rodriguez V*, 914 P.2d 230, 290–91 (Colo. 1996). However, I do not find that this was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998). This is because: (I) the judgment in 92–N–425, which Petitioner relies on for the alleged admitted interference with the attorney-client relationship, had not yet been entered; thus, there was no admitted interference at that time; and (ii) this issue had been litigated in a different court, the

Eleventh Judicial District, which the state district court had no jurisdiction to review. I further find that the decision of the Colorado Supreme Court that it was not reversible error for the trial court to deny these motions without a hearing is not contrary to or an unreasonable application of federal law given the fact that this issue was being litigated in a different judicial district. Accordingly, I conclude that Petitioner is not entitled to habeas relief on this ground.[13]

## B. Whether Petitioner Was Denied the Effective Assistance of Counsel in the Trial and the Direct Appeal in Violation of the Sixth and Fourteenth Amendments to the Constitution

Petitioner argues that the trial and direct appeal of his convictions and sentence of death were so fundamentally flawed that the Court cannot let the death penalty stand. This is because his counsel performed so poorly that he was denied the effective assistance of counsel. What is allegedly unusual about this case according to Petitioner is the conjunction of both a shocking lack of investigation into available mitigation, which was never discovered by his counsel or presented to the jury, coupled with the extremely compelling nature of the mitigation left uninvestigated. Petitioner alleges that he had one of the most compelling mitigation presentations available, but had one of the most superficial mitigation investigations imaginable conducted. The ineffectiveness was allegedly compounded in the direct appeal of this matter, as outlined by the Colorado Supreme Court in *Rodriguez V* and as addressed in the prior section. Petitioner argues that these numerous instances of ineffective representation resulted in proceedings which were fundamentally unfair and resulted in the complete breakdown of the adversary system, violating his Sixth Amendment rights.

Turning to the standard of review, ineffective assistance of counsel claims present a mixed question of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir.1998). Such claims are analyzed under the two-prong test of *Strickland*, where it must be shown both that petitioner's counsel's performance was deficient and that the deficient performance prejudiced the defense such that petitioner was deprived of a "fair trial, a trial whose result is reliable". *Id.* at 687, 104 S.Ct. 2052.

 With respect to the first prong of the test, the petitioner must show that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* Further, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. "Judicial scrutiny of counsel's performance must be highly deferential", however, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. That is, the petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Id.* (quotation omitted). Petitioner can make out a claim of ineffective assistance of counsel only by pointing to specific errors made by trial counsel. *United States v. Cronic*, 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *see also Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Strickland, id.*

---

13. Although Petitioner asserted in the caption to this argument that the state interference with the attorney-client relationship violated the Fifth and Eighth Amendments, he did not explain how such Amendments were violated. I do not find any violations of these Amend-ments. Further, to the extent that Petitioner in other sections fails to address certain Amendments which he contends were violated, I also find no constitutional infirmities in connection with those Amendments.

A difference of opinion as to trial tactics does not constitute ineffective assistance. *See United States v. Davis*, 929 F.2d 554, 558 (10th Cir.1991).

 Regarding the second prong of the test, the petitioner "must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In other words, even where particular errors are shown, the petitioner "must show that they had an adverse effect on the defense, and not just some conceivable effect." *Id.* at 693, 104 S.Ct. 2052. Thus, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been entirely different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In terms of a death penalty case, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

Turning to the case at hand, the Colorado Supreme Court found that Petitioner did not show ineffective assistance of counsel in connection with either the trial, the direct appeal or the Rule 35(c) proceeding. As to the trial itself, the court spent considerable time analyzing this issue. *Rodriguez V*, 914 P.2d 230, 293–299 (Colo. 1996). I first address the issue of trial counsel's alleged failure to present mitigating evidence at the trial. Evidence was presented at the hearing on ineffective assistance of counsel in the trial court that counsel Robin Desmond ("Desmond") and David Eisner ("Eisner") failed to adequately investigate potential mitigating factors and that, in Desmond's opinion, presentation to the jury of child abuse allegations would have resulted in the imposition of a life sentence instead of the death penalty. ROA v. 65 at 32–40.

The Colorado Supreme Court found that trial counsel's failure to discover and present mitigating evidence of Rodriguez' child abuse did not constitute ineffective assistance of counsel. *Rodriguez V*, 914 P.2d at 295. This is because "[t]he reasonableness of an attorney's decision to forego investigation or to limit investigation into potentially mitigating evidence is 'directly related to the information the defendant has supplied.'" *Id.* (quotation omitted). Further, "[t]rial counsel's alleged failure to investigate or present mitigating evidence does not constitute ineffective assistance 'when the essential and foundational information required to trigger such an investigation is withheld from the defendant's attorney by the defendant himself.'" *Id.* (quotation omitted). The court found that the record disclosed that both trial counsel Desmond and defense investigator Judy Sholl ("Sholl") specifically asked Rodriguez whether he had suffered abuse as a child and that Rodriguez denied any abuse. *Id.* at 296. Further, it found that defense counsel "conducted a reasonable investigation into potentially mitigating evidence and that Rodriguez' affirmative denials that he suffered child abuse foreclosed further investigation into the subject." *Id.*

 I find that this analysis by the Colorado Supreme Court was reasonable and that it is not contrary to, or an unreasonable application of, Supreme Court law. Indeed, as the Supreme Court stated in *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691, 104 S.Ct. 2052. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure

to pursue those investigations may not later be challenged as unreasonable." *Id.; see also United States v. Miller,* 907 F.2d 994, 999 (10th Cir.1990).[14]

Here, it is undisputed that Petitioner was asked by his investigator and his counsel about prior abuse and he said there wasn't any. *See Rodriguez V,* 914 P.2d at 296 (citing ROA v. 63 at 16–17, v. 65 at 35). Conducting any further inquiry into that issue was thus not the fault of defense counsel. In any event, it is undisputed that the investigator and/or defense counsel continued to talk to other people who knew Petitioner, including his family, in conducting their investigation. *Id.* Thus, they did conduct an independent investigation and still failed to discover this information. Such conduct does not amount to ineffective assistance of counsel, and Petitioner has pointed the Court to no Supreme Court or other case that supports his position.

Petitioner argues, however, that this analysis fundamentally misconstrues the unique role of counsel in a capital case, and that it is unrealistic to expect that an uneducated, impoverished defendant such as Petitioner will reveal to a total stranger these intimate details without the establishment of trust in the relationship. Further, Petitioner argues that the real issues here are not what Petitioner told his counsel, but the fact that counsel and the investigator made no meaningful attempt to explain to Petitioner why these very personal questions were being asked of him on the eve of trial and did not establish the sort of trusting relationship necessary to draw such sensitive information out of him. Petitioner cites numerous cases where he contends that death penalties have been vacated because defense lawyers have in-

adequately investigated mitigation. None of these cases, according to Petitioner, involved a case of mitigation, available yet investigated, that rose to the level of mitigation in this case.

The problem with these arguments is that although Petitioner cites to certain law review articles and treatises for this argument, he cites absolutely no established federal law, Supreme Court or otherwise, that these alleged failures constitute effective assistance of counsel.[15] Instead, as the Colorado Supreme Court correctly noted, the critical inquiry is whether the questions were asked of the petitioner and whether the petitioner failed to disclose such information. Where such information is not disclosed by the petitioner, as here, the case law previously cited is clear that the petitioner cannot claim ineffective assistance of counsel. Without such clearly established federal law, Petitioner cannot prevail on these arguments.

Related to this argument is Petitioner's assertion that although the evidence presented at the penalty phase presented a chilling picture of a "sociopath" who was simply a hardened killer and rapist that could be stopped only by a death penalty, defense counsel failed to give the jury a rational explanation as to why Petitioner is the way he is, *i.e.,* what factors contributed to the person he became. He asserts, without citing any authority, that it is the job of defense counsel to present this argument, and that had any real effort been undertaken to try to show the jury this dimension of Petitioner, a different verdict would likely have resulted. Petitioner details examples of mitigation which he contends effective counsel would have discov-

14. Petitioner also seems to suggest that counsel was ineffective for failing to conduct a mitigation investigation during the fourteen months that the Public Defender's Office was taken off the case and the case was pending before the Colorado Supreme Court on an interlocutory appeal. However, counsel can not be faulted for failing to conduct such an investigation since they were not counsel of

record during this time period. Petitioner has cited no federal law, including any Supreme Court authority, to support this argument.

15. Petitioner primarily relies on Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty,* 58 N.Y.U.L.Rev. 299 (1983).

ered, and which would have explained what turned him into a killer. The facts would have disclosed that Petitioner grew up in the "most horrific environment imaginable" (Opening Brief, p. 109), including, but not limited to, sexual and continual physical abuse, profound neglect, an alcoholic mother, and a father who was in and out of jail, who injected Petitioner with heroin, and who forced Petitioner to accompany him on his crime sprees.

▮▮▮ This argument fails to provide Petitioner any relief for the same reason previously discussed—all of this relates to information about which defense counsel asked Petitioner and which he purposefully chose not to reveal. Petitioner cannot claim ineffective assistance of his counsel when it was his own actions that led to the nondisclosure of such information. In any event, counsel did present evidence regarding why Petitioner became the way he was. As noted in *Rodriguez V*, "[a]t the penalty phase, trial counsel chose the strategy of portraying Rodriguez as an underprivileged youth from a broken home who had been betrayed by the juvenile justice system." 914 P.2d at 299. An essential part of this mitigation was testimony by Kent Wilson that as a young offender, Petitioner desperately wanted vocational training but was denied such opportunity. ROA v. 35, pp. 27–28, 31–32. Wilson also described Petitioner's childhood problems in some detail and explained why his lack of a father figure and a permissive mother resulted in a personality disorder. *Id.*, pp. 18–42. Presenting this type of testimony can hardly be deemed ineffective assistance of counsel, given the fact that Petitioner failed to cooperate in the mitigation investigation.

▮▮▮ The same is true for Petitioner's argument that the defense, instead of relying on mitigation, relied solely on notions of fairness and consistency in the criminal justice system, and that this led to the jury being virtually predestined to give the death penalty. First, it is inaccurate to say that the defense relied solely on notions of fairness and consistency since, as

detailed above, mitigation evidence was provided. Further, the reason that more mitigation evidence was not given was because Petitioner failed to disclose the existence of it. Petitioner cannot be heard to attack the strategy of his counsel when his own conduct led, at least in part, to the adoption of this strategy. As the Colorado Supreme Court reasonably found, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchangeable," and "Rodriguez' second guessing of trial counsel's strategy will not support a claim of ineffective assistance of counsel." *Rodriguez V*, 914 P.2d at 298 (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052).

Petitioner also argues that there was virtually no penalty phase investigation done until days prior to the commencement of the trial. Judy Sholl, the primary investigator, was not contacted by trial counsel to begin her penalty phase investigation until November 5, 1986, even though trial was scheduled to commence November 21, 1986. He asserts that Sholl was a total stranger to Petitioner, had no training on how to address sensitive issues like child abuse, and had never been asked to compile a written life history as she was asked to do with Petitioner. Further, Petitioner argues that Sholl's initial investigation report was not given to defense counsel until sometime during the first week in December—well after the trial had commenced. Petitioner asserts that if an investigation regarding the penalty phase is delayed to the point where the trial has almost commenced, an inadequate investigation will be conducted since the evidence to be presented at the penalty phase drives the nature of the guilt phase presentation.

Finally, Petitioner asserts that when the investigation began, a slip-shod effort occurred because lead counsel was too burdened with a predominantly death-penalty caseload to devote the appropriate amount of attention to the case. Since the case was handled so poorly, Petitioner contends

that the Public Defender's office subsequently changed its policy to pull cases away from their lawyers in order to allow them to focus solely on the death penalty case they are assigned.

■ Petitioner's assertions that the outcome of the investigation would have been different if it had been commenced earlier and/or if Sholl had not been used are pure speculation. There is no evidence to support the argument that if the investigation had been conducted earlier, the mitigation evidence argued herein would have been discovered and/or a more effective investigation would have been conducted. Indeed, this is belied by the fact that Petitioner himself was the cause of the failure to further investigate abuse or other similar issues, given the fact that he denied such abuse. In any event, Petitioner has not shown how this set of circumstances violates any clearly established Supreme Court law. Further, Petitioner's assertion that lead counsel was too burdened with other death penalty cases to devote adequate time to this case and/or that the Public Defenders Office changed its policy after this case is not supported by evidence in the record and appears to be rank speculation. Moreover, since I find that counsel was not ineffective, this argument does not provide any relief to Petitioner.

■ Finally, the fact that Judy Sholl had no formal training in obtaining sensitive material from people and that she had never compiled a life history of a defendant also does not provide relief to Petitioner. Sholl's work was described as "diligent" (ROA v. 65, p. 67) and she was chosen from several public defenders to assemble the mitigating evidence. Apparently, Eisner, as lead counsel in the case, viewed her as more capable than anyone else and this viewpoint was no doubt based upon Eisner's experience in working with her in prior capital litigation. ROA v. 63, pp. 11–13. Petitioner does not, and cannot, describe how the decision to use Sholl and/or her credentials or lack thereof violated or was an unreasonable application of

any Supreme Court law. Accordingly, Petitioner has not shown that these actions or inactions rise to the level of ineffective assistance of counsel.

■ Petitioner also asserts that the defense was inadequate and that his counsel's performance was deficient in presenting "A Life History" of Frank Rodriguez. Defense Exhibit 38. He contends that this document made him look like nothing but a hardened criminal. The Colorado Supreme Court found that Rodriguez established no error in arguing that damaging evidence was presented at the penalty phase, stating:

In their efforts to humanize Rodriguez to the jury, counsel presented a candid life history and personality profile of Rodriguez which informed the jury of his offenses as a juvenile and his violations in prison. Given the strength of the aggravating evidence, trial counsel made a reasonable decision that a credible picture of Rodriguez could not be presented without revealing his extensive history with the criminal justice system. Thus, trial counsel's strategy cannot be viewed as either incompetent or prejudicial.

*Rodriguez, V* 914 P.2d at 297–299.

I find that the Colorado Supreme Court's analysis was reasonable and was not contrary to or an unreasonable application of clearly established federal law. The "Life History" of Frank Rodriguez was largely cumulative of the prosecution's case in the habitual offender and penalty phase. While some additional evidence was presented in the document as to Petitioner's offenses, defense counsel could reasonably have believed that this needed to be included in any candid and credible biography. Further, given the overwhelming evidence of guilt and aggravation in the case, defense counsel conceded very little by presenting a candid life history which included the offenses Petitioner had committed as a juvenile and in prison. Indeed, defense counsel needed to maintain their credibility with the jury (*see*

*Davis v. People*, 871 P.2d 769, 777 (Colo. 1994)), and defense counsel could not realistically have presented a credible picture of Petitioner as a troubled and disadvantaged youth if they ignored his problems with the law. Accordingly, I do not find that the presentation of this document to the jury or the defense in general constituted ineffective assistance of counsel.

 Petitioner also argues that his counsel was ineffective for failing to present evidence of mental illness. The Colorado Supreme Court disagreed, holding, "[i]n a capital case, the decision to present evidence of mental illness is within the sound strategic judgment of counsel". *Rodriguez V*, 914 P.2d at 297. The court further held that counsel did present some evidence of mental illness at the penalty phase by Kent Wilson, director of Psychological Services for the Denver Juvenile Court, and that counsel contemplated calling Dr. Morall, Rodriguez' prison psychiatrist, as a witness to testify about prescribed medications that Petitioner was taking. *Id.* Petitioner only declined to call Dr. Morall when it became apparent that the prosecution's cross-examination could produce detrimental results to the defense. *Id.* The Colorado Supreme Court concluded, "[t]rial counsel knew of Rodriguez' psychiatric problems and prescribed medications and made an informed judgment that presentation of such testimony would do more harm than good," that counsel "acted well within the bounds of professional competency in deciding not to present further evidence of Rodriguez' mental illness", and that "Rodriguez failed to make any showing at the postconviction hearing that he suffered actual prejudice." *Id.*

Petitioner fails to demonstrate how such analysis regarding the mental health issue is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. Indeed, this appears to be a tactical or strategical decision supported by the circumstances of the case that does not rise to the level of ineffective assistance. *See*

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Davis*, 929 F.2d 554, 558 (10th Cir.1991).

 I next address Petitioner's argument that the presentation of the child abuse and other mitigation outlined here and in his Opening Brief would have changed the outcome of the trial. Essentially, this is related to the prejudice argument, since Petitioner must show in that regard that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been entirely different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. I agree with the Colorado Supreme Court that, even if I assume for the sake of argument that counsel's performance was deficient in regard to any of the raised issues, Petitioner has failed to show prejudice.

As the Colorado Supreme Court correctly found, the prosecution presented overwhelming evidence of aggravation at the penalty phase. *Rodriguez V*, 914 P.2d at 298. This included evidence by Judy Archuleta who testified that Petitioner raped and sodomized her prior to the rape and murder of Martelli, and that following that assault, Petitioner stated that he wanted to kill her but that Chris Rodriguez convinced him to let her go. *Id.* Further, George Stapleton testified that ten (10) days before Martelli's murder, Petitioner shot him four (4) times in the head during an attempted robbery. *Id.* Finally, the jury heard that Petitioner was on parole during the crimes against Martelli. *Id.* The jury found that six out of seven aggravating factors had been proved beyond a reasonable doubt, after hearing extensive testimony regarding the heinous nature of the crime and Petitioner's guilt. ROA v. 43, pp. 3–4; v. 52, pp. 746–52. Given the foregoing, Petitioner has not, and cannot demonstrate, prejudice. Accordingly, his argument of ineffective assistance of counsel at the trial does not entitle him to relief on his petition.

Finally, on the issue of ineffective assistance at the trial level, Petitioner argues

that the district court in the Rule 35(c) proceedings was uninterested in hearing any testimony regarding what could have and should have been admitted in a properly presented penalty phase, and continually cut off Petitioner's court-appointed counsel, Richard Hostetler, from presenting such evidence. Petitioner contends that since the state did not provide him with a full and fair hearing at that time, a hearing de novo is mandated before this Court. However, it is undisputed that the trial court did provide a hearing on the issue of ineffective assistance—the only issue is whether the trial court erred in not considering certain evidence at that hearing. ROA v. 62.

The Colorado Supreme Court, in addressing this fact, determined that Petitioner was at fault for withholding this information from his attorneys. *Rodriguez V*, 914 P.2d at 294. I find the state court was correct in this determination, and as such, there was no reason to allow inquiry into what would have been discovered through other means. Since Petitioner had a full hearing on the issue of ineffective assistance of counsel at trial, I also find that Petitioner is not entitled to an evidentiary hearing on this issue. *See also* Order Regarding Evidentiary Hearing dated this same date.

▇▇ Turning to the direct appeal, the Colorado Supreme Court found no error in the district court's decision sustaining the prosecution's objections to Heher's testimony that he rendered ineffective assistance of counsel by failing to raise all available issues on appeal. *Rodriguez V*, 914 P.2d at 303. The court cited *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), which "held that appellate counsel's failure to include every conceivable issue available for appeal does not amount to ineffective assistance," and that "counsel's duty to render effective advocacy requires prioritizing issues on appeal based upon their strength. . . ." *Id.* The Colorado Supreme Court noted that Petitioner's argument in the 35(c) proceed-

ing simply asserted the same argument which the Supreme Court rejected in *Jones*, and that the district court "did not need to hear testimony from Michael Heher admitting that he failed to raise all available issues." *Id.%*

I find that the Colorado Supreme Court's holding on this issue was reasonable and not contrary to or an unreasonable application of clearly established Supreme Court precedent. Indeed, the court properly applied *Jones*, which held that appointed counsel does not have a duty to raise every "colorable" claim in an appeal, as that would "disserve the very goal of vigorous and effective advocacy." *Jones*, 463 U.S. at 754, 103 S.Ct. 3308. As the Supreme Court explained in *Jones*, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52, 103 S.Ct. 3308.

The Tenth Circuit further clarified this issue in *United States v. Cook*, 45 F.3d 388 (10th Cir.1995), holding, "Strickland's performance and prejudice prongs 'partially overlap when evaluating the performance of appellate counsel.'" *Id.* at 394 (quotation omitted). Citing *Jones*, the Tenth Circuit noted that "[t]he Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal" and that "[t]he weeding out of weak claims to be raised on appeal 'is the hallmark of effective advocacy.'" *Id.*

Consequently, " '[a]ppellate counsel . . . will frequently remain above an objective standard of competence . . . and have caused h[is] client no prejudice . . . for the same reason—because [ ]he declined to raise a weak issue.'" *Id.* at 395 (quoting *Miller*, 882 F.2d at 1434). "Conversely, an appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner' even though counsel may have presented strong but unsuccessful claims." *Id.* A "dead-bang winner" is "an issue which is obvious from the trial record, . . . and one which would

have resulted in a reversal on appeal." *Id.; see also Jackson v. Shanks,* 143 F.3d 1313, 1321 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998) (where petitioner fails to cite any authority indicating issues omitted from an appeal were individually meritorious, or obvious winners, appellate counsel's failure to raise them was not error).

▉ In this case, Petitioner complains that his counsel, after four (4) extensions of time, filed a "Partial Opening Brief" which listed 102 additional issues that he wanted to raise but could not because of alleged unreasonable time limitations and an inadequate record on appeal. Petitioner asserts that the failure to raise these issues is ineffective assistance of counsel. I disagree.

Although appellate counsel failed to adequately raise the 102 issues that were presented but not briefed to the Colorado Supreme Court, counsel filed a 138 page brief raising nine appellate issues that he obviously decided were the critical issues to be appealed given the fact that he chose to brief only those issues. The fact that the Colorado Supreme Court split four to three on whether Petitioner's rights had been violated on the direct appeal in *Rodriguez IV* bears witness to the fact that appellate counsel presented substantial arguments, even though not ultimately meritorious, to the court.[16] Petitioner has made no showing that any of the issues which were not adequately raised were "obvious" or "dead-bang winners", such that they would have resulted in a reversal of the conviction or the death sentence. *Cook,* 45 F.3d at 395. Accordingly, he has not shown either that his counsel's performance was deficient or that he was prejudiced thereby. Further, he fails to demonstrate that the Colorado Supreme Court's finding on this issue is either contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

▉ Petitioner also argues that counsel's failure to certify the record on appeal is ineffective assistance of counsel. The Colorado Supreme Court found that even though Petitioner argued that an incomplete and inadequate record was provided, this did not amount to ineffective assistance, given the filing of the 138 page brief. *Rodriguez V,* 914 P.2d at 300. I find that this was reasonable and was not contrary to or an unreasonable application of federal law. Again, Petitioner fails to show how the failure to certify the appeal adversely affected the appeal's outcome or how, if the record had been certified, this would have resulted in a reversal of the conviction or the death sentence. At the very least, Petitioner has failed to show prejudice in connection with this argument.

Next, it is argued that Petitioner was prevented from presenting any evidence of ineffective assistance of counsel in the direct appeal at the hearing held by the trial judge. I find that the Colorado Supreme Court was reasonable in its finding that the trial court did not need to hear testimony from Michael Heher admitting that he failed to raise all available issues on appeal. The trial judge had the "Partial Opening Brief" before it as part of the record. AROA v. 18. Further, it had the decision in *Rodriguez IV* which listed the issues actually raised as well as the 102 other issues that appellate counsel did not properly raise. There existed an adequate record for the court to determine whether counsel was ineffective for failing to raise issues on appeal, and Petitioner has not shown how testimony at the hearing would have impacted this issue. Accordingly, I find that Petitioner is not entitled to relief on this ground, nor is he entitled to an evidentiary hearing on this issue. *See also* Order Denying Evidentiary Hearing.

Finally, to the extent that Petitioner, either in connection with the argument in

---

16. Accordingly, *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), a case relied on by Petitioner addressing nominal representation on appeal is not applicable. Petitioner did not receive merely nominal representation on appeal.

this section or the previous section of this Memorandum Opinion and Order, asserts that counsel was ineffective during the postconviction proceeding, such argument is without merit. As stated earlier, Petitioner does not have a federal constitutional right to assistance of counsel in such proceeding. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). As such, he has no ability to allege constitutionally ineffective assistance of counsel in such a situation. *Id.* at 752–53, 111 S.Ct. 2546. In any event, as with the direct appeal, Petitioner has not shown that any of the issues that counsel failed to raise or waived in the postconviction proceeding were "dead-bang winners" that would have resulted in a reversal of the conviction or death sentence.[17]

In summary, I find neither violations of clearly established federal law in connection with the Colorado Supreme Court's opinion denying Petitioner's ineffective assistance of counsel argument nor an unreasonable application of federal law. Accordingly, Petitioner is not entitled to habeas relief on this issue.

### 3. Aggravating And Mitigating Factors

### A. Whether Petitioner Was Denied the Right to Present Evidence in Mitigation or to Rebut the Non–Statutory Aggravating Factors Argued by the Prosecution in Violation of the Due Process Clause and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

Petitioner argues that he was denied the right to present evidence regarding important mitigating circumstances, and that he was sentenced to death on the basis of aggravating circumstances which he had no opportunity to rebut or to confront. Petitioner makes four general arguments in this regard: (i) he was denied the ability to adequately present evidence regarding parole eligibility mitigation; (ii) he was denied the ability to rebut evidence of his future dangerousness; (iii) he was prevented from presenting effective mitigation evidence regarding the nature of the death penalty; and (iv) he was denied the right to present mitigation evidence concerning prison conditions.

With respect to the first and second arguments, Petitioner asserts he was adjudged by the jury to be a habitual offender after the primary guilt phase of his trial, which required the trial judge to sentence him to life in prison for each of the eight (8) non-capital felony convictions arising from this incident. Five (5) of these sentences were allegedly required by statute to be imposed consecutively. Petitioner argues that "upon information and belief" his trial counsel requested that these sentences be imposed prior to the penalty phase of the capital trial, and the trial judge refused. Petitioner asserts that this prevented him from presenting the powerful mitigating evidence that he would not have received an initial parole eligibility date for at least 100 years, *i.e.*, that he would not be parole eligible.[18] Petitioner further argues that this mitigating evidence was particularly important in light of the fact that the state argued "future dangerousness," "fear of parole," and "fear of governmental incompetence".[19]

---

**17.** Although Petitioner argues that the Colorado Supreme Court's alleged criticism of counsel shows that counsel was ineffective, I do not agree. The Colorado Supreme Court neither stated nor intimated that appellate counsel was ineffective. Instead, the court simply addressed the fact that Petitioner inadequately raised, waived or procedurally defaulted certain issues during the appeal. For the reasons discussed above, this does not constitute ineffective assistance of counsel.

**18.** He contends that such evidence can have a powerful effect on a sentencing jury as evidenced by the fact that his brother, Chris Rodriguez, received a life sentence after being allowed to present mitigation regarding his sentencing which was conducted after the guilty verdicts and before the penalty phase.

**19.** Although Petitioner argues that the state provided "extensive and detailed argument" that "he would be released from prison and that he would then be a great danger to the

Although the trial court recognized that the sentences for the non-capital offenses were relevant, Petitioner asserts that it did not instruct the jury that consecutive sentences would be imposed. He argues that this forced him to counter the state's arguments based upon the mere hypothetical possibility that the judge would impose consecutive sentences.

I find that Petitioner cannot prevail on these arguments. First, he has failed to establish in the record that he actually requested that his sentencing be set on the non-capital offenses prior to the capital penalty phase. Indeed, he states that this request was made only upon "information and belief". *See People v. Rollins,* 759 P.2d 816, 819 (Colo.App.), *cert. denied,* (1998) ("It is the duty of the defendant appealing a judgment of conviction to provide those portions of the record necessary to substantiate his claims on appeal.... [i]n the absence of such a record, appellate courts must presume that the actions of the trial court... were correct") (citations omitted). Further, Petitioner has cited no case authority from the Supreme Court or otherwise that a trial court errs in imposing sentence after the penalty phase where there has been no request by the Petitioner for an earlier sentencing.

█ Second, even if I assume that Petitioner did make this request, I find no violation of clearly established federal law in connection with the trial court's decision to wait until after the penalty phase to sentence Petitioner. Petitioner has cited no Supreme Court authority that mandates that the trial court sentence a petitioner on non-capital offenses prior to the capital phase. The Colorado Supreme Court specifically declined to adopt the holding of *Clark v. Tansy,* 118 N.M. 486, 882 P.2d 527, 534 (1994) "that the trial court has no discretion to delay imposing sentencing...," relied on by Petitioner in

support of his argument. *Rodriguez V,* 914 P.2d 230, 281 n. 52 (Colo.1996). Moreover, it does not appear that *Clark* is even applicable, since it was premised on the question of whether a court must impose sentence for noncapital offenses before jury deliberations on a capital sentence if requested to do so by the defendant. *Clark,* 882 P.2d at 534. As stated earlier, Petitioner has not shown that he made such request.

Further, the Colorado Supreme Court in *Rodriguez V* found that the trial court correctly applied state law on this issue, and "accurately informed the jury of its noncapital sentencing options prior to the jury's capital sentencing deliberations" pursuant to Colo.Rev.Stat. § 16–11–103(1)(b). 914 P.2d at 280. Specifically, the trial court instructed the jury that Petitioner would get life imprisonment, meaning that he "must spend twenty calendar years in prison before he would be eligible to apply for release on parole from that sentence." ROA v. 4, p. 783, renumbered as v. 52, p. 783 (Jury Instruction 24). Further, Instruction 24 stated, "[t]his does not mean that Mr. Rodriguez would be paroled from the life sentence after twenty calendar years", only that "he could apply for parole at that time" subject to a decision by the Parole Board. *Id.* Finally, the jury was instructed that it:

should also be aware that when a defendant is facing multiple charges in addition to murder he can be sentenced to a number of years to be served consecutively to a life sentence, which would increase the amount of time to be served before becoming parole eligible. In fact, it is possible that enough consecutive sentences could be given to assure that a defendant would never be eligible for parole in a natural lifetime. That is also a proper factor for your consideration.

---

general public," he provides no substantiation in the record. In fact, he fails to cite to the record in support of this entire argument. This Court is in the untenable position of trying to substantiate the Petitioner's claims

in the voluminous record without any direction from the Petitioner. I also note that to the extent that this argument raises issues about closing argument being improper, this is addressed in Section V(5)(A), *infra.*

*Id.* To the extent that Petitioner argues that this was an incorrect interpretation of state law, federal review is not available. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).[20]

Petitioner also cites a number of cases which hold that an accused must be able to present at trial every reason why a sentence less than death may be appropriate. *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The right to present such mitigation includes the right to present evidence to rebut the state's assertion of future dangerousness, such as "the actual duration of the defendant's prison sentence" and the fact that petitioner is not eligible for parole. *Simmons v. South Carolina,* 512 U.S. 154, 161–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

It is true that since death "is a different kind of punishment from any other which may be imposed in this country ... it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Here, however, after a careful review of the record, I agree with the Colorado Supreme Court that Petitioner was not denied the right to present mitigating evidence regarding his sentence on the non-capital offenses to rebut the state's arguments regarding eligibility for parole, future dangerousness and related issues. Further, there was no violation of clearly established federal law based on the trial court's actions.

As the Colorado Supreme Court reasonably recognized, the instructions given to the jury allowed Petitioner to argue mitigating evidence in rebuttal to future dangerousness arguments. *Rodriguez V,* 914 P.2d at 281. It is further undisputed that such rebuttal evidence was presented. Defense counsel argued that if spared the death penalty, Petitioner would be incarcerated until he died in prison. ROA, v. 35, pp. 127, 131–33. Further, counsel argued the trial judge's sentencing record and asserted that she was a "heavy hitter" who imposed consecutive sentences in 15 out of 17 previous cases. *Id.* at 132. Finally, counsel referred to the fact that multiple, consecutive life sentences could be imposed to ensure that Petitioner never got out of prison. *Id.* Accordingly, there was no constitutional violation.[21]

Further on this issue, I find that the Colorado Supreme Court reasonably applied *Simmons* and *Clark v. Tansy,* 118 N.M. 486, 882 P.2d 527 (1994). *Rodriguez V,* 914 P.2d at 280. In *Simmons,* constitutional error occurred because the trial court allowed the state to argue future dangerousness but refused to provide the jury with accurate information regarding the defendant's parole ineligibility. 512 U.S. at 161–62, 114 S.Ct. 2187. Further, the defendant was prohibited from presenting any such evidence to the jury. *Id.* Unlike *Simmons,* in this case the jury was advised that Rodriguez could be legally paroled and he was allowed to present rebuttal evidence. In *Clark,* the prosecu-

---

**20.** To the extent that Petitioner argues that the trial court was required to impose five consecutive sentences, it appears this argument is incorrect. Colorado law at the time of the sentencing provided for either consecutive or concurrent sentences. Colo.Rev.Stat. § 16–11–309 (1978). Although a sentence was added to the statute in 1985 requiring consecutive sentencing for multiple counts, it applied only to crimes committed on or after July 1, 1985. *See* 1985 Colo.Sess.Laws pp. 647–48, 654. The crimes committed by Rodriguez in this case occurred in November, 1984. Accordingly, the trial court correctly determined that the question of consecutive or concurrent sentences was a matter of judicial discretion under Colorado law. *People v. Montgomery,* 669 P.2d 1387, 1390 (Colo. 1983).

**21.** Petitioner also cites cases that address the right to have compulsory process for obtaining witnesses. *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) and related cases. However, Petitioner has not shown that he was denied this right.

tor incorrectly informed a jury that an offender could be paroled in as little as ten years. 882 P.2d at 530. Here, the jury was told the appropriate options regarding sentencing, including the fact that Petitioner might not be eligible for parole in a natural lifetime.[22]

Petitioner also argues that the state improperly made extensive arguments on the issue of escape and future dangerousness after a ruling by the state court granting Petitioner's motion in limine on this issue. The motion in limine was based on the fact that Petitioner did not intend to rely on the statutory mitigation factor that he would not pose a continuing threat to society, and that the state should thus be precluded from arguing that he would escape from prison. He also argues that the motion stated that if it was not granted, Petitioner wished to present evidence to rebut such assertions by the state. Petitioner states that although the motion was granted, the court refused to enforce its order or sustain objections to this by defense counsel. I find no violation or unreasonable application of clearly established federal law as determined by the Supreme Court in connection with the trial court's actions. Petitioner has cited no Supreme Court case indicating that the trial court's decision to admit evidence in contradiction to an earlier ruling is erroneous. Further, it is undisputed, as stated above, that Petitioner was allowed to present rebuttal evidence. Thus, there was no due process or other violation of law in connection with this issue.[23]

Also on the future dangerousness issue, Petitioner argues that the State was permitted to argue fear of escape without any supporting evidence, on the ground that the likelihood of escape was "common public knowledge." *See Rodriguez IV,* 794 P.2d 965, 976 (Colo.1990). Thus, he asserts that the jury considered this argument as a fact-based reason to impose death. Further, Petitioner contests the holding of the Colorado Supreme Court that the argument about escape did not introduce a non-statutory aggravating factor since the state was merely rebutting a mitigating factor that the State "correctly anticipated" the accused would argue. *See id.*

I find that this evidence did not improperly introduce a non-statutory aggravating circumstance, nor has Petitioner shown how it violated Supreme Court law. The jury was given an instruction which explicitly told it what the statutory aggravating factors were and that "[n]o other circumstances [other than the statutory aggravating factors] are sufficiently aggravating to support consideration of the death penalty in Colorado." ROA, v. 4. p. 773. More importantly, the jury was instructed that "no other aggravating circumstances shall be considered by you at any time during your deliberations." *Id.* Petitioner has provided me no reason to depart from "'the almost invariable assumption of the law that jurors follow their instructions.'" *Shannon v. U.S.,* 512 U.S. 573, 584, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quotation omitted); *see also Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) ("we adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions.").[24]

---

**22.** Further, *Clark* does not provide a basis for habeas relief in this Court since it is a state law decision. *See Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475.

**23.** To the extent that Petitioner claims that he could not make objections because he feared a contempt ruling, this issue is addressed in Section V(5)(B), *infra.*

**24.** Even if I were to assume that the jury disregarded this instruction, the Supreme Court in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), held that once the statutory aggravators "circumscribe the class of persons eligible for the death penalty", "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death." *Id.* at 878, 103 S.Ct. 2733. Future dangerousness has been held to be an appropriate factor for the jury to consider. *Simmons,* 512 U.S. at 163, 114 S.Ct. 2187. *See also* Section V(5)(A),

Finally, as to the third and fourth arguments, Petitioner argues that the trial court prevented him from presenting mitigation evidence regarding the painful nature of death by cyanide poisoning to rebut the state's argument that infliction of death by this method was fast and humane. Petitioner also argues that he was denied the right to present mitigation evidence concerning prison conditions to rebut the prosecution's assertion that prison was the "life of Riley." [25] Respondent argues that these are essentially attempts to relitigate allegations of improper prosecutorial argument under more recently contrived constitutional theories. Respondent further argues that while the court may review the Colorado Supreme Court's resolution of Petitioner's prior complaints of improper prosecutorial misconduct under the standards of 28 U.S.C. § 2254, it should not review reformulated versions of such claims which were properly dismissed as successive, citing *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

This argument does appear to be a reformulated version of the prosecutorial misconduct argument. *See Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (recognizing that identical grounds may often be supported by different legal arguments). To the extent that Petitioner's claims are complaints about prosecutorial closing argument, this is addressed and rejected in Section V(5)(A), *infra*. Further, the court in *Rodriguez V* held that Petitioner's failure to specifically reassert the issue of prosecutorial misconduct in closing arguments (Issue 106 in that court), which the district court disposed of as previously litigated on direct appeal, constituted a conscious relinquishment of that claim. 914 P.2d at 248-49, 315. Accordingly, it appears that this issue is not properly before this Court. *Coleman*, 501 U.S. at 729-31, 111 S.Ct. 2546.

*infra,* regarding alleged prosecutorial misconduct in presenting such evidence.

Even if the argument may be considered in this Court, I find that it is without merit. Petitioner was allowed to present mitigation evidence on these issues. His counsel presented mitigation evidence in response to the prosecution's arguments as to prison conditions and execution by cyanide gas, including testimony regarding the bleak and oppressive conditions at Colorado's maximum security prison. ROA, v. 34, pp. 243-46. This testimony described how inmates in the prison are locked in their cells most of the day, how they have very little social contact, how the cells have a steel bunk and a toilet without a lid, and how inmates have television but otherwise experience "severe" punishment. *Id.* at v. 35, pp. 133-36, 152-53, 164.

Further, defense counsel repeatedly referred to execution by gas as "killing" (*id.* at pp. 160, 165) and, in so doing, rebutted the purported suggestion by a prosecutor that execution by cyanide gas was pleasant. In fact, Mr. Eisner presented specific rebuttal evidence in this regard stating, without any objection from opposing counsel:

> ... the prosecutor has chosen to try to tell you death by affixiation in the gas chamber is a fast and pleasant way to die. He knows that's not true. He has heard evidence that is not true. Yet, he wants you to believe that.

*Id.* at 131 ll. 12-17.

In conclusion, I find that Petitioner has not established the violation of any clearly established federal law as determined by the Supreme Court or an unreasonable application of same. Further, he has not established that the trial court's decisions were based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**25.** Petitioner fails to cite to the record to support his contentions regarding the prosecution's allegedly improper arguments.

### B. Whether the Colorado Supreme Court's Decision Regarding the Especially Heinous, Cruel or Depraved Aggravating Factor Was An Unreasonable Application of Clearly Established United States Supreme Court Law

Petitioner asserts that the Colorado Supreme Court's decision that the submission to the jury of the aggravating factor that "the defendant committed the crime in an especially heinous, cruel or depraved manner..." was harmless error violated the Eighth Amendment and *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). *Rodriguez IV*, 794 P.2d 965, 982–84 (Colo.1990). He further argues that the state court's application of *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) was unreasonable. *Id.*

Specifically, Petitioner asserts that Colorado's death penalty scheme requires the jury to "weigh" the statutory prescribed aggravating factors against the mitigating factors. Since there are no written or other findings required as to mitigation, there is no way of knowing what the jury in this case found to be mitigation or what weight it gave any factor. Thus, Petitioner argues that the Colorado Supreme Court's conclusion that the result would have been the same without the improper aggravating factor or if the aggravating factor had been subject to a limiting definition is unreasonable. Further, he asserts that the Colorado Supreme Court's failure to consider mitigation in any fashion invalidates the harmless error analysis. Finally, Petitioner argues that the fact that five (5) other aggravating factors were found does not automatically mean that the death sentence cannot be overturned. In that regard, he asserts that two (2) of the aggravating factors were at best identical, and the other aggravating factors included the killing of a witness to the crime, which exists in every first-degree murder case.

The Colorado Supreme Court agreed on this issue that the submission to the jury of the "especially heinous, atrocious or cruel" aggravating factor without any narrowing definition violated the Eighth Amendment under *Maynard. Rodriguez IV*, 794 P.2d at 982–83. Four members of the Court held this error harmless, relying on *Clemons. Id.* at 983–84. Three justices dissented. *Id.* at 998–1006.

In *Maynard*, the Supreme Court held that Oklahoma's aggravating factor that the murder was "especially heinous, atrocious, or cruel" was unconstitutionally vague under the Eighth Amendment. 486 U.S. at 360–66, 108 S.Ct. 1853. The Supreme Court found that the aggravating factor "gave no more guidance than the 'outrageously or wantonly vile, horrible or inhuman'" aggravating factor that was found to be unconstitutional in *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Maynard*, 486 U.S. at 363–64, 108 S.Ct. 1853. Given this holding, I find that the Colorado Supreme Court correctly applied *Maynard* in concluding that the "especially heinous, cruel or depraved" aggravating factor violated the Eighth Amendment because it gave insufficient guidance to the jury. Thus, the question becomes whether the Colorado Supreme Court reasonably applied the harmless error standard set forth in *Clemons*.

In *Clemons*, the Supreme Court discussed what a state appellate court could do when an unconstitutional aggravating factor was given to the jury in the underlying trial. The court held that in a state where, under state law, the jury is not given the sole responsibility for weighing aggravating and mitigating factors, the appellate court may, if it determines that it is appropriate, conduct a weighing or reweighing of the aggravating and mitigating circumstances to determine whether a death sentence can be salvaged. 494 U.S. at 745–747, 750, 110 S.Ct. 1441. This is true even where, as here, the jury did not specify what mitigating factors it found. *Id.* at 750, 110 S.Ct. 1441. The Supreme Court stated, "state appellate courts can and do give each defendant an individualized and reliable sentencing determination

based on the defendant's circumstances, his background and the crime", which is the "[t]he primary concern in the Eighth Amendment context." *Id.* at 748–49, 110 S.Ct. 1441. Further, even where under state law the weighing of aggravating and mitigating circumstances is left solely to the jury, and is not an appellate function, the appellate court may still "find that the error which occurred during the sentencing proceeding was harmless." *Id.* at 752, 110 S.Ct. 1441 (citations omitted).

The Supreme Court in *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) held in this regard:

> There is no reason why the [state appellate court] cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.... What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

*Id.* at 958, 103 S.Ct. 3418.

▆▆▆▆ In determining whether a "federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Coleman v. Saffle,* 869 F.2d 1377, 1389 (10th Cir.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 964 (1990). The harmless error analysis conducted by the state appellate court may include the determination as to whether "beyond reasonable doubt the result would have been the same had the especially heinous aggra-

vating circumstance been properly defined in the jury instructions." *Clemons,* 494 U.S. at 754, 110 S.Ct. 1441; *see also Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) ("a state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined").

The Colorado Supreme Court has indicated that, like Mississippi in *Clemons,* it is a weighing state. *People v. Davis,* 794 P.2d 159, 178 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *Rodriguez V,* 914 P.2d 230, 329 (Colo.1996). This is because in the third step of the capital sentencing scheme, if the jury has found the existence of both aggravating and mitigating factors, the jury must determine whether "sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist." Colo.Rev.Stat. § 16–11–103(2)(a)(II). The Colorado Supreme Court in this case chose not to conduct a reweighing of the aggravating and mitigating factors, but to conduct a harmless error test.[26] Under either analysis in *Clemons,* whether the jury has the sole responsibility for weighing or not, the Supreme Court made clear that such a harmless error analysis is appropriate.[27] I must now examine whether this harmless error analysis was reasonable. *See Davis v. Executive Dir. of Dept. of Corrections,* 100 F.3d 750, 768 and n. 18 (10th Cir.1996), *cert. denied,* 520 U.S. 1215, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997).

▆▆▆▆ In conducting its harmless error analysis, the Colorado Supreme Court

**26.** As the dissenting opinion by Justice Lohr in *Rodriguez IV* points out, a reweighing of such factors may not be appropriate in Colorado since the weighing of mitigating and aggravating factors appears to be left solely to the jury. *Rodriguez IV,* 794 P.2d at 1000. I need not address this issue given the fact that reweighing was not the basis of the decision.

**27.** The Tenth Circuit in *Davis* indicated that Colorado is really a "hybrid" state because the capital sentencing scheme calls for weighing in the third analysis but then, in the

fourth step, allows the jury to make an independent decision of whether to impose life or death where the mitigating factors do not outweigh the aggravating factors. 100 F.3d at 768. According to the Tenth Circuit, this last step is more similar to the sentencing decision made in a non-weighing state. *Id.* Nonetheless, the Tenth Circuit also held that "[b]ecause weighing ... performs a critical function in the jury's sentencing scheme," it would apply, "where appropriate, the Clemons harmless error analysis." *Id.*

chose to decide whether beyond reasonable doubt the result would have been the same if the aggravating factor had been properly defined. In that regard, it narrowed the definition of the "especially heinous, cruel or depraved" aggravating factor to whether the murder was "conscienceless or pitiless, and [was] unnecessarily torturous to the victim." *Rodriguez IV,* 794 P.2d at 984. I find that this analysis by the Colorado Supreme Court was appropriate. *See Clemons,* 494 U.S. at 754, 110 S.Ct. 1441; *Richmond,* 506 U.S. at 47, 113 S.Ct. 528; *Walton,* 497 U.S. at 653–54, 110 S.Ct. 3047. I further find that this definition is constitutional and properly limits the aggravating factor so that it meets the requirements of the Eighth Amendment. *See Proffitt v. Florida,* 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Davis,* 100 F.3d at 767–72.

After limiting the definition of the aggravating factor, the state court held that "the jury, given the facts and circumstances of this case, would have found that the murder" met this definition. *Rodriguez IV,* 794 P.2d at 984. It based this on the following:

> Lorraine Martelli was kidnapped off the streets of Denver in her own car, driven around for hours, repeatedly raped, sodomized, beaten and humiliated. She was ultimately murdered in a manner indicating that the defendant intended to torture her before she died. We conclude that the error in failing to give the proper limiting instruction in this case was harmless beyond a reasonable doubt.

*Id.*

 When reviewing a state court's application of a properly narrowed definition of a facially vague aggravator, "application of the narrowing construction should be reviewed under the 'rational' factfinder standard of *Jackson v. Virginia,*

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)." *Richmond v. Lewis,* 506 U.S. 40, 47, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992); *see also Davis,* 100 F.3d at 767–68. This standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements identified by the construction given by the court." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Davis,* 100 F.3d at 772. Here, I agree with the Colorado Supreme Court that a rational factfinder could have found that the murder of Lorraine Martelli was "conscienceless or pitiless, and [was] unnecessarily torturous to the victim." In addition to the foregoing evidence considered by the Colorado Supreme Court, the evidence at trial showed that Martelli pleaded for her life, that Chris Rodriguez told her they would probably let her go but that Petitioner said that they had to kill her since she could identify them, that Petitioner beat and stabbed Martelli repeatedly with a knife, that many of these knife wounds were shallow indicative of torture, and that Martelli eventually died a slow death from loss of blood.

The Colorado Supreme Court's finding of harmless error is also supported by the fact that Petitioner's counsel agreed that the crime was "heinous" and "a terrible death" (ROA v. 35, p. 129, II. 1–2), that Martelli "suffered greatly" (*id.* at 163, II. 24–25), and that the prosecutors had proved this aggravating factor (and all the others) beyond a reasonable doubt. *See id.* at 139.[28] This finding is also supported by the fact that no evidence was introduced in connection with this aggravating factor that would have been excluded if the factor had not been given. *Rodriguez IV,* 794 P.2d at 983. As the Colorado Supreme Court noted, "[t]he facts and circumstances relevant to the manner in which the murder was committed were also admissible to prove the existence of other valid statutory aggravating factors,

---

**28.** Further, as Respondent points out, no objections by defense counsel were made to statements made by the two prosecutors in closing and rebuttal closing argument that the

death was "especially cruel," heinous, "agonizingly slow", and "terrible and gruesome", and that Martelli was "brutally tortured to death." ROA v. 35, pp. 108–10, 170, 179–80.

as well as the relative weight to be accorded the aggravating and mitigating factors found." *Id.* I agree with this analysis, and find no violation of clearly established federal law. *See Zant v. Stephens,* 462 U.S. 862, 886–88, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (holding that evidence introduced to support an invalid aggravating factor did not require reversal, the evidence was admissible because it accurately described facts about the defendant's background); *Barclay,* 463 U.S. at 956, 103 S.Ct. 3418 (same); *Coleman,* 869 F.2d at 1390 (stating that evidence admitted to support the "heinous" aggravator was properly admitted because it accurately depicted facts of crime).[29]

The Petitioner's argument that *Clemons* did not indicate approval of the type of harmless error analysis conducted in this case is thus unfounded, since *Clemons* found that this type of analysis could be appropriate to find harmless error. 494 U.S. at 754, 110 S.Ct. 1441. Further opinions of the Supreme Court have clarified that this analysis is constitutionally acceptable. *Richmond,* 506 U.S. at 47, 113 S.Ct. 528; *Walton,* 497 U.S. at 654, 110 S.Ct. 3047. *Clemons* also made clear that such analysis is separate and distinct from the harmless error analysis of reweighing mitigating and aggravating factors. Thus, the Colorado Supreme Court did not have to conduct the reweighing analysis or specifically take into account mitigating factors. Finally, *Clemons* made clear that although "[i]n some situations, a state appellate court may conclude that peculiarities in a case make appellate reweighing or harmless-error analysis extremely speculative

or impossible, ... that decision is for state appellate courts ... to make." *Clemons,* 494 U.S. at 754, 110 S.Ct. 1441.

Even if I were to agree that the Colorado Supreme Court did not conduct an appropriate harmless error test because it did not explicitly consider mitigating evidence, the result would be the same. The Tenth Circuit in *Davis* relied on the harmless error standard of *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which requires that the court ask on habeas review "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Davis,* 100 F.3d at 772. In this case, Petitioner does not dispute the validity of the other five (5) aggravating factors found to exist by the jury. The Colorado Supreme Court found that these other factors were supported by overwhelming evidence. *Rodriguez IV,* 794 P.2d at 984.

This was an appropriate analysis and I agree with the court's conclusion. *See Walton,* 497 U.S. at 654, 110 S.Ct. 3047 (the court can "eliminate consideration of the invalid factor ... and determine whether any remaining aggravating circumstances are sufficient to warrant the death penalty"). This is particularly true since Petitioner's counsel admitted in closing arguments that the prosecutors had proven these aggravating factors. ROA, v. 35, p. 139. Further, as in *Davis,* the prosecutor's discussion of the "heinous, cruel or depraved" aggravating factor in the closing argument "did not allude to any evidence or facts not already properly before the jury." 100 F.3d at 773.[30] Finally, like

**29.** Further, I agree with the Colorado Supreme Court that, since this evidence was admissible in regard to the other aggravating factors, the fact that the prosecutors may have relied on the "especially heinous, cruel or depraved" factor in closing arguments does not make the error prejudicial. *Rodriguez IV,* 794 P.2d at 983–84.

**30.** Petitioner argues that the Colorado Supreme Court's conclusion that no evidence was introduced under the aggravating factor that would not otherwise have been admissi-

ble is meaningless since the jury was permitted to consider a multitude of improper, irrelevant, unconstitutional factors under the label of this aggravating factor. I agree with Respondent that this argument is unfounded since the jury was told that it could consider only statutory aggravation in the weighing stage of the sentencing scheme. *See* Section V(4)(C), *infra.* I must assume that the jury followed the instructions. *Francis v. Franklin,* ·471 U.S. 307, 324, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). To the extent that this is

in *Davis,* I believe that the valid aggravators powerfully outweigh the mitigating evidence. I thus conclude that the submission of the improper aggravator to the jury did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *See id.*[31]

For all of the above reasons, I find that Petitioner has failed to show a violation of, or unreasonable application of, clearly established federal law. Accordingly, Petitioner is not entitled to have his death sentence overturned on this ground.[32]

### C. *Whether The Trial Court's Instructions that the Jury Could Not Consider the Number of Mitigating or Aggravating Factors in Their Decision and that They Should Not "Weigh" Aggravating and Mitigating Factors Violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution*

Petitioner argues that the trial court erred in giving instructions 15 and 21 to the jury. He contends that these instructions improperly told the jurors that they could not consider or "weigh" the number of mitigating or aggravating factors in their decision in violation of the Due Pro-

cess and Cruel and Unusual Punishment Clauses of the Constitution. Accordingly, he argues that these instructions (i) forbade the jurors to consider the number of mitigating factors in their decision, (ii) told the jurors not to consider the mitigating factors as a sum, only individually, and (iii) distorted the jurors' decisions regarding the weighing of aggravating and mitigating circumstances.

In support of this argument, Petitioner relies on the Eighth Amendment's requirement that the sentencer in a death penalty case cannot be precluded from considering any reasons why a sentence less than death may be appropriate. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Further, Petitioner argues that these instructions violated the requirement that the jurors weigh aggravation and mitigation, citing *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). He asserts that the Colorado Supreme Court improperly dismissed this argument out of hand.

The pertinent part of Instruction 15 that Petitioner objects to is as follows:

directed to the closing argument, I address this in Section V(5)(A), *infra.*

**31.** *Tuggle v. Netherland,* 516 U.S. 10, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995), another case relied on by Petitioner, also does not support his argument. In *Tuggle,* the lower courts construed *Zant* to mean that in a state where the jury was not required to weigh the aggravating and mitigating circumstances, "a death sentence may be upheld on the basis of one valid aggravating circumstance, regardless of the reasons for which another aggravating factor may have been found to be invalid." *Id.* at 11, 116 S.Ct. 283. The Supreme Court found this interpretation to be invalid, stating, "[a]lthough our holding in Zant supports the conclusion that the invalidation of one aggravator does not necessarily require that a death sentence be set aside, that holding does not support the quite different proposition that the existence of a valid aggravator always excuses a constitutional error in the admission or exclusion of evidence." *Id.* at

14, 116 S.Ct. 283. In this case, the Colorado Supreme Court did not determine that the existence of the five other aggravating factors automatically meant that the death sentence could be upheld. Instead, it conducted the appropriate harmless error analysis under *Clemons.*

**32.** Petitioner raises for the first time in this Court a violation of the Ex Post Facto Clause of the United States Constitution. Since this argument was not raised below, it is not appropriate for consideration by this Court. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). Nonetheless, I find that, even examining the merits of this argument, it is without merit. The jury sentenced Petitioner to death under a statutory aggravating factor that was in existence at the time of his offense. *Clemons, Richmond* and *Walton* make clear that a state appellate court may later narrow the definition of the factor and determine whether the jury would have reached the same result.

The third step in your deliberations involves a weighing of the specified aggravating factor or factors against any and all mitigating factors. You may consider only those aggravating factors [sic] or factors found to exist beyond a reasonable doubt. You may assign any weight you wish to each aggravating or mitigating factor. *It is the weight assigned to each factor, and not the number of factors found to exist that is to be considered.* If one or more jurors finds sufficient mitigating factor or factors exist that outweigh a specified aggravating factor or factors, then the result is a sentence of life imprisonment. If and only if the jury finds that one or more specified aggravating factors outweigh the mitigating factors, the jury then should proceed to the fourth step.

ROA, v. 4 at 772 (emphasis added).

Petitioner also objects to Instruction number 21 which provided, in pertinent part:

In the third step of your deliberations you must weigh the aggravating factor or factors found to exist against any and all mitigating factors. *This is not a mere counting process in which aggravating factors are weighed against mitigating factors.* Rather, it is a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of the circumstances present.

*The number of factors found is not determinative. The jury may emphasize one factor more than another in a particular case.* You must consider the relative substantiality and persuasiveness of the existing aggravating and mitigating factors in making this determination.

Id. at 779 (emphasis added).

The Colorado Supreme Court did not agree with Petitioner's argument that the "instructions unconstitutionally foreclosed the jury from any consideration of the number of aggravating and mitigating fac-

tors". *Rodriguez IV,* 794 P.2d 965, 988 (Colo.1990). Instead, the court held that "[t]he instructions properly told the jury that the statutory weighing process did not involve *merely* a counting process" and that "the instructions were consistent with the statute and did not offend the federal or state constitutions." *Id.* (emphasis added).

■ I agree with the Colorado Supreme Court's analysis of this issue and do not find a violation of, or unreasonable application of, Supreme Court law. I find that the instructions did adequately advise the jury to weigh the aggravating and mitigating factors, and did not tell the jury to consider the mitigating factors individually, rather than as a sum. *See* ROA, v. 4, p. 772 (referring the jury to "a weighing of the specified aggravating factor or factors against *any and all* mitigating factors") (emphasis added); *id.* at 781 ("In the third step of your deliberations you must weigh the aggravating factor or factors ... against *any and all* mitigating factors") (emphasis added); *see also id.* at 781 (advising the jury that "[e]ach of you must also decide for yourself what weight to give each mitigating factor that you find exists").

Further, the instructions did not forbid the jury from considering the number of mitigating factors in its decision but stated only that "[t]he number of factors is not *determinative* " of the issue. *Id.* at 779 (emphasis added). This instruction simply forbade a mechanistic counting of the factors or comparison of the number of aggravating versus mitigating factors as the sole basis to reach a decision. Petitioner has not shown that this instruction is contrary to Supreme Court law, and it appears that this instruction was appropriate. *See People v. Brown,* 40 Cal.3d 512, 230 Cal.Rptr. 834, 726 P.2d 516, 531 (1985), *rev'd on other grounds,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (holding that if a statute required jurors to render a death verdict on the basis of some arithmetical formula, or if it forced them to

impose death on any basis other than their own moral judgment, it would not pass constitutional muster). Indeed, defense counsel obviously agreed that the death determination should not be made on the basis of a simple counting process since they tendered a separate instruction to the court to this effect. *See* ROA, v. 4, p. 712.[33]

■■■■ Finally, even if I were to assume that Petitioner is correct that the instructions given did not adequately provide standards for the jury in its consideration of the aggravating and mitigating factors, *Zant* held that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." 462 U.S. at 890, 103 S.Ct. 2733. In other words, a lack of standards for weighing the significance of the aggravating factors does not necessarily render a case constitutionally defective. *Id.* Plaintiff has not demonstrated to the Court that the instructions given herein violate or unreasonably apply *Zant* or any other Supreme Court law. Accordingly, I deny Petitioner relief on this ground.

**D. Whether The Due Process, Cruel and Unusual Punishment And Equal Protection Clauses Were Violated By The Trial Court's Refusal To Put A Burden of Proof On The Prosecution To Prove That Mitigating Factors Did Not Exist**

Petitioner argues that the trial court's refusal to require that the state prove that mitigating factors did not exist, and its refusal to give any of the Petitioner's instructions in this regard, denied him his constitutional rights. Further, he argues that the death statute violates his constitutional rights in that there is no burden of proof imposed as to mitigating factors.

Finally, he asserts that the death statute provides a vague and incomprehensible standard incapable of being effectuated by the jury, citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) and *Papachristou v. Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

First, I agree with Respondent that Petitioner has failed to specify where he raised this issue in the state court. Instead, Respondent only referred generally to these issues being the subject of a state court adjudication in *Rodriguez IV* and *Rodriguez V. See* Opening Brief at p. 159. However, I decline to find that these claims were forfeited since the court in *Rodriguez V* did address these issues, at least in part. *Rodriguez V*, 914 P.2d 230, 250, n. 12 (Colo.1996).

■■■■ Turning to the merits of this argument, I find that Petitioner is not entitled to relief. He has failed to cite any clearly established Supreme Court law that requires an instruction that the state prove a negative in connection with mitigating factors, *i.e.*, that mitigating factors do not exist. The cases relied on by Petitioner do not support his argument. *Papachristou* holds simply that a law must " 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute' " and must not "encourage arbitrary and erratic arrests and convictions." 405 U.S. at 162, 92 S.Ct. 839 (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). *Godfrey* holds that a capital sentencing scheme "may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner" and must "provide a 'meaningful basis for distinguishing the few cases in which the

---

**33.** This instruction (Instruction 25) provided in pertinent part, "In deciding whether the aggravating factor or factors outweigh the mitigating circumstance or circumstances, *you should not merely count up the number of aggravating factors and compare that to the number of mitigating circumstances. Also,*

*you should not merely assign values to the aggravating and mitigating factors and subtract one value from another. Your decision on life in prison or death should not be mechanical or mathematical." Id.* (emphasis added). This instruction was not given by the trial court.

[penalty] is imposed from the many cases in which it is not.'" 446 U.S. at 427–38, 100 S.Ct. 1759 (citing *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (quotation omitted)).

Further, there is no showing by Petitioner as to how the sentencing statute in place at the time of his sentencing, Colo. Rev.Stat. § 16–11–103(1) (1986), or the instructions actually violated any of the above requirements. Nor can he make such a showing because, as stated above, there is no requirement that the state be required to prove that mitigating factors do not exist. Instead, the Supreme Court holds that "the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Therefore, I agree with the Colorado Supreme Court that Petitioner has failed to show a violation of his constitutional rights. *See Rodriguez V*, 914 P.2d at 250 and n. 12.[34] He further failed to show that the state courts' decision in this regard was an unreasonable application of Supreme Court law.

### 4. *Jury Instructions*

### A. *Whether The Jury Was Misled Into Thinking Its Decision In Favor Of The Death Penalty Was Not Conclusive Or Binding On The Trial Court In Violation Of Caldwell v. Mississippi*

Petitioner argues that the jury instructions and statements made to the jury by the trial court and the prosecutors misled the jury as to the conclusive effect of their reaching a death sentence in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Peti-

tioner cites as an example Instruction 25, given to the jury, which stated: "You are instructed that for purposes of sentencing, Counts One and Two merge and *the Defendant will receive a life sentence.*" ROA, v. 4 at 784 (emphasis added). He asserts that this instruction must be read to mean that, regardless of what the jurors say should be the appropriate penalty, Petitioner would receive a life sentence from the court for the first two counts of first-degree murder.

He further argues that this is consistent with other instructions which had the effect of communicating to the jury that its verdict of death would be merely a recommendation to the judge. Petitioner cites Instruction 23 which states, "You must assume that the penalty of death will be carried out if imposed by the Court pursuant to the jury verdict." ROA, v. 4, p. 782. He argues that the court rejected his instruction which properly stated, "The penalty of death will be carried out if you impose it." ROA, v. 4 at 723. Thus, he argues that in the face of otherwise correct and unambiguous instructions, the trial court's instructions interjected such uncertainty and ambiguity into the jury's verdict as to violate the heightened reliability and certainty requirements imposed by the Cruel and Unusual and Due Process Clauses of the Constitution.

He argues this error was compounded by the trial court's preliminary instruction during jury selection which stated, in connection with the sentencing hearing to be conducted if the accused is found guilty of first-degree murder:

> At the conclusion of the hearing the jury will determine whether certain statutory, aggravating factors have been proven beyond a reasonable doubt, and also

---

**34.** Moreover, the Colorado Supreme Court held that the statute was constitutional under the Colorado Constitution. *See Rodriguez V*, 914 P.2d at 250 (citing *People v. Tenneson*, 788 P.2d 786 (Colo.1990) and *People v. Davis*, 794 P.2d 159 (Colo.1990), *cert. denied*, 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991)). It also held that, under state law, the

trial court properly instructed the jury regarding the fact that "a mitigating factor does not have to be proved by any burden of proof." *Id.* at n. 12. These findings under state law are not challenged herein and/or are not appropriate for resolution by this Court. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)

the jury will determine whether any mitigating circumstances exist. *Depending on the determination of the jury, the court will enter a sentence of life imprisonment or impose the death penalty.* ROA, v. 22 at 264 (emphasis added).[35] Finally, Petitioner argues that the verdict form continued the same erroneous theme, stating the jury could "sentence the Defendant ... to life in prison," or it could "find that death is the appropriate punishment." Absent from the verdict form was the statement, "We the jury, sentence the Defendant to death", tendered by Petitioner and rejected by the trial court. ROA, v. 4 at 744–45.

Petitioner argues that the result of these instructions was a communication to the jurors that they were supposed to act, not as individuals expressing their personal consciences, but as "representatives of the community", *i.e.*, their role was solely to send a message of community outrage to the trial court who would then determine punishment.[36] He further asserts that the prosecutors explicitly argued this during closing arguments and argued that the ultimate decision was up to the trial judge, citing ROA v. 35 at 168–69. Accordingly, Petitioner argues that the jurors may have thought that their verdict of death would not have any effect on the trial court's determination. If only one reasonable juror could have so interpreted the instructions, he asserts that the death sentence must be reversed under *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

*Mills* did not discuss the precise issue at hand, but discussed instructions which the petitioner argued indicated to the jurors that they could not find the existence of mitigating factors unless they could unanimously agree. This is discussed in Section V(4)(B), *infra*. However, *Mills* is perti-

nent as to its holding that "[t]he critical question ... is whether petitioner's interpretation of the sentencing process is one a reasonable juror could have drawn from the instructions given by the trial judge and from the verdict form employed in this case." *Mills*, 486 U.S. at 375–76, 108 S.Ct. 1860. In that regard, the court concluded:

there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

*Id.* at 384, 108 S.Ct. 1860.

Although *Mills* is applicable to the standard of review, the merits of Petitioner's argument turns on the applicability of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–29, 105 S.Ct. 2633. When comments are made to the jury in this regard, they " 'presen[t] an intolerable danger that the jury will in fact choose to minimize the importance of its role', a view that would be fundamentally incompatible with the Eighth Amendment requirement that the jury make an individualized decision that death is the appropriate punish-

---

**35.** Petitioner cites to v. 21; however, the correct cite is v. 22, p. 264.

**36.** Petitioner argues that this is reinforced by defense counsel's attempt to inform all of the prospective jurors that they were not to act as representatives of their neighborhoods or

community, which was successfully objected to by the state. ROA, v. 23, p. 29. Petitioner also cites to ROA, v. 14 at 51 and 185; v. 16 at 29; v. 17 at 56; v. 18 at 66; v. 19 at 103–04; and v. 20 at 76, as examples of alleged improper argument.

ment in a specific case." *Darden v. Wainwright,* 477 U.S. 168, 183 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (quoting *Caldwell,* 472 U.S. at 333, 105 S.Ct. 2633).

However, "*Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Id.* This is consistent with the Eighth's Amendment's requirement that since death is qualitatively different from all other punishments, it requires a " 'correspondingly greater degree of scrutiny of the capital sentencing determination.' " *Caldwell,* 472 U.S. at 329, 105 S.Ct. 2633 (quotation omitted).

Several factors were particularly relevant to the decision in *Caldwell.* First, the prosecutor had specifically urged the jury not to view itself as determining whether the accused would die, because the death sentence would be reviewed for correctness by the state supreme court. *See Caldwell,* 472 U.S. at 323, 105 S.Ct. 2633. Further, the trial court "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them; [the judge] stated to the jury that the remarks were proper and necessary, strongly implying that the prosecutor's portrayal of the jury's role was correct." *Id.* at 339, 105 S.Ct. 2633.

 In this case, at best, the challenged argument and instructions were ambiguous. Further, the trial court did not sanction any argument taking responsibility away from the jury for the final decision of life or death. I turn now to a specific examination of the instructions and arguments. Before doing so, I note that I must not judge the challenged instructions in "artificial isolation", but must consider them "in the context of the instructions as a whole and the trial record." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Further, I must keep in mind that " '[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire

record of the trial.' " *United States v. Park,* 421 U.S. 658, 674–75, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (quotation omitted). Finally, I must determine whether Petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions. *Mills,* 486 U.S. at 375–76, 108 S.Ct. 1860; *see also Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (holding that where an instruction is ambiguous, the court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence"). .

 I find that, as a whole and in context, I agree with the Colorado Supreme Court that the instructions did not violate *Caldwell* and did not mislead the jury into thinking that the judge, rather than the jury, was responsible for the sentencing decision. *Rodriguez IV,* 794 P.2d at 984–86. Further, the instructions did not mislead the jurors into thinking that they were acting only as representatives of the community.

Instruction 2 stated as follows:

Members of the jury, the evidence in the sentencing hearing has been completed and I will now instruct you on the law. *After these instructions and after closing arguments by counsel, it will then be **your** duty to decide whether Frank D. Rodriguez should be put to death or whether he should be sentenced to life imprisonment.*

ROA, v. 4 p. 758 (emphasis added). This instruction was emphatic in its use of the words "put to death". Further, the words of the use "duty" and "should" convey that this is a mandatory process for the jury rather than a discretionary process.

This instruction was reinforced by Instruction 12 which stated:

There is a presumption of life imprisonment in this case. Unless the prosecution proves beyond a reasonable doubt that the sentence should be death in-

stead of life, *you* must return a verdict of life in prison. This presumption of life imprisonment remains with [Petitioner] throughout these proceedings, unless the prosecution proves to *your* satisfaction beyond a reasonable death that [he] *should be put to death* instead of being sentenced to life in prison.

*Id.* at 768; v. 52 at 768 (emphasis added). Moreover, Instruction 13 told the jury that "*you* may sentence the Defendant to life in prison" if "*you* decide that no mitigating factor exists or that a mitigating factor or factors do not outweigh an aggravating factor found to exist." ROA, v. 4 at 769 (emphasis added).

Instruction 21 also reinforces that it is the jury's decision to impose life or death:

In the third step of your deliberations *you* must weigh the aggravating factor or factors found to exist against any and all mitigating factors. This is not a mere counting process in which aggravating factors are weighed against mitigating factors. Rather, it is a process in which *you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires imposition of the death penalty in light of the circumstances present.*

*Id.* at 779 (emphasis added). Further, it states that "[y]our deliberations during this step of the proceeding can lead to one of three results: either 'the jury shall enter a verdict of life imprisonment' or it 'shall determine if death is the appropriate punishment in this case.'" *Id.* at 779–80.

Finally, the verdict form in this case reinforced that it was the jury's decision to decide life or death, stating in pertinent part:

I.* We, the jury, sentence the Defendant, FRANK D. RODRIGUEZ, to life in prison.

. . . . .

II. We, the jury, find that there are insufficient mitigating factors to outweigh the aggravating factor or factors which have been proved by the prosecution beyond a reasonable doubt.

. . . . .

Having found that _____ aggravating factor(s) were proven beyond a reasonable doubt and based upon all the evidence presented, we further find that death is the appropriate punishment in this case beyond a reasonable doubt.

*Id.* at 753.[37]

I agree with Respondent that Instruction 23 and the preliminary statement by the Court merely implied to the jury that the Court would enter life or death "*pursuant to the jury verdict*" or "*[d]epending on the determination of the jury*", *i.e.*, the jury would make the final decision and the court would simply enforce this decision in a ministerial role. *See id.* at 782; v. 22, p. 264 (emphasis added).[38] In other words, I find that, when reading the instructions and verdict form in context, Petitioner's interpretation is not one a reasonable juror could have drawn. The instructions adequately advised the jury that it was their "awesome responsibility" to make the determination of life or death. *See Caldwell,* 472 U.S. at 330, 105 S.Ct. 2633. They were not misled as to their role in making the ultimate decision. Thus, I agree with the Colorado Supreme Court that neither *Caldwell* nor *Mills* was violated by the trial court's instructions to the jury.[39]

Further, I do not read the closing argument to change this result. The prosecutor argued in rebuttal as follows:

Thank you. Ladies and Gentlemen of the Jury: For two years now everything has been coming down to this moment of truth; *this moment when the citizens of this state take over.* You heard how many transcripts have been generated.

---

37. The jury obviously selected number II and found the existence of 6 aggravating factors.

38. Petitioner incorrectly referred to volume 21 of the record.

39. This finding is reinforced by the fact that defense counsel conceded that Instruction 23 was a correct statement of the law. ROA, v. 35, p. 85, ll. 17–18.

If counsel looked a little tired on both sides, it's obviously because we have been working, but ultimately it's up to the judge, and it's not up to the attorneys; *it's up to the citizens, the lay people who make that final decision in the case.*

ROA, v. 35, p. 168, II. 16–24. Although the language used may not have been as clear as it could have been, the argument reinforced that the jurors, as citizens of the state, make the ultimate decision. Again, when viewed in the context of the instructions and trial record as a whole, I find that the argument did not mislead the jurors as to their role in connection with making the determination as to death, and a reasonable jury could not have adopted Petitioner's interpretation.

In addition to the instructions, I agree with Respondent that statements of counsel reinforced, rather than diminished, the jury's sense of responsibility in making the ultimate determination of whether Petitioner would be put to death. Mr. Silverman argued for the prosecution: (I) "There are two options you have in terms of sentencing, life imprisonment or death.... Those are still your options; only two of them; life imprisonment or the death penalty. It's a difficult decision. I don't want to minimize it for you" (ROA, v.35, p. 113, II.8–22); (ii) "It is a difficult decision for you because you're the people who have to make the decision" (*id.* at 114, II. 10–12); (iii) "The defendant was undeterred by the death penalty because he thought no jury would ever give it to him. But the People submit that you are the jury. You are that jury that will declare that there are sentences worse than life in Canon City. You will declare to this defendant that Lorraine Martelli's life, this woman's life had value; she had value" (*id.* at 122 II. 23–25, 123, II. 1–3); (iv) "We think we have people, we think we have all people who can follow the law and impose the death penalty when it is appropriate as it is here" (*id.* at 124, II. 8–10); (v) "The People believe this jury has the collective guts to come back with a unanimous verdict; a verdict based on the facts you heard in this courtroom; a verdict for this man, the defendant, Frank Rodriguez.... Once you arrive at that verdict, ladies and gentlemen, you come back out here and you hold your heads up high and you tell everybody this defendant, that the State of Colorado has a law which provides for death.... You know, putting someone to death is certainly not a pleasant proposition" (*id.* at 124 II. 24–25, 125 II. 1–10); and (vi) "Let's close the book on Frank Rodriguez. Return a verdict of death" (*id.* at 126, II. 7–8).

Defense counsel also made it clear in closing that it was the jury's ultimate responsibility to impose life or death. Examples include the following: (I) Frank Rodriguez will die in prison. This has already been decided.... The only question is who will decide when he dies? "Will it be you or will it be God?" (*id.* at 127, II. 11–17); (ii) in distinguishing the penalty phase from the guilt phase, defense counsel stated, "[N]ow the question before you is totally different .... [m]ust this man die in the gas chamber in Canon City...." (*id.* at 129, II. 21–22); (iii) "Now our society insists a person not be killed unless twelve members of this community are unanimously very, very certain of the heavy presumption we have always had in our society in favor of life has been overcome. It is your task to determine whether this case is one in which we can say with unshakable confidence that this man must die" (*id.* at 130, II. 8–13); and (iv) references by the defense counsel as to why the prosecutor wanted "*you* [the jury] to kill Frank Rodriguez" (*see id.* at 155, II. 14–25, 156 II. 1–11; 158, II. 4–12, 159, II. 19–21) (emphasis added).

Finally, defense counsel cogently pointed out the jury's responsibility in deciding life or death as follows:

The prosecutor wants you to kill Frank Rodriguez on the testimony of Patricia Thomas and Judy Archuleta, among other things. You heard their testimony. Is there testimony proof beyond a reasonable doubt that he should die? Do

you want to base a death statement on the testimony of Patricia Thomas and Judy Archuleta?

Obviously, in making a decision of this magnitude, you want to be very certain you are correct in doing the right thing. It doesn't matter [if] none of your fellow jurors agree with you. You can have eleven jurors coming out the other way, but if you believe the death sentence is wrong, you have a responsibility to stick to your guns and insist on a sentence of life imprisonment.

This is your responsibility as a juror. You owe it to this court, and you owe it to Frank Rodriguez. There is no way you can avoid the responsibility of voting to take the life of another human being and place it on your fellow jurors. It has to be your decision. Frank Rodriguez is entitled to twelve separate verdicts. Remember, there is no way under the law that he can be executed; that he can be eliminated unless you and each of you agree to kill him; remember that.

*Id.* at 159. II. 19–25, 160, II. 1–15.[40]

In conclusion, I find that Petitioner has failed to show a violation of *Caldwell, Mills,* or other clearly established federal law as determined by the Supreme Court. *See also Dutton v. Brown,* 812 F.2d 593, 596–97 (10th Cir.), *cert. denied,* 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987) (en banc) (holding *Caldwell* not violated where prosecutor told jurors that they were "part of the process" and were "not functioning as individuals"). Further, Petitioner has failed to show that the state courts' decisions were an unreasonable application of clearly established law, or that the adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence. Accordingly, I deny Petitioner relief on this ground.

## B. *Whether The Jury Instructions Given By The Trial Court Violated The Eighth Amendment To The United States Constitution As Interpreted In Mills v. Maryland and McCoy v. North Carolina*

Petitioner argues that the instructions given to the jury regarding mitigating factors violated *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) in that they precluded jurors from considering any mitigating factors that were not unanimously found. He relies on Instruction 15 which tells the jury that "[t]he second step in [their] deliberations is to decide whether any mitigating factors have been shown to exist" ... and that the court "will now instruct [them] in great detail regarding the steps you must follow in [their] deliberations." ROA, v. 4, pp. 771–772. The mitigating factors are listed in Instruction 20. *See id.* at 778.

Petitioner further relies on Instruction 21 as the critical instruction which details how the jury is to determine what mitigating factors exist. It states:

> If in the first two steps of your deliberations you have made unanimous findings that the prosecution has proven beyond a reasonable doubt that one or more aggravating factors exist and that no mitigating factors exist, *or that a mitigating factor or factors exist,* you must now decide whether the prosecution has proven that any factors in mitigation do

**40.** Finally, I note that throughout the voir dire process the prosecutors also reinforced the fact that the jury had the responsibility for deciding whether life or death was appropriate. *See,* for example, ROA, v. 16, pp. 28–29 ("should we reach the point where the defendant has been convicted of First Degree Murder and *you're called upon to consider whether*

*death or a life sentence is appropriate,* would you follow the law at that point as well?") (emphasis added); ROA, v. 19, p. 102 ("I think the judge would tell you, and I think counsel would agree that you are to presume that if you return a death sentence, that it will be carried out").

not outweigh the aggravating factor or factors.

*Id.* at 779 (emphasis added).

Petitioner argues that Instruction 21 clearly instructed the jury that unanimity was required in the determination of what, if any, mitigating factors existed. He states that for Instruction 21 to be constitutional it must have allowed the jurors to consider any mitigating factors that they, as individuals, found to exist. Petitioner further argues that the Colorado Supreme Court's attempt to cure this defect by referring to the jury instructions as a whole is clearly erroneous when the instructions are examined in context and measured against the constitutional requirement of *Mills. See Rodriguez IV,* 794 P.2d 965, 980–82 (Colo.1990). He asserts that nowhere in the instructions are the jurors told that they do not have to unanimously find mitigating factors, and Instruction 21 is the only instruction that indicates whether mitigating factors are unanimous or non-unanimous. Thus, Petitioner argues that it must be assumed that the jurors followed Instruction 21, citing *McKoy,* 494 U.S. at 454, 110 S.Ct. 1227. Finally, Petitioner argues that there is a "reasonable likelihood" that the jury applied Instruction 21 in a way that prevented consideration of constitutionally relevant evidence in violation of *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).[41]

I agree with Petitioner that I must apply clearly established Supreme Court law, *i.e., Mills* and *McKoy,* in determining this issue. As referenced in the previous section, *Mills* is a seminal case on this issue. *Mills* addressed two hypotheticals that were raised by the petitioner's argument therein that the instructions and verdict form required unanimity in connection with the mitigating factors: (1) the petitioner argued that if 11 jurors agreed that there were six mitigating circumstances, the result would be that no mitigating circumstance is found since the decision was not unanimous; consequently, there would be nothing to weigh against the aggravating factors and the judgment would be death even though 11 of the jurors think the death penalty wholly inappropriate; and (2) the dissenting opinion in the state court argued that in a situation where 12 jurors agreed that some mitigating circumstances were present and that they were significant enough to outweigh any aggravating circumstance, unless all 12 could agree that the same mitigating circumstance was present, they would not be permitted to engage in the weighing process or any deliberation on the appropriateness of the death penalty. 486 U.S. at 373–74, 108 S.Ct. 1860.

The Supreme Court found in respect to these hypotheticals that "it would certainly be the height of arbitrariness to allow or require the imposition of the death penalty under the circumstances so postulated." *Id.* at 374, 108 S.Ct. 1860. This is because in a capital case, " 'the sentencer [may] not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Id.* (quotation omitted). Further, "the sentencer may not refuse to consider or be precluded from considering any 'relevant mitigating evidence.' " *Id.* at 374–75, 108 S.Ct. 1860 (quotation omitted).

Further, the Supreme Court also set the standard for determining whether instructions violate the Eighth Amendment's requirement that the jury be allowed to consider all mitigating evidence. This is "whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given by the trial court and from the verdict form employed in th[e] case." *Id.* at 375–76, 108 S.Ct. 1860. Unless the court "can rule out the substantial possibil-

---

**41.** Petitioner also argues that the Colorado Supreme Court's reliance on *People v. Davis,* 794 P.2d 159 (Colo.1990) and *Davis v. Zavaras,* 100 F.3d 750 (10th Cir.1996), wherein similar instructions were upheld, was unreasonable because these cases did not address *Mills* or *McKoy.*

ity that the jury may have rested its verdict on the 'improper' ground, the court must remand for resentencing." *Id.* at 377, 108 S.Ct. 1860. Analyzing the instructions in *Mills,* the Court concluded that there was "a substantial probability that reasonable jurors ... may well have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384, 108 S.Ct. 1860.[42] Later, in *McKoy,* the Supreme Court relied on *Mills* in striking down instructions and a verdict form issued in accordance with North Carolina's sentencing scheme which expressly limited the jury's consideration to mitigating circumstances unanimously found. 494 U.S. at 444, 110 S.Ct. 1227.

 Thus, under the above analysis, I must examine whether Petitioner's interpretation is one a reasonable juror could have drawn from the instructions given by the trial court. In making this determination, as stated earlier, I must consider the instruction "in the context of the instructions as a whole and the trial record." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). I find that the Colorado Supreme Court's determination that a reasonable juror would not have interpreted the instructions to require unanimity in connection with mitigating factors is reasonable and not in violation of *Mills* or *McKoy.*

As the Colorado Supreme Court noted, there is no affirmative requirement like in *McKoy* that required unanimity in connection with mitigating factors. *Rodriguez IV,* 794 P.2d at 980–81. Not even Instruction 21 requires agreement by all 12 jurors before any mitigation can be considered by an individual juror. I agree with Respondent that the first paragraph of that in-

struction, the portion that Petitioner claims violates *Mills* and *McKoy,* does not state that the jury has to unanimously find a mitigating factor. Instead, it asks the jury to consider whether the prosecution has *proved* the existence of one or more aggravating factors and the existence or nonexistence of mitigating factors and if so, to now decide whether such mitigating factor(s) outweigh the aggravating factor(s). ROA, v. 4, p. 779 (emphasis added). Further, the instruction allows the jury to unanimously find that mitigators exist but does not require them to do so before beginning the weighing process. I find that this does not violate *Mills* and *McKoy.* There is no clearly established federal law that prohibits a jury from unanimously declaring that a particular mitigator exists, so long as unanimity is not required. If anything, as Respondent points out, such a unanimous declaration might add more weight to the mitigator when balanced against the aggravators.

Moreover, regardless of any ambiguity in this language, there is no unanimity requirement in connection with the balancing of "any factors" in mitigation against aggravation. The instruction made it clear in regard to the balancing process that the jury did not have to be unanimous in their decision as to whether mitigating factor(s) outweigh aggravating factor(s). In that regard, the instruction stated that if one or more of the jurors, *or* all of the jurors, believed that the mitigating factors outweighed the aggravating factors, the verdict would be life. *See* ROA, v. 4, pp. 779–80 (emphasis added). Conversely, the instruction made it clear that for death to be the appropriate punishment, the jurors had to unanimously agree that there are no mitigating factors or that the mitigating factor(s) did not outweigh the aggravating factors.[43] The requirement of unanimity

---

**42.** The court noted in connection with its decision that "the trial judge stressed '[o]ver and over again' ... that the jury's findings had to be unanimous" and that "not once in any of those instructions did the trial court explain to the jury" that the findings regarding mitigating factors did not have to be

unanimous. *Id.* at 378 n. 11, 108 S.Ct. 1860; *see also* p. 379.

**43.** The instruction states as follows in that regard:

In the third step of your deliberations you must weigh the aggravating factor or fac-

as to the absence of any mitigating factor tends to ensure that any mitigator found to exist by even one juror would be weighed against aggravators.

In addition to this instruction, a number of other instructions dispel any lingering doubt as to whether the jury was advised that they did not have to unanimously find mitigating factors. Instruction 11 states:

A mitigating factor does not have to be proved by any burden of proof. You must find that a mitigating factor exists if there is any evidence to support it.

ROA, v. 4 at 767. Instruction 15 clearly subjects aggravators to a unanimity requirement. *Id.* at 771 ("If and only if all jurors agree that one or more specified aggravating factors have been proven beyond a reasonable doubt, then you should proceed to the second step in your deliberations"). This is contrasted to the portion of Instruction 15 dealing with mitigating factors, which does not have any language requiring unanimity. *Id.* at 771–72. Further, Instruction 15 goes on to state in connection with the weighing process, "[i]f *one* or more jurors finds that sufficient mitigating factor or factors exist that outweigh a specified aggravating factor or factors, then the result is a sentence of life imprisonment." *Id.* at 772 (emphasis added).

Finally, and I think most importantly, Instruction 22 states as follows:

tors found to exist against any and all mitigating factors. This is not a mere counting process in which aggravating factors are weighed against mitigating factors. Rather, it is a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of the circumstances present.
The number of factors found is not determinative. *The jury may emphasize one factor more than another in a particular case. You must consider the relative substantiality and persuasiveness of the existing aggravating and mitigating factors in making this determination.*
Your deliberations during this stage of the proceeding can lead to one of three results:

*Each of you* must also decide for yourself what weight to give each mitigating .circumstance that you find exists. Your decision as to what weight to give any mitigating circumstance does not have to be unanimous. You do not have to take the decisions, opinions or feelings of any other juror into account although you may do so if you wish.

*Id.* at 781 (emphasis added). As Respondent recognizes, this last instruction was addressed to each individual juror, not the jury as a whole.

Petitioner argues that Instructions 15 and 22 do not cure the alleged defect in connection with Instruction 21 because they addressed only the weight of the mitigating factor(s), not the existence of same. I disagree, particularly in connection with Instruction 22. I find that a reasonable juror reading this instruction, in context with the instructions discussed above, would find that each individual juror was allowed to decide both the existence of the mitigating circumstance as well as the weight to give it; in other words, that these decisions did not have to be unanimous.

This is reinforced by defense counsel's closing argument wherein he made it clear that mitigation did not have to be decided unanimously. *See Rodriguez IV*, 794 P.2d at 982 n. 13. Specifically, defense counsel said:

1. *If one or more of the jurors believe that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury shall enter a verdict of life imprisonment.*
2. *If all jurors unanimously agree that a mitigating factor or factors outweigh the aggravating factor of factors found to exist, then the jury shall enter a verdict of life imprisonment.*
3. If all jurors unanimously agree that there are no mitigating factors or there are not sufficient mitigating factors that outweigh the aggravating factor or factors found to exist, then the jury shall determine if death is the appropriate punishment in this case.

ROA, v. 4, p. 779–80; v. 52 at 779–780 (emphasis added).

You have to decide whether or not the mitigating factor as to the punishment the other people received in this case, how much those are worth in comparison to these aggravating factors, and if you don't like the factors the court has given to you, if you think there are other factors that you think justify a life sentence, then you can rely upon those factors. *Each and everyone of you individually can rely on any factor you wish to return a life sentence. You don't have to be unanimous on those factors.*

*Id.; see also* ROA, v. 35, p. 140, II. 12–21 (emphasis added).

I find that this argument, combined with the above instructions as a whole and in context, adequately informed the jury that it did not have to unanimously find the existence of a mitigating factor. Accordingly, a reasonable juror would not interpret the instructions in accordance with Petitioner's argument. *See United States v. Park,* 421 U.S. 658, 675 and n. 16, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (citing the closing argument of counsel as support for the court's decision that the jury could not have failed to be aware of what its duties were, and that the instructions were not misleading and adequately complied with the law).[44]

Accordingly, I find that the Colorado Supreme Court's decision that the jury instructions did not violate *Mills* and *McKoy* is reasonable. I further find that Petitioner has failed to establish a violation or unreasonable application of clearly established Supreme Court law. Thus, Petitioner is not entitled to relief on this ground.

## C. *Whether the Trial Court's Instructions to the Jury at the Penalty Phase of the Trial Failed to Place Constitutionally Required Restrictions Upon the Jury's Consideration in Violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution*

Petitioner next argues that the trial court failed to instruct the jury that its decision whether to return a verdict of life or death should be based solely upon the statutory considerations listed in Colo.Rev. Stat. § 16–11–103(2), *i.e.,* the statutory aggravating factors and any mitigating factors. Further, he argues that the trial court improperly instructed the jury that the jury's life or death decision was in its "discretion" (citing Instruction 14, ROA v. 4, p. 772), and that it gave no guidance or limitations on what factors the jury should consider. *See* Instruction 21 (allegedly stating as guidance only that "...., then the jury shall determine if death is the appropriate punishment in this case" (*id.* at 779–80)). He also argues that the verdict form was patently inconsistent with the statutory scheme. Thus, he contends that the jury was allowed to consider arbitrary, unfair and irrelevant matters rather than makings its decision on statutory criteria in violation of the Constitution and *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).[45]

Petitioner argues that even under statutory schemes which, unlike Colorado's, allow considerable jury discretion once a statutory aggravating factor has been found, the jury cannot simply be "turned loose", with no constraints, to decide whether a person lives or dies, citing *May-*

44. Finally, although not dispositive of my decision, I note that defense counsel raised no specific objection to Instruction 21 being given. *See* ROA, v. 35, pp. 60–98.

45. Petitioner also cites to violations of state law cases, the state statute, and the Colorado standard jury instructions. However, as stated earlier, a federal court conducting habeas review is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The fact that a jury instruction is alleged to be incorrect under state law is not a basis for federal habeas relief. *Id.* Accordingly, state law arguments will not be considered.

*nard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Examples of improper factors that were considered according to Petitioner include "bias, prejudice, public opinion, sympathy, speculative future dangerousness, terrorism, cost, the amiableness of the death penalty, proportionality", the race of Petitioner and the victim, Petitioner's expressions of racial prejudice, Petitioner's personal appearance, his simultaneous romantic relationships with at least two unmarried mothers, and "innumerable other irrelevant, unconstitutional factors." Opening Brief, p. 84–89 Thus, I must determine whether the Constitution was violated through consideration of these alleged improper factors.[46]

Turning to the merits, the Supreme Court in *Zant* characterized *Furman* as holding " 'that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' " *Zant v. Stephens,* 462 U.S. 862, 874, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (quotation omitted). *Zant* recognized that the statutory aggravators must satisfy constitutional standards, "[f]or a system 'could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur.' " *Id.* at 876–77, 103 S.Ct. 2733. "To avoid this constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must rea-

sonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 877, 103 S.Ct. 2733. Further, the jury "must find and identify at least one statutory aggravating factor before it may impose a penalty of death." *Gregg v. Georgia,* 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

This is because " '[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.' " *Zant,* 462 U.S. at 885, 103 S.Ct. 2733 (quotation omitted). The Supreme Court concluded that "although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." *Id.* A colorable claim of error is a decision based on "mere 'caprice' " or on " 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process.' " *Johnson v. Mississippi,* 486 U.S. 578, 585, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (quoting *Zant,* 462 U.S. at 884–85, 103 S.Ct. 2733).

In the case at hand, Petitioner does not attack the statutory aggravating factors as invalid because they are "constitutionally impermissible" or "totally irrelevant" (other than the "especially heinous, cruel or depraved" factor discussed in Section V(3)(B), *supra* ). *See Zant,* 462 U.S. at 885, 103 S.Ct. 2733. If the statutory aggravating factors were invalid for those reasons, they may be invalid under the Due Process Clause. *Id.* Nor does he attack as unconstitutional the state statutory scheme in general.[47] Instead, he at-

---

**46.** Many of these factors are addressed elsewhere in this Memorandum Opinion and Order and will not be readdressed here. For example, as to the argument that the jury was improperly allowed to consider the "especially heinous, atrocious or cruel" aggravating factor in violation of *Maynard,* I address this issue in Section V(3)(B), *supra.* As to the argument that the jury was improperly allowed to consider sympathy for the victim, and to consider bias, prejudice and public opinion, see the subsequent section. As to the

argument about future dangerousness, see Section V(5)(A), *infra.*

**47.** The statute was attacked as unconstitutional in the state court, and the Colorado Supreme Court upheld the statute's constitutionality. *Rodriguez V,* 914 P.2d 230, 250 (Colo. 1996). This decision is not subject to review in this Court. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

tacks the instructions that gave the jurors "discretion" in imposing death, and the fact that the jurors were allegedly allowed to consider factors in addition to the statutory factors, in violation of the statute.

I agree with the Colorado Supreme Court that the instructions, in context and as a whole, adequately informed the jurors of their duties and, in fact, essentially tracked the statutory language. *Rodriguez IV*, 794 P.2d 965, 986–87 (Colo.1990). In that regard, the statute in effect at that time stated:

(2)(a) After hearing all the evidence and arguments of the prosecuting attorney and the defendant, the jury shall deliberate and render a verdict based upon the following considerations:

(I) Whether at least one aggravating factor has been proved as enumerated in subsection (6) of this section;

(II) Whether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist; and

(III) Based on the considerations in subparagraphs (I) and (II) of this paragraph (a), whether the defendant should be sentenced to death or life imprisonment.

Colo.Rev.Stat. § 16–11–103(2)(a) (1984).

Comparing this statute to the instructions, I make these observations. In connection with § 16–11–103(2)(a)(*l*), Instruction 15 stated, "The first step in your deliberations is to decide whether the prosecution has proven the existence of at least one specified aggravating factor beyond a reasonable doubt." ROA, v. 4, p. 771. Instruction 16 then lays out the statutory aggravating factors and makes clear that "[n]o other circumstances are sufficiently aggravating to support consideration of the death penalty in Colorado." *Id.* at 773. It further states that "no other aggravating circumstances shall be considered by you at any time during your deliberations." *Id.* This instruction essentially tracks the statutory language.

Next, with respect to § 16–11–103(2)(a)(II) and (III), Instruction 15 states that "the second step in your delib-

erations is to decide whether any mitigating factors have been shown to exist." *Id.* at 771. The mitigating factors are listed in Instruction 20. *Id.* at 778. Instruction 15 then requires in the third step, as does the statute, "a weighing of the specified aggravating factor or factors against any and all mitigating factors" to determine if the one or more aggravating factors outweigh the mitigating factors. *Id.* at 772. Finally, Instruction 15 then instructs the jury that "[i]f and only if the jury finds that one or more specified aggravating factors [the statutory factors] outweigh the mitigating factors, the jury then should proceed to the fourth step", *i.e.*, to consider whether the petitioner should be sentenced to death or life imprisonment. *Id.* Again, this is consistent with the statute. The verdict form, read in context with the other instructions, is also generally consistent with the statute. *Id.* at 753.

As Respondent points out, Instruction 15, combined with the other instructions, provided elaborate and step-by-step guidance for the jury's deliberative process in making its sentencing decision. The jury only reached the fourth and final step of deliberations after all constitutional requirements for channeling its discretion were satisfied and Petitioner was found eligible for, and deserving of, a death sentence as a result of steps 1 (finding the existence of at least one statutory aggravating factor), 2 (asking the jury to consider all mitigating factors) and 3 (weighing the statutory aggravating factors against the mitigating factors).

 Next, I address the heart of Petitioner's argument, that the instructions, specifically Instruction 15 and 22, allowed the jury to improperly consider other aggravating factors that were not imposed by statute, and that the jury was not given any guidance as to the meaning of these instructions. In this regard, I first disagree that the instructions, taken as a whole, omitted to tell the jury that its decision of life or death must be based solely on the statutory aggravating factors.

Instruction 16 explicitly told the jury what the statutory aggravating factors were and that "[n]o other circumstances [other than the statutory aggravating factors] [we]re sufficiently aggravating to support consideration of the death penalty in Colorado." ROA, v. 4, p. 773. More importantly, the jury was instructed that "no other aggravating circumstances shall be considered by you at any time during your deliberations." *Id.*

Further, I find the use of the phrase "sole discretion" is not error since under Colorado law at the time of the sentencing, it was the exclusive province of the jury, not the judge, to make the decision as to whether death was appropriate. *People v. Drake,* 748 P.2d 1237, 1254 (Colo.1988) (en banc); *see also McCleskey v. Kemp,* 481 U.S. 279, 313 n. 37, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (holding that if capital punishers are to be treated as "uniquely individual human beings," then discretion to evaluate and weigh the circumstances relevant to the particular petitioner and the crime committed is essential).[48] Thus, I find no violation of any clearly established federal law.

▮ Second, I agree with the Colorado Supreme Court that, even assuming the instructions can be read to allow the jury to consider aggravating circumstances outside of the statutory factors, there is no constitutional infirmity or violation of Supreme Court law. *See Rodriguez IV,* 794 P.2d at 986. It is clear under *Zant* that

"statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant,* 462 U.S. at 878, 103 S.Ct. 2733. However, once that class is narrowed and the defendant is found by the jury to be a member of the class made eligible for the death penalty by statute, "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death." *Id.*[49]

This is because "[w]hat is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 879, 103 S.Ct. 2733. Indeed, most of the factors that Petitioner complains of, such as the issue of race, Petitioner's expressions of racial prejudice, his personal appearance, his simultaneous romantic relationships with at least two unmarried mothers gang membership, etc... are simply background or character evidence which may properly be considered by the jury. *See Barclay v. Florida,* 463 U.S. 939, 956, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); *Zant,* 462 U.S. at 879, 103 S.Ct. 2733.

In essence, Petitioner makes the same argument urged in *Zant,* that "the mandate of *Furman* [wa]s violated by a scheme that permits the jury to exercise unbridled

---

**48.** As Respondent points out, this "discretion" language essentially corresponded with instructions tendered by the Petitioner but refused by the Court. These included Proposed Instruction numbers 2 ("[e]ach of you now must express your own personal conscience and each of you must make a moral assessment on the ultimate question of life in prison or death"), 3 ("[whether the death penalty should be imposed] is a decision that is left to you as a jury"), 5 ("Each of you must make your own, individual moral assessment whether Mr. Rodriguez shall be sentenced to life in prison or to death"), 24(a)–(c) ("The ultimate decision must be your own"). ROA, v. 52, p. 686–87, 690, 709–11.

**49.** *See also California v. Ramos,* 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)

("[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury is then free to consider a myriad of factors to determine whether or not death is the appropriate punishment"); *Gregg v. Georgia,* 428 U.S. 153, 203–04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (finding that the Georgia court wisely chose not to impose unnecessary restrictions on the evidence that can be offered in a presentence hearing, and approving "open and far-reaching argument" so long as a defendant is not prejudiced, since "[w]e think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision").

discretion in determining whether the death penalty should be imposed after it is has found that the defendant is a member of the class made eligible for that penalty by statute." 462 U.S. at 875, 103 S.Ct. 2733. The Supreme Court rejected this argument, holding that it could not accept the argument without overruling the holding in *Gregg. Id.*

In any event, there is simply no showing by Petitioner that the jury actually considered those factors which he complains of in connection with its finding of aggravating factors or that Petitioner was prejudiced thereby. Accordingly, I find that Petitioner has failed to show the violation of, or unreasonable application of, Supreme Court law. I thus deny Petitioner relief on this ground.

### D. *Whether The Trial Court's Failure To Instruct The Jury As Requested By Petitioner Concerning Sympathy And Complicity Violated his Rights Under The Fifth, Sixth, Eighth, and Fourteenth Amendments To The Constitution*

In this section, Petitioner objects to the trial court's refusal to tender instructions both on complicity (Petitioner's tendered Instruction 35) and sympathy. I address the complicity argument first. The complicity instruction tendered by defense counsel in the penalty phase and refused by the Court stated:

> In the first part of this trial, you were instructed in the principle of complicity, by which a person may be criminally liable for the actions of another. You are instructed that this principle does not apply in the penalty phase of this trial.

ROA v. 4 at 726.

Petitioner asserts that this instruction should have been given pursuant to *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) and *Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). This is because the "personal responsibility and moral guilt" of the accused are the key elements upon

which the jury must make its decision in the penalty phase. *Enmund,* 458 U.S. at 801, 102 S.Ct. 3368. In other words, Petitioner argues that "a jury must make an individualized determination of whether the defendant in question should be executed, based on the character of the individual and the circumstances of the crime," citing *Zant,* 462 U.S. at 879, 103 S.Ct. 2733 and *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Petitioner concludes that it must be assumed that the jurors relied upon the State's complicity theory in finding Petitioner guilty of first-degree murder and that, therefore, Petitioner bore full responsibility for the actions of Chris Rodriguez, David Martinez and Patricia Thomas. Further, Petitioner argues that it is inconceivable that the jurors, on their own in the penalty phase, disregarded the complicity principles. *See Rodriguez IV,* 794 P.2d 965, 989 (Colo.1990). Indeed, Petitioner asserts that the risk that the jurors applied complicity principles in the penalty phase is so great as to amount to near certainty, thus requiring that the death sentence be vacated. Further, Petitioner argues that the Colorado Supreme Court tacitly admitted that the jury carried forward the instructions from one phase to another in holding that the sympathy instruction did not need to be tendered when "[t]he jury was instructed in the guilt phase not to let prejudice influence their decision." *Rodriguez IV,* 794 P.2d at 989.

■ Regarding the merits of this argument, I agree with Petitioner that the Eighth Amendment prohibits punishments which are disproportionate to the offenses charged. As the Supreme Court noted in *Enmund,* "[t]he Cruel and Unusual Punishments Clause of the Eighth Amendment is directed, in part, 'against all punishments which by their excessive length or severity are greatly disproportionate to the offenses charged.'" *Enmund,* 458 U.S. at 788, 102 S.Ct. 3368 (quoting *Weems v. United States,* 217 U.S. 349, 371, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). In the sentenc-

ing, the "focus must be on [petitioner's] culpability . . . for [the court] insist[s] on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Id.* at 798, 102 S.Ct. 3368 (quoting *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

Here, however, I find that there is no violation of the Eighth Amendment. First, *Tison* and *Enmund* do not support Petitioner's argument that his anti-complicity instruction should have been given. *Enmund* held that the Eighth Amendment prohibited the death penalty for a person who did not commit a killing and who had no intention of committing a killing. *Enmund,* 458 U.S. at 798, 800, 102 S.Ct. 3368. *Tison* held that the Eighth Amendment does not prohibit the death penalty in the case of a defendant who may not have intended to kill, but whose participation is major and whose mental state is one of reckless indifference. *Tison,* 481 U.S. at 158, 107 S.Ct. 1676. These cases do not require that anti-complicity instructions be given in the penalty phase, nor do they ban complicity principles from being considered. Instead, as Respondent points out, they support the principle that the death penalty can be applied to a person who either intended to kill or who had a major role in the crime and showed reckless indifference.

In the case at hand, the jury found, beyond a reasonable doubt, that the Petitioner himself killed Martelli and that he acted intentionally. *See Rodriguez IV,* 794 P.2d at 989–90 (citing the special verdict form on aggravating factors wherein the jury concluded that "[t]he defendant intentionally killed a person kidnapped or being held as a hostage by him.") ROA, v. 52, p. 746.[50] This instruction was fully supported by the evidence at trial which showed that

Petitioner personally killed the victim. *Rodriguez IV,* 794 P.2d at 969–70. Thus, there was no error in giving the instruction, or at most, harmless error as the Colorado Supreme Court recognized. *Id.*

Further, as the Colorado Supreme Court noted, there was no suggestion in the sentencing phase instructions that Petitioner's individual culpability could depend on complicity principles, and the jury was explicitly instructed that their "decision must be made by applying the rules of law which I give you to the evidence presented" from the sentencing phase. *See id.;* ROA, v. 4, 756–58. Thus, I agree with the Colorado Supreme Court that it is not reasonable to conclude from the record that the jury carried the complicity instruction through to the sentencing phase. *Rodriguez IV,* 794 P.2d at 989. Although Petitioner argues that it must be "assumed" that the jury relied on complicity, Petitioner's assertions do not support this assumption, and it is unsupported by the record.

As to the sympathy argument, Petitioner asserts that the refusal to give a sympathy instruction constituted error because sympathy, bias, prejudice and publicity were so prevalent in the prosecution of Petitioner as to amount to a violation of the Due Process Clause of the Fourteenth Amendment, citing *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, Petitioner has neither stated what type of sympathy instruction should have been given nor has Petitioner cited to an instruction that his counsel tendered in this regard to the trial court. I therefore assume that the instruction he claims should have been given is the one discussed by the Colorado Supreme

---

**50.** Instruction No. 27 given to the jury stated, in pertinent part:

A crime is committed when *the defendant has committed a voluntary act* prohibited by law [accompanied] by a culpable mental state. Voluntary act means an act performed consciously as a result of effort or

determination. Culpable mental state means "with intent" and "knowingly". . . . A person acts "intentionally" or "with intent" when *his* conscious objective is to cause the specific result proscribed by the statute defining the offense. . . .
ROA, v. 4, p. 786 (emphasis added); *see also Rodriguez IV,* 794 P.2d at 989.

Court in *Rodriguez IV,* 794 P.2d at 987–88; *see also* ROA, v. 4, p. 704.

I find that Petitioner has failed to cite any clearly established federal law that required such an instruction to be given. In fact, as recognized by the Colorado Supreme Court, it might have been error in the penalty phase for the trial court to instruct the jury not to be influenced against the defendant by sympathy for the victim. *See Rodriguez IV,* 794 P.2d at 973–74, 988. This results because the jury may consider evidence about the victim and the emotional impact of the murder on her family. *Payne,* 501 U.S. at 827, 111 S.Ct. 2597. In any event, there is simply no constitutional right under Supreme Court law for the jury to be directed to be unsympathetic and ignore the emotional trauma suffered by the victim.

As to the remainder of the instruction, I agree with the Colorado Supreme Court that the portion of the instruction that requested the jury be told that they may be influenced by mercy, sentiment and sympathy in the sentencing phase was adequately given in connection with other instructions. *See Rodriguez IV,* 794 P.2d at 987 (citing Instruction 26 which stated, " '[m]itigating circumstances' are circumstances which do not constitute a justification or excuse for the offense in question, but which *in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability* ") (emphasis added); *see also* ROA, v. 4 at p. 785. Further, as the Colorado Supreme Court noted, the United States Supreme Court approved an instruction in *Boyde v. California* as constitutionally adequate that was much less explicit or favorable to the defendant. *Rodriguez IV,* 794 P.2d at 987 (citing *Boyde,* 494 U.S. 370, 373, 381–84, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

As to the portion of the sympathy instruction that stated "You must not be influenced by prejudice, bias or public opinion against Mr. Rodriguez", Petitioner has cited no clearly established federal law that requires that such an instruction be given or, conversely, that the failure to give this instruction violates the law. Further, under Colorado law the giving of a cautionary or admonitory instruction such as this is generally held to be within the discretion of the trial court. *See Rodriguez IV,* 794 P.2d at 987; *Young v. People,* 180 Colo. 62, 502 P.2d 81, 82–83 (1972). Petitioner has failed to show any prejudice that arose as a result of the failure to give this instruction.

Finally, in regard to the sympathy instruction, Petitioner argues that the Due Process Clause was violated because "[s]ympathy, bias, prejudice and publicity were so prevalent in [his] prosecution," citing *Payne.* However, *Payne* held that the Due Process Clause is only implicated where "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Petitioner fails in any regard to show what evidence was admitted that was prejudicial, let alone how such evidence rendered the trial unfair.

Accordingly, I find that Petitioner has failed to show that the trial court's decision regarding these instructions was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Further, Petitioner has failed to show how the trial court's decision was based on an unreasonable determination of the facts in light of the evidence. Thus, I deny Petitioner relief under 28 U.S.C. § 2254 on this ground.

### 5. *Prosecutorial Misconduct*

### A. *Whether The Prosecutor Engaged In Flagrant, Repeated and Continuing Misconduct In Violation Of Petitioner's Rights Under The Fifth, Sixth, Eighth And Fourteenth Amendments Of The United States Constitution*

Petitioner argues that he was denied a fair, just and reliable sentencing hearing because of the prosecution's closing argument. He argues that the death sentence

resulted directly from the prosecution's violations of law in the closing. These alleged violations of law included: (i) the denial of Petitioner's rights under the Due Process Clause because the violations were intended to and did deprive him of a fair trial;[51] (ii) the denial of his right to a trial by jury because the arguments misled and inflamed the jury so thoroughly that it could no longer make an impartial, fair decision;[52] and (iii) the denial of his rights under the Eighth Amendment because the argument diverted the jury's attention from its constitutionally required tasks, minimized its role and interjected irrelevant and improper considerations into the jury's deliberations.[53]

Petitioner also asserts that the trial court's double standard—refusing to allow the accused to present certain evidence but permitting the State to argue as if it knew the truth in connection with such evidence, was fundamentally unfair and in violation of the Constitution. Finally, Petitioner argues that the trial court improperly ordered that defense counsel not to object during closing argument.[54] Thus, Petitioner argues that the Court should view the prosecutors' arguments in the harshest possible light.

Petitioner concludes that the prosecutors' misconduct was as extensive and egregious as that in any published decision in this country's recent history, and that the "twist" which sets this case apart from the other cases is the trial court's improper participation in, and approval of, the State's illegal conduct. Because the prosecutors' misconduct was allegedly so pervasive, Petitioner requests that the Court review the entire record concerning the closing argument, and asserts that the examples given in the brief are not an exhaustive list of the improper arguments. Finally, Petitioner cites *Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995) for the proposition that closing arguments much more tame than the one presented here have resulted in reversal.

Before addressing the substance of Petitioner's argument, I first address the appropriate standard of review with regard to same. In a habeas proceeding, the federal court's review is limited. *Coleman v. Brown*, 802 F.2d 1227, 1237 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). " 'A federal court does not have supervisory jurisdiction over state courts and may overturn a state court conviction only when a defendant's constitutional rights have been violated.' " *Id.* (quotations omitted). "Remarks that would cause [the federal court] to reverse in a direct appeal of a federal conviction are not necessarily grounds for reversal when spoken in state courts." *Id.* However, since "[d]eath is qualitatively different from all other punishments ... 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Id.* at 1238–39 (quotation omitted). "A decision

---

51. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

52. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) and *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

53. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Petitioner also asserts that the improper closing arguments were not cured by any jury instruction, since the trial court refused to instruct the jury that bias,

prejudice or public opinion against Petitioner and sympathy for the victim should not be considered at the penalty phase. This argument is considered and rejected in Sections V(4)(D), *supra*, and V(6)(B), *infra*. The arguments that the comments violated *Caldwell* in that the jury may have been led to believe that the responsibility for determining the appropriateness of the death penalty rests with someone other than the jury in violation of the Eighth Amendment is considered and rejected in Section V(4)(A), *supra*.

54. I address in the following section whether the trial court's alleged rebuke of defense counsel's objections violated Petitioner's constitutional rights.

on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances ... and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law." *Id.* at 1239.

With respect to due process, the closing argument will only warrant relief on federal habeas review if it renders a petitioner's trial or sentencing "fundamentally unfair." *See Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). That determination depends on whether there is a reasonable probability that, in the absence of the improper arguments, the outcome would have been different. *Strickland v. Washington,* 466 U.S. 668, 695–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052. This is not a harmless error standard; instead, if the court finds that the circumstances of the case did not render petitioner's trial unfair, then there is no constitutional error. *Darden v. Wainwright,* 477 U.S. 168, 183 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

While "foul" blows by the prosecutor are not allowed, "hard blows" are. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). A verdict or conclusion only weakly supported by the evidence is more likely to have been affected by errors than one with overwhelming record support. *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. In other words, the strength of the case is to be considered in making this determination. *Berger,* 295 U.S. at 89, 55 S.Ct. 629 (finding of prejudice to the defendant as a result of prosecutorial misconduct might have been different "[i]f the case against Berger had been strong, or, as some courts have held, the evidence of his guilt 'overwhelming.' ")

With respect to the Eighth Amendment, the Supreme Court in *Darden* held that where "the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eight Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case' ... [s]uch comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Caldwell,* 472 U.S. at 340, 105 S.Ct. 2633. There, the statements were "pointedly directed at the issue that this Court has described as 'the principal concern' of our jurisprudence regarding the death penalty, the 'procedure by which the State imposes the death sentence.' " *Id.* (quotations omitted).

The Colorado Supreme Court in *Rodriguez IV* found that certain argument of the prosecutors was improper or objectionable, including statements based on the prosecutors' personal beliefs and superior knowledge and the argument that it was cheaper to execute the defendant than to keep in prison for the rest of his life. *Rodriguez IV,* 794 P.2d 965, 979 (Colo.1990). Nonetheless, it concluded that:

> [r]eading the closing arguments as a whole and mindful of the circumstances of the crime itself as revealed by the evidence before the jury during trial, we are confident that their inclusion in the closing argument could not have affected the result in this case. We conclude that the errors in the arguments were harmless beyond a reasonable doubt.

*Id.*

In arriving at its decision, the Colorado Supreme Court could have dismissed many of these claims under a "plain error" standard, as Petitioner failed to object to many of the alleged instances of misconduct. *Id.* at 972 & n. 7. Instead, given the fact that this is a capital case and that "death is a punishment qualitatively unlike any other", the Colorado Supreme Court elected to analyze Petitioner's claims as if there had been contemporaneous objections. *Id.* at 972. I will adopt the Colorado Supreme

Court's approach and treat each argument as if a timely objection had been made.

Petitioner refers to several categories of statements by the prosecutor which he asserts violate his constitutional rights. I will address the categories of specific statements for which there are objections and then focus on the closing arguments as a whole, as requested by Petitioner.

Petitioner first objects to the closing statements where the prosecutor allegedly told the jury to base its decisions on inflamed emotions of fear and sympathy, not on the facts or the required constitutional and statutory requirements. Petitioner points to the prosecution's reference to Martelli's birthday and the fact that she won't be here to celebrate it, and the request to the jury to contrast Martelli's fate with that of the defendant's "if you are to determine that he should spend a life sentence in the penitentiary." ROA, v. 35, pp. 180–81. Further, Petitioner refers to the argument that Martelli "will not ever be able to write letters to anyone" and "[h]er family will never be able to write to her", "[s]he won't have a group of peers to hang out with", "[s]he won't even be able to go to work at the House of Glass", and "[s]he will never see television again." *Id.* at 180, ll. 3–7.

Also objected to is the following statement:

> Counsel for the defendant would like to dismiss these thoughts because they don't serve the defendant well, because a jury thinking those types of thoughts might just start putting them in when you start to weigh those aggravating factors in making a just determination under the law, so let's dismiss those. Let's just weigh that off; forget about Lorraine. This terrible thing is conceded; don't be emotional and don't be upset; don't be the conscience of the community; don't be a jury.
> You know, as I look at you through my blood-shot eyes, I know this is not a jury of twelve computers, but twelve human beings who do have feelings about these things, and that's why we use citizens

and not computers, and that's why that's okay, because justice is the product we manufacture in this courtroom and that's what we're here for.

*Id.* at 181, ll. 8–23. Petitioner objects to the emotional tenor of these statements and argues that they denied him his due process rights and his rights under the Eighth Amendment's prohibition on cruel and unusual punishment. Petitioner does not cite any specific Supreme Court cases which support his argument in this regard.

 I find that the statements were not in violation of clearly established federal law or Petitioner's constitutional rights. The Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), held as follows with respect to victim impact evidence:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Id.* at 825, 111 S.Ct. 2597. The court went on, "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. 2597.

Based upon the foregoing, I do not find any constitutional infirmities in connection with the statements regarding Lorraine Martelli and/or the impact of her death on her family. Further, I agree with the Colorado Supreme Court's analysis that these comments were not outside the scope of proper summation which the pros-

ecutor may argue from the facts in evidence and reasonable inferences therefrom, and that such statements did not violate either *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) or *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). *Rodriguez IV,* 794 P.2d at 975–76.

In that regard, I agree with the following holding of the Colorado Supreme Court:

> The jury knew of the victim's family because they were called to testify during the guilt phase of the trial. The victim's employer also testified that Lorraine Martelli was kidnapped as she was leaving work. The remainder of the sentences were mainly in response to defense counsel's argument regarding the severity of life imprisonment, and compared the victim's fate with that of the defendant. As such, they were permissible comment by the prosecuting attorney 'for or against a sentence of death,' § 16–11–103(1)(b), and were relevant to the jury's decision on the appropriate penalty, § 16–11–103(2)(a)(II), (III).... [T]he comments of the prosecutors in this case did not draw the jury's attention to any impermissible impact on the family, or personal characteristics of the victim unknown to the defendant....

*Id.* at 975–76.

Also encompassed in the above statements, and argued elsewhere in the closing argument, the prosecutors allegedly asked the jurors to act, not as the Constitution required them to act, but as spokespersons for the community. Petitioner refers as an example of this to the argument that "justice has been terribly, terribly offended; justice is out of whack." ROA, v. 35, p. 183, ll. 18–19. Following this was the statement referring to the death penalty as that "last fall-back position of society," allegedly made in an effort to dissuade the jurors from exercising their own judgment. *Id.* at 184, ll. 1–3. Petitioner also objects to the references to what a difficult decision it would be for the jurors, the "battle-field" the jurors were on, and that there were many "interested" in the result in the audience. Finally, he objects to the following argument:

> For two years now everything has been coming down to this moment of truth; this moment when the citizens of this state take over. You heard how many transcripts have been generated. If counsel looked a little tired on both sides, it's obviously because we have been working, but ultimately it's up to the judge and it's not up to the attorneys; its up to the citizens, the lay people who make that final decision in the case. You weren't elected by your community to come down here; you were drafted.

*Id.* at 168, ll. 18–25, 169, ll. 1–2.

Petitioner contends that these arguments were improper because they attempted to influence the jury with the demand for the death penalty by the community and/or the family of Martelli. Further, he argues that such arguments have been condemned, and that the only purpose of such argument is to ensure that the jury consider the improper factors of fear of crime and to place the burden of protecting our society on jurors whose constitutional role requires avoidance of such considerations.

The Colorado Supreme Court found that the prosecutors did not improperly attempt to inflame the emotions of the jury by asking them to consider the feelings of the victim's family or to extend sympathy to the victim. *Rodriguez IV,* 794 P.2d at 974–75. Instead, "[r]ead in context, and as reasonably construed by the trial judge, these statements served to remind the jurors of their 'awesome responsibility,' ... in reaching a decision on life or death." *Id.* at 975. "We do not believe that the jury would have reasonably interpreted the comments as an improper reference to the wishes of the family." *Id.* The Colorado Supreme Court did hold that "prosecutors should not appeal to the jury to consider the wishes of the community in

reaching a verdict." *Rodriguez IV*, 794 P.2d at 977. However, it stated that "because the considerations inherent in a capital sentencing proceeding are unique, we conclude that such comments do not constitute reversible error in this case." *Id.*

■ I agree with the Colorado Supreme Court and find that such comments did not violate the Petitioner's right to a fair trial under either the Due Process Clause or the Eighth Amendment. First, I find that a jury would not have reasonably interpreted the statements referring to interested persons in the audience as an improper reference to the wishes of the family. Nor has Petitioner cited the violation of any clearly established federal law as determined by the Supreme Court in support of this argument. In any event, the state is entitled to remind the sentencer that the " 'victim is an individual whose death represents a unique loss to society and in particular to his family.' " *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (quotation omitted). Thus, evidence regarding the emotional impact of the crimes on the victim's family is appropriate. *Id.*

Further, with respect to the remainder of the statements, appeals to the jury to act as spokespersons of the community have been held to be admissible, so long as they are not "specifically designed to inflame the jury." *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir.1984) (citation omitted). Indeed, "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Witherspoon v. State of Illinois*, 391 U.S. 510, 520, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Also, retribution has been held to be a permissible factor for the jury—an argument based upon "society's legitimate interest of purging itself of this wrong." *Davis v. Kemp*, 829 F.2d 1522, 1528 (11th Cir.1987).

■ I do not find that the prosecutors' statements rose to the level that they were "specifically designed to inflame the jury." Instead, the prosecutors' arguments in this regard were prefaced by a reminder that the prosecution had to establish its case for a death sentence beyond a reasonable doubt. *See* ROA v. 35, pp. 179–80. The prosecution also reminded the jury of the overwhelming evidence of aggravating factors and that Petitioner virtually conceded that these aggravators were proven beyond a reasonable doubt. *Id.* at 139, ll. 6–11. In this context, the prosecution's appeal to the jury to be the conscience of the community was more in the nature of a request that they act on the evidence, or more specifically, on conceded proof of "this terrible thing"—the kidnapping, rape and murder of Lorraine Martelli. *Id.* at 181, l. 15.

■ I also do not find that the statements about the death penalty being that "last fall-back position of a free society" or that justice has been "terribly offended" are improper. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1457–58 (9th Cir.1987) (similar arguments by prosecutor held to relate, at least indirectly, to future dangerousness argument). Further, the statements about this being a "battlefield" were not inappropriate. *Davis*, 829 F.2d at 1527 (argument comparing death penalty to national defense in war held not improper). Moreover, these statements in context were part of the overall argument by the prosecution that Petitioner already faced life imprisonment for the rape, robbery and kidnapping of his victim and that mere life imprisonment for Martelli's murder would be unjust. ROA, v. 35, pp. 182–83. This argument thus constituted proper comment upon penological justifications for the application of a death penalty in this case. *See, e.g., Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986). The Tenth Circuit holds that the types of statements that are unwarranted are "improper appeals to societal alarm" or requests for "vengeance for the community to set an example." *Brecheen v. Reynolds*, 41 F.3d 1343, 1356 (10th Cir.1994).

Nonetheless, even those comments are "not the type of comments that the Supreme Court has suggested might amount to a due process violation." *Id.* (citing *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

In *Brecheen,* the Tenth Circuit concluded that while remarks made by the prosecutor that attempted to frighten the jury into convicting the defendant, called for revenge or deterrence, and appealed to the jury's passions and prejudices were "unbecoming to his office and needlessly jeopardized his case", the Court did not find that the remarks, either individually or collectively, violated the petitioner's due process rights. *Id.* Here, the comments regarding appeals to the community do not approach the severity of the statements made in *Brecheen* which were found not to constitute a violation of the petitioner's constitutional rights. Accordingly, there is no constitutional error or violation of clearly established Supreme Court law.

Next, Petitioner asserts that the prosecutors improperly argued that killing him would save the jurors their tax dollars, that "nobody wants to support this man for the rest of his life," that "[i]f you sentence this defendant to life imprisonment, as a courtesy of the government this defendant will get free food for the rest of his life; three meals a day; not great food, but meals that meet the requirements of state and federal law," that Petitioner will get to sleep in a bed, and that there are color televisions and radios at Canon City, *e.g.,* arguments about the good prison conditions. ROA, v. 35, pp. 113, 118. Petitioner also objects to arguments regarding the alleged humane nature of the death penalty, asserting that these arguments are not supported by the evidence.

Further, Petitioner asserts that the argument that the death penalty is cheaper than life imprisonment is false, irrelevant and unconstitutional. The legal process of killing is very expensive, much more so than a life sentence. The state's argument was allegedly designed to take advantage of the common ignorance of this fact.

Further, Petitioner argues that the cost of a life sentence is not a constitutionally permissible consideration, since it has nothing to do with the moral culpability of the accused or the nature of the crime. Petitioner concludes that this type of argument has been universally condemned in other capital cases, and asserts that these arguments were especially improper since he was not allowed to present rebuttal evidence on the nature of the death penalty and prison conditions.

■ I agree with the Colorado Supreme Court that if the prosecution had argued that the death penalty was less costly than life imprisonment, this type of comment would be improper. *See Rodriguez IV,* 794 P.2d 965, 979 (Colo.1990). However, the only person that specifically referenced this argument was Petitioner's counsel, when he told the jury that they should *not* consider this fact. *See* ROA, v. 35, p. 137, ll. 5–9.

■ As to the prosecutors' statements, I find that they cannot be construed in the manner that Petitioner suggests. First, the statement, "[n]obody wants to support this man for the rest of his life" was not made in the context of the death penalty costing less than life imprisonment. *Id.* at 112–113. Instead, it was made in the context that Petitioner is a violent person that would constitute an imposition on the prison system, particularly upon less violent prisoners who may be in danger from him, *i.e.,* a future dangerousness argument. This has been held to be appropriate argument. *See Campbell v. Kincheloe,* 829 F.2d 1453, 1457–58 (9th Cir.1987). This was also a valid sentencing consideration in determining whether mitigation outweighed aggravation and whether death was appropriate. Colo.Rev.Stat. § 16–11–103(1)(b).

■ Moreover, the possibility that Petitioner, serving consecutive life sentences with no possibility for parole, would not be deterred from assaulting other inmates provided a penological justification for the

death penalty in this case that could be argued to the jury. *See Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir. 1986); *Drake v. Kemp,* 762 F.2d 1449, 1460 (11th Cir.1985). Viewed in context, this statement had little adverse impact, and could not, in my opinion, have rendered the trial fundamentally unfair. *See, e.g., Tucker v. Kemp,* 762 F.2d 1480, 1488–89 (11th Cir.1985).

As to the comments that Petitioner would be entitled to "free food for the rest of his life; three meals a day; not great food, but meals that meet the requirements of state and federal law," that Petitioner "will get to sleep in a bed, and that there are color televisions and radios at Canon City" (ROA, v.35, p. 118, II.4–11), again, these must be viewed in context. First, these remarks were disconnected from the remark, "[n]obody wants to support this man for the rest of his life." Second, these remarks were also not made in reference to an argument that the death penalty is less costly than life imprisonment. Instead, the prosecution argued that these things were "too good for this defendant," *i.e.,* that the death penalty rather than life imprisonment was the more appropriate punishment. *See id.* at 118–19.

In that regard, the prosecution argued, "[t]he defendant has been in jail, in the penitentiary most of his adult life, and he can take it there just fine ... [f]or the defendant the state penitentiary in Canon City is home." *Id.* at 118. The argument goes on to reference the influence that Petitioner would have if sent back to jail and that he's had plenty of chances to give up his life of crime but is "beyond redemption." *Id.* at 120–21. This led to the argument that life imprisonment was hardly a deterrent or punishment to a person already facing a natural life term for the lesser felonies committed against Martini before the murder (*e.g.,* the kidnapping, rape, etc ...). *See id.* at 121–23. There was evidence showing that Petitioner engaged in such a weighing process. Accordingly, I find that such argument was not inappropriate and cannot be construed

in the manner that Petitioner suggests. *See Coleman,* 802 F.2d at 1239.

 To the extent that any of these comments could be construed as argument that life imprisonment was less expensive than the death penalty, I find that the remarks are not so egregious so as to rise to the level of making the trial fundamentally unfair, particularly given the overwhelming evidence against Petitioner. They also do not violate the Eighth Amendment. *See* discussion, *infra* at 1137–39, regarding the closing argument as a whole. Finally, I note that the argument that Petitioner was not allowed to present rebuttal evidence about prison conditions is without merit given the fact that he did, in fact, present such evidence. *See id.* at 1132–34.

 I agree with Petitioner, however, that it was probably improper to allow the prosecution to argue that death imposed under the death penalty is humane (see ROA, v. 35 at 110–11). Although improper, I do not believe that this argument would have had enough of an adverse impact so as to render the trial fundamentally unfair. The prosecution's brief statements regarding the humaneness of death that Petitioner would suffer if the jury imposed the death penalty were made to contrast the type of slow tortuous death that Martelli suffered when she was stabbed to death. The omission of these statements from the closing simply could not, in my opinion, have created a contrary result, given the overwhelming evidence of guilt and the fact that the jury found so many of the aggravating factors to be proved. *See* discussion below in connection with closing argument as a whole.

Any adverse effect of this evidence was also alleviated, at least in part, by rebuttal argument presented by Petitioner's counsel. Although Petitioner asserts that his counsel was precluded from presenting such argument, this is not true since his counsel stated, without any objection:

[T]he prosecutor has chosen to tell you death by affixiation in the gas chamber is a fast and pleasant way to die. He knows that's not true. He has heard evidence that is not true. Yet, he wants you to believe that.

*Id.* at 131 II. 12–19.

Petitioner also objects to the characterization of the document entitled, "The Life History" of Frank D. Rodriguez (Defense Exhibit 38) as hearsay and the prosecutor's statement that this document was not subject to cross examination. *See id.* at 173–75. He asserts that these arguments are a distortion of the law and the truth. Thus, Petitioner argues that the jury gave this crucial piece of mitigating evidence less than the appropriate weight. It is true that the prosecutor in rebuttal referred to this document as "hearsay" and stated that it was "not subject to cross examination." *Id.* at 174 II. 11–12. Further, the prosecution stated that "at a penalty phase, the Rules of Evidence are a bit relaxed; hearsay is admissible ..." *Id.* at 173 II. 22–23.

 The Colorado Supreme Court found that "[t]he prosecutor's statement was essentially accurate" with respect to this mitigating evidence and that the comment did not constitute reversible error. *Rodriguez IV,* 794 P.2d 965, 978–79 (Colo. 1990). I find the Colorado Supreme Court's analysis to be reasonable. The "Life History" document clearly was hearsay—the fact that it was admitted without objection does not change this. Further, the document itself could not be subjected to cross examination, and a statement to this effect is not clearly erroneous. Finally, it is not error to say that the rules of evidence are somewhat relaxed at the sentencing phase and that evidence that may not be admissible in the guilt phase is admissible there. Petitioner has not shown how any of these statements misstated or were an unreasonable application of law.

Further, as the government points out, this argument was a response, at least in part, to a defense argument in closing argument that before the present trial, Judy Archuleta had not said that Petitioner threatened to kill her and her baby. ROA v. 35, pp. 156–58. Mr. Little argued in rebuttal that prior statements by Ms. Archuleta were in fact made and were contained in this document and that the jury should give it appropriate weight. I do not believe that these brief comments about "The Life History" of Frank Rodriguez rise to the level of constitutional error, either in rendering the trial fundamentally unfair or in violating the Eighth Amendment.

Next, Petitioner argues that a major theme of the prosecution was "future dangerousness", stressing that Petitioner could get out of prison and/or that he would be a threat to others in prison. An example of this is Mr. Silverman's statement that "[t]he defendant says he is going to be out with Margie; he will get out; ... [d]o you have any doubt that he would assault and kill a prison guard if it served his purpose?" *Id.* at 116, II. 7–11. It is also argued that Petitioner was characterized as a criminal overlord who could reach the jurors and others from inside prison. The State thus allegedly injected fear of escape, fear of ineptitude by the government and the personal fear of the jurors into their deliberations. Petitioner concludes on this issue that future dangerousness is not an aggravating factor in Colorado and was not supported by any evidence. Despite this, he argues that the trial court indicated its approval of these arguments and gave no indication that fear could not be used in arriving at a decision.[55]

Related to this argument are the Petitioner's objections to statements made that Petitioner was a businessman in prison in the dope business, that Petitioner was part

55. Petitioner argues that this evidence was allowed despite the fact that the trial court ruled in connection with a motion in limine

on this issue filed by Petitioner that this subject could not be introduced by either party.

of a gang in prison, and that Petitioner had influence over potentially dangerous inmates in the prison. One such statement objected to in this regard is as follows:

Ladies and gentlemen, there have been many, many, many, many lives touched and destroyed and ruined by this defendant, and the future could be like the past, a series of 'don't take responsibility; blame others.' Contact visits, always lurking in the shadows of the Department of Institutions somewhere will be Frank D. Rodriguez, lurking there; no finality; no finality for his family or for the Martelli family. He will always be lurking and waiting and conning, threatening, a shadowy figure of a defendant who kills by torture, who gets out and within a very, very short period of time he did these whole series of terrible crimes and now he is back.... He will be there [in prison] advising others; being the big man, being a cell block captain, strutting around with his bragging rights, and he will be bragging to people how he will be right back out on the street.... Or ... Rodriguez can obtain the type of justice that the government, the State of Colorado has provided for under the law.

*Id.* at 181, II. 24–25, 182, II. 1–16. Petitioner asserts that these arguments were inflammatory and were not relevant to the aggravating factors the jury may consider.

I find that the Colorado Supreme Court reasonably declined to hold that comments on future dangerousness introduced non-statutory aggravating factors into the penalty phase or were otherwise inappropriate. *Rodriguez IV*, 794 P.2d at 976. Rather, the court effectively recognized that under Colorado's statutory capital sentencing scheme, the prosecution may rebut mitigation which a jury might reasonably be expected to presume such as lack of dangerousness while incarcerated. *Id.* This appears to be a construction of state law which is binding on this Court. *See Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Further, it was a reasonable application of United States Supreme Court precedent.

The Supreme Court holds that once the statutory capital sentencing process has narrowed the class of individuals eligible for the death penalty through proof of valid statutory aggravation, the Constitution does not prohibit a jury from considering aggravating factors other than statutory aggravators. *Zant v. Stephens*, 462 U.S. 862, 878–79, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); see also *Rodriguez IV*, 794 P.2d at 986.

■ The Supreme Court generally holds that argument on a petitioner's future dangerousness is appropriate in the penalty phase, even where future dangerousness is not alleged as an aggravating factor. *Simmons v. South Carolina*, 512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). "Comments on a defendant's future dangerousness are relevant to specific deterrence, one of the purposes of the death penalty." *Coleman v. Brown*, 802 F.2d 1227, 1240 (10th Cir.1986); *Davis v. Kemp*, 829 F.2d 1522, 1527 (11th Cir.1987). In addition, the "defendant's character, prior criminal history, mental capacity, background, and age are just a few of the many [other] factors ... that a jury may consider in fixing appropriate punishment." *Simmons*, 512 U.S. at 163, 114 S.Ct. 2187; *Coleman*, 802 F.2d at 1239. The court in *Campbell v. Kincheloe*, 829 F.2d 1453, 1457–59 (9th Cir.1987) held that such information could include argument about the potential harm to prison guard, persons in prison or even trial witnesses when there was evidence to support this. *See also Davis v. Kemp*, 829 F.2d at 1529 (future dangerousness argument asking "Who's daughter will be killed next" was not improper).

■ Arguments that Petitioner was a sick and dangerous man with a propensity and desire for violence, and/or that he would escape or be dangerous in the future, were supported by the evidence in this case. This is shown, particularly, in Petitioner's correspondence where he boasts about escaping (Appendix D to Respondent's Brief) and a defense exhibit on

his life history which showed gang activity and the burning of another inmate's cell. Defense Ex. 38, pp. 13–15. The Colorado Supreme Court reasonably declined to hold that there was any "probability" of escape. *See Rodriguez IV,* 794 P.2d at 976. However, it properly held that the prosecution could comment on the "possibility" of escape. *Id.* It also held correctly that comments related to Petitioner's poor prospects for rehabilitation were supported by the evidence. *Id.* at 978; *see Coleman v. Brown,* 802 F.2d at 1239.

■ Remarks by the prosecution concerning Petitioner's status in prison, his intention of selling drugs in prison, his membership in a prison gang, his perversity, his animosity for other races, his ability to adapt to prison life, his ability to lead or influence other criminals, and the possibility that he would sexually assault other prisoners were also supported by the evidence, primarily his correspondence (App. D to Respondent's Brief) and his own exhibit on his life history (Defense Ex. 38, pp. 13–15). Petitioner's correspondence showed animosity toward blacks and homosexuals (App.D). Further, Petitioner expressed anxiety about being considered homosexual and stated that he didn't tolerate homosexuals and assaulted them. *Id.* The prosecution's remarks are also supported by the testimony of Margie Marquez which indicated that Petitioner intended to traffic in drugs while incarcerated. ROA v. 30 at 96–97, 145–47. Finally, testimony of a defense witness concluded that Petitioner had an anti-social personality. *Rodriguez V,* 914 P.2d at 297. The prosecutors could draw reasonable inferences from this evidence and argue that Petitioner was a leader of criminals who would participate in gang and drug related activities and generally constitute a threat to the safety of other persons inside prison. *See High v. Kemp,* 819 F.2d 988, 995 (11th Cir.1987); *Tucker v. Kemp,* 762 F.2d 1480, 1486 (11th Cir. 1985).

■ Moreover, given Petitioner's proven participation in gang rapes outside of prison, the prosecutors could reasonably argue that Petitioner might sexually assault other prisoners. *See Tucker,* 762 F.2d at 1486; *Campbell v. Kincheloe,* 829 F.2d 1453, 1457–59 (9th Cir.1987). Again, these remarks were relevant to the prosecution's argument that life imprisonment was neither a deterrent nor a punishment for the crimes Petitioner committed on Martelli shortly before her death. *See Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir.1986). This evidence and the argument which it supported was also relevant to the jury's assessment of life imprisonment as a sentencing alternative.

■ Since evidence of gang activity was introduced by Petitioner himself as part of his life history and behavior in institutions, it did not violate the proscriptions of *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). While *Dawson* holds that the prosecution may not introduce the mere fact of gang membership, it also indicates that such gang membership along with evidence of how gang racism and drug trafficking can create security problems in prison may well prove relevant in a capital sentencing proceeding. *Id.* at 164–67, 112 S.Ct. 1093. In fact, it stated that "[i]n many cases, . . . associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." *Id.* at 166, 112 S.Ct. 1093. Finally, to the extent that any of the above arguments related to future dangerousness were made in rebuttal to defense counsel's closing argument, they constituted an appropriate response to Petitioner's argument that he would "never again be in a position to harm anyone." ROA v. 35, p. 167, II. 1–2.

■ Petitioner also argues that the prosecutors improperly played on the fears of the jury that he would be paroled in only 20 years, even though they knew that he would not be, that the parole board might mistakenly parole Petitioner in 20 years, or that Petitioner would escape. Specifically, Mr. Silverman said the trial

judge could put Petitioner "away for the rest of his life" or that he could be sentenced so as to become parole eligible in twenty years. *Id.* at 113, II. 8–19. I find that these statements in context show no impropriety.

First, Petitioner has failed to show that the reference to 20 years as a possibility for parole eligibility was a misstatement of law or fact. In fact, parole eligibility was legally possible (Colo.Rev.Stat. § 17–22.5–104(b) (1986)) and Petitioner admitted as much in his closing argument. ROA v. 35 at 132, II. 1–3. As such, it cannot be construed as misleading. Second, contrary to Petitioner's argument, the prosecution did not place undue emphasis on this 20 year time frame or argue that this was a realistic option. Instead, although Mr. Silverman made the reference to possible parole eligibility in 20 years, he then said, "let's assume the choice is either the death penalty or the defendant will die of natural causes in jail 50 years from now . . . Those are still your options; only two of them; life imprisonment or the death penalty." *Id.* at 113, II. 15–21. Finally, Petitioner's counsel was given the opportunity to argue to the jury that the 20 year time frame was not realistic. *Id.* at 131–33. Accordingly, Petitioner has not established constitutional error or the violation of any clearly established federal law as to this argument.

Petitioner next objects to the prosecutors' references to the sex of the jurors, specifically, the female jurors. Petitioner objects to the following comment in this regard:

> This courtroom has been crowded throughout the trial. It's crowded now. A lot of attorneys come in. They watch the trial; they look at you; they see eight women on the jury and they say to us, "oh, no eight women on this jury; they won't give the death penalty. Women don't give the death penalty; men do. Men do, especially when it's been proven that an innocent woman was brutally murdered." It's widely perceived the women are so kind; they're too nurturing to do it, but we don't think that's

true in this case. We think we have women on the jury who are strong; women who recognize the continuing threat to women and to other people that this defendant poses.

*Id.,* 123, II. 18–25, 124, II. 1–4. Petitioner argues that the sex of the jurors is not a constitutionally valid consideration for the jurors, and that the prosecutor improperly preyed upon the irrelevant fears of future assault on the jurors and others.

I first note in this regard that the trial court sustained an objection to this statement, telling the prosecutor that he was getting a little far afield. Such warnings in the jury's presence afforded Petitioner some relief from this statement. *See People v. Harris,* 633 P.2d 1095, 1099 (Colo. App.1981). Further, I don't find constitutional error in connection with the statement that Petitioner posed a continuing threat to women or to other people. This addresses the future dangerousness of the Petitioner, which I previously found to be proper. *See Campbell v. Kincheloe,* 829 F.2d 1453, 1457–59 (9th Cir.1987) (future dangerousness evidence can include argument about the potential harm to prison guards or other persons in prison or potential harm to trial witnesses when there is evidence to support this); *Davis v. Kemp,* 829 F.2d 1522, 1529 (11th Cir.1987) (future dangerousness argument asking "Who's daughter will be killed next" was not improper). Here, there was evidence that Petitioner had killed Martelli so that she would not testify against him and that he had threatened to kill another woman, Judy Archuleta, and her baby. Further, Petitioner's correspondence indicated that he planned to try to escape from prison. App.D. There was thus evidence to support this type of argument.

I also don't find error in the statements to the jurors to be "strong" in rendering the death verdict. This appears to be an argument to invoke the juror's "awesome responsibility" in deciding whether death is appropriate and/or a deterrence argument, argument that is constitutionally

permissible. *See, e.g., Rodriguez IV,* 794 P.2d 965, 975 (Colo.1990); *Coleman v. Brown,* 802 F.2d 1227, 1239–40 (10th Cir. 1986).

■■■ However, I agree that the sex of the jurors and/or the appeal to a juror because of her sex are not appropriate comments for the prosecution to make. As the Tenth Circuit explained in *Coleman,* "comments are permissible only to the extent they are relevant to factors the jury may properly consider." 802 F.2d at 1239. The court then explains what arguments are appropriate. *Id.* Obviously, an appeal to a juror based on his or her sex is not included as appropriate argument. Nonetheless, as stated previously, not all improper statements lead to constitutional error. In this case, limited comments to the women jurors based on their gender, for which objections were sustained, simply did not, in my opinion, render the trial so fundamentally unfair as to violate Petitioner's due process rights. Petitioner has not shown that there is a reasonable probability that, but for such statements, the outcome would have been different. Further, these statements do not violate the Eighth Amendment's heightened need for reliability in the determination that death is the appropriate sentence. Finally, Petitioner has not argued how such statements violate any clearly established federal law as determined by the Supreme Court.

Petitioner next objects to the reference to the "big blue book" by the prosecution which contains the death penalty law "passed by our elected officials." ROA v. 35, p. 98. The prosecution went on to state as to that book, "you see will see that on page 140 it is this defendant that is exactly the sort of person they're talking about as being appropriate for the death penalty." *Id.* Petitioner argues that such references were not relevant to the jury's decision. Most improper, according to Petitioner, was the assertion that on page 140 of the statutes "our elected officials" had anything to say about whether Petitioner should get the death penalty. Petitioner asserts that these arguments misinformed

the jurors and caused them to consider irrelevant and unconstitutional criteria. This error and prejudice was allegedly magnified because the trial court refused to instruct the jury that, "[t]he fact that this is a case in which the death penalty is a sentencing option in no way means that this is a case in which the law says the death penalty should be imposed." *See* Petitioner's tendered instruction No. 3; ROA, v. 4, p. 687.

The Colorado Supreme Court found, and I agree, that "[i]t is impermissible to deliver arguments 'wrapped in the cloak of state authority.'" *Rodriguez IV,* 794 P.2d at 976 (quoting *Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir.1985) (en banc)). However, the Colorado Supreme Court found that the above argument did not misstate or misinterpret the law, nor did the prosecution usurp the trial court's duty and authority to instruct the jury on the law. *Rodriguez IV,* 794 P.2d at 977. This is because "[t]he prosecuting attorney did not attempt to read from the book he was holding, and he did refer to the law as contained in the judge's instructions." *Id.* I find the Colorado Supreme Court's decision reasonable and not in violation of any Supreme Court law.

Petitioner's primary objection appears to be in connection with the state court's holding that, although it would have been prosecutorial misconduct for the prosecutor to tell the jury that the General Assembly had somehow decided that the death penalty was appropriate for this particular defendant, it did not believe "that the jury would have interpreted the prosecutor's statement in so literal and unreasonable a fashion." *Id.* (citing *Drake,* 762 F.2d at 1469). Thus, although the Colorado Supreme Court discouraged use of this particular argument in closings, it concluded that it did not constitute reversible error. *Rodriguez IV,* 794 P.2d at 977. I agree with the Colorado Supreme Court that the statements by the closing argument referring to the "blue book" and the General Assembly or "elected officials"

cannot reasonably be construed as an argument that the General Assembly determined that the death penalty was appropriate for this particular defendant.

I do, however, find the references to the "blue book" and the "State" and "General Assembly" to be inappropriate when combined with the statement, "on page 140 it is this very defendant that is exactly the sort of person they're talking about as being appropriate for the death penalty" for a different reason. That is not because it suggested that the General Assembly actually decided that the death penalty was appropriate for Petitioner but because it stressed that this case is "special", that "a more authoritative source (the prosecution) has already decided that this case, more so than others, fits the criteria for the death penalty." *See Tucker v. Kemp*, 762 F.2d 1480, 1484 (11th Cir.1985). In other words, this statement tended to show that "out of all possible cases, [the prosecution] has chosen a particular case [Petitioner's case] as one of the very worst." *Id.* Nonetheless, I do not find that this statement, even when combined with other statements which the Colorado Supreme Court found were improper along the same lines, rose to the level of rendering the trial fundamentally unfair or violated the Eighth Amendment. *See Rodriguez IV*, 794 P.2d at 977–78. *See* discussion, *infra* at 141–46, regarding closing argument as a whole.

Petitioner next objects to statements that he was "evil," "warped," and "perverted." He asserts that all of these terms are subjectively emotional terms designed to divest him of even the most basic humanity in violation of the Constitution. I note that such statements appear to be reasonable inferences from the overwhelming evidence in this case about the brutal nature of the rape, torture and murder of Martelli. However, I agree that such terms should not have been used to describe Petitioner and that they were thus inappropriate. Nonetheless, I do not find that these statements were so egregious as to rise to the level of constitutional error.

Finally, Petitioner objects to the overall emotional tone of the closing argument, contending that it was clearly designed to make the jury set aside proper considerations and focus on the emotion of the crime or sympathy for the victim. Although I agree that the prosecutors certainly made an emotional appeal throughout the closing argument, the Tenth Circuit noted in *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986) that "[s]ome emotion is inevitable in capital sentencing." Thus, "appeals to emotion ordinarily do not alone render an argument improper." *Id. See also Darden v. Wainwright*, 477 U.S. 168, 182–83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (emotional argument during guilt phase did not render trial fundamentally unfair). Nonetheless, if the prosecutor's comments are "designed to evoke a wholly emotional response from the jury, constitutional error can result." *Coleman*, 802 F.2d at 1239. "Prosecutorial playing on jurors' passion can only subvert the delicate process of preventing the arbitrary imposition of the death penalty, with which the courts have long struggled." *Id.* at 1241.

I do not find that the prosecutors' statements were "designed to evoke a wholly emotional response from the jury." Overall, the subjects that the prosecutors addressed, as discussed above, were permissible. Just as the Tenth Circuit concluded in *Coleman*, I find that although the prosecutor's emotional argument came close to the line dividing proper from improper argument, it did not violate Petitioner's Eighth or Fourteenth Amendment rights.

In summary, as to the specific categories of statements by the prosecution objected to by Petitioner, I conclude that some were improper but the vast majority of the statements were proper. I must next determine, then, whether the closing argument, viewed as a whole, deprived Petitioner of a fair trial. I agree with the Colorado Supreme Court that the inappropriate remarks "inclusion in the closing argument could not have affected

the result." As such, Plaintiff was not denied a fair trial nor were his Eighth Amendment rights violated.

As the Supreme Court stated in *Darden,* "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Darden v. Wainwright,* 699 F.2d 1031, 1036 (11th Cir.1983)). There, although the Supreme Court found, like here, that certain comments were inappropriate, the court also found that they did not deprive the petitioner of a fair trial. *Id.* at 181–82, 106 S.Ct. 2464. In doing so, it noted:

> The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent.... Much of the objectionable content was invited by or was responsive to the opening summation of the defense.... The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the 'overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges,' ... reduced the likelihood that the jury's decision was influenced by argument.

*Id.*

Here, like in *Darden,* Petitioner has not shown that the prosecution manipulated or misstated the evidence, nor did the closing argument implicate other specific rights of the accused. The prosecution told the jurors that they were to follow the law and instructions given them (*see* ROA v. 35 at 100–101, 124), and reinforced that it is the jury who must weigh the facts and evidence and make the ultimate decision. *Id.* at 169–70, 106 S.Ct. 2464. Defense counsel also reinforced this. *Id.* at 129–31. Further, the jury was properly told by the prosecution that it had to prove the statutory aggravating factors beyond a reasonable doubt, and that the jury could only

award the death penalty if the aggravating factors outweighed mitigation. *See id.* at 101, 171–72, 178, 180. The prosecution even reminded the jury that the death penalty should be used judiciously. *Id.* at 101. Further, like *Darden,* many of the objectionable arguments occurred in rebuttal to defense counsel's arguments that Petitioner would never be in a position to harm anyone again.

The prosecution properly described how the evidence supported the existence of the aggravating factors and concluded that the evidence was "overwhelming." *Id.* at 172–73, 106 S.Ct. 2464. This is supported by the evidence which was overwhelming that Petitioner was guilty not only of the kidnapping and rape, but also of the brutal stabbing, torture and murder of Martelli. The evidence of guilt was thus clearly sufficient to support the charges that Petitioner was convicted of.

Further, as to the aggravating factors, the jury found not just one aggravating factor to be proved beyond a reasonable doubt, but six aggravating factors of out a proposed seven. These included: (1) intentionally killing a kidnap victim (ROA, v.52, p. 746); (2) intentionally causing the death of Lorraine Martelli in furtherance of a class 3 or greater felony (*id.* at 748); (3) agreeing with others to kill Lorraine Martelli and intentionally killing her in furtherance of this agreement (*id.* at 749); (4) committing murder while under a sentence of imprisonment for a prior class 3 felony (*id.* at 750); (5) committing murder for the purpose of avoiding or preventing a lawful arrest or prosecution (*id.* at 751); and (6) committing murder in an especially heinous, cruel, or depraved manner (*id.* at 752). *See also* ROA, v. 43, pp. 3–4. The sole aggravating factor that was not found by the jury to be established beyond a reasonable doubt was the allegation that the murder was committed for pecuniary gain. ROA, v. 52, p. 747.

Accordingly, the evidence regarding aggravating factors was very strong and supported the jury's finding that the aggravating factors outweighed the mitigat-

**1138**

ing factors, regardless of any improper argument by counsel. Even defense counsel conceded that "there is no question" that the "aggravating factors exist" and that the prosecutors "have proven them beyond a reasonable doubt". ROA, v. 35, p. 139, II. 8–11. Further, defense counsel conceded that "there is no question Frank Rodriguez is truly dangerous." *Id.* at 128, II. 7–8. Given this, I do not find that there is a reasonable probability that, in the absence of the improper arguments, the outcome would have been different. Accordingly, I find that Petitioner was not denied a fair trial in violation of the Due Process Clause of the Fourteenth Amendment.

I also do not find, from a review of the closing argument as a whole, that the Petitioner's Fifth, Sixth or Eighth Amendment rights were violated. First, Petitioner has not provided any evidence or argument as to how his Fifth or Sixth Amendment rights were violated in connection with the closing argument. Accordingly, Petitioner has not shown that he is entitled to relief on those claims.

As to the Eighth Amendment, I do not find that the prosecutors' argument sought to give the jury a view of its role in the sentencing "that was fundamentally incompatible with the Eight Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quotation

omitted). As stated earlier, the jury was instructed that it, alone, must weigh the facts in the case relevant to Petitioner and make a decision. It was properly instructed as to its role and the factors that must be considered and was not misinformed, like in *Darden*, about the procedure by which the state imposes the death penalty. Further, the argument did not improperly diminish the jury's sense of responsibility for imposing the death sentence. Accordingly, I find that there is no Eighth Amendment violation arising from the closing arguments.[56]

In conclusion, I find that Petitioner has not established the violation of any clearly established federal law as determined by the Supreme Court, any unreasonable application of such law, or any constitutional error. Further, Petitioner has failed to show how the trial court's decisions were based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner is not entitled to habeas relief on the ground of prosecutorial misconduct.

**B. *Whether the Trial Court's Harsh Rebuke Of Defense Counsel's Objections To Gross Prosecutorial Misconduct Violated Petitioner's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution***

Petitioner next argues that, at the outset of the State's outrageous closing argument

---

**56.** The case of *Antwine v. Delo*, 54 F.3d 1357 (8th Cir.1995) does not compel a different result. In that case, unlike here, the prosecutors told the jury that when the petitioner was administered death, "he would be put to death instantaneously." *Id.* at 1361. The Eighth Circuit concluded that this statement, combined with certain other statements that were not supported by the evidence, such as a statement that "isn't it much more humane to sentence this man to death so that his brother can get on with his life, and so that the two children can get on with their lives....", violated the Eighth Amendment by undermining the jury's sense of responsibility and violated due process, because they were prejudicial enough to render the entire sentencing pro-

ceeding fundamentally unfair. *Id.* at 1361–1364. Here, the prosecution did not make the type of egregious statements at issue in *Antwine*. Although the prosecution made certain statements about the death penalty, including a general reference to it being humane, the prosecution never went so far as to argue the details of how death is administered as in *Antwine* or that Petitioner would be put to death instantly. Nor did the prosecution, when referring to the humaneness of the death penalty, assert this argument in the context used in *Antwine*—that it would be more humane to kill Petitioner so that the family of Martelli could get on with their lives.

in the penalty phase, the trial court ordered defense counsel to "shut up," "be quiet," "sit down" and to allow the prosecutor to finish his argument without further objection. The record reveals the following exchange between counsel and the Court:

> Mr. Silverman: It's a very rare combination of a crime and a defendant that satisfies so many of the statutory criteria.
>
> Mr. Eisner: Objection, judge, to any comparison to this to other cases.
>
> The Court: Overruled. Let Mr. Silverman finish his argument.
>
> Mr. Eisner: Can the Court please tell the jury that I have a right to object?
>
> The Court. Mr. Eisner.
>
> Mr. Eisner: Thank you, judge.
>
> The Court: Let Mr. Silverman finish his argument.
>
> Mr. Eisner: Just for clarification—
>
> The Court: Mr. Eisner, please have a seat.

ROA, v. 35, p. 102, II. 4–16,

Petitioner argues that the official transcript is substantially incorrect and that the correct version of the transcript according to unspecified witnesses at trial is as follows:

> Mr. Eisner: Objection, judge, to any comparison to this to other cases.
>
> The Court: Overruled. Sit down and let Mr. Silverman finish his argument without further objection.
>
> Mr. Eisner: Can the Court please tell the jury that I have the right to object?
>
> The Court: Mr. Eisner, shut up and sit down.
>
> Mr. Eisner: Thank you, judge.
>
> The Court: Let Mr. Silverman finish his argument, without interruption.
>
> Mr. Eisner: Just for clarification—
>
> The Court: Mr. Eisner, sit down and be quiet.

Petitioner argues that, under either version, the court's conduct denied him the right to a fair trial, citing *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). He argues that it is serious judicial misconduct for a judge in the jury's presence to rebuke defense counsel in such a way as to indicate partiality, or to preclude defense counsel from objecting or making a record. Petitioner argues that the result of the trial court's rebuke was an implied approval of the prosecutors' arguments and a belittlement of the defense. Petitioner argues that "[t]he only imaginable reaction for the jurors to have had was to believe that the State's arguments were proper, the considerations urged by the State were proper, and the defense counsel had committed serious misconduct by objecting." Opening Brief, p. 94. Petitioner further asserts that the context of the court's remarks, in the closing argument at the penalty phase, increased the prejudice and constitutional error, and that this error was magnified by the refusal of the court to instruct the jury that arguments of counsel are not evidence. ROA, v. 4 at 687.

■ Turning to the merits of Petitioner's argument, I first agree with the Colorado Supreme Court and Respondent that Petitioner has failed to overcome the statutory presumption that the official reported version of the record is correct. *See Rodriguez IV,* 794 P.2d 965, 990 (Colo.1990) (citing Colo.Rev.Stat. § 13–5–128 (1987)); *Jones v. District Court,* 780 P.2d 526, 528 (1989). Petitioner's conclusory, unsworn assertion that unspecified witnesses at trial thought that his version of record is correct simply fails in any regard to convince me that the reported record is incorrect.

Nevertheless, under either version of the record, I find that Petitioner has failed to show a constitutional violation or violation of clearly established federal law. Contrary to Petitioner's argument, I find, as did the Colorado Supreme Court, that Petitioner could not reasonably have interpreted the trial court's comments as foreclosing further objections, especially since defense counsel did object to subsequent statements by the prosecutors during clos-

ing. *See Rodriguez IV,* 794 P.2d at 972 n. 7, 990; ROA v. 35, pp. 113–16, 124. Several of these objections were sustained by the trial court, thus giving no credence to Petitioner's argument that the court's rulings showed approval of the prosecutor's argument at the expense of the Petitioner. *Id.* Further, Petitioner has failed to show prejudice by such comments in light of: (1) the instruction given to the jury that it was not to draw conclusions from objections or the court's rulings (ROA, v.4, pp. 756–57); and (2) the fact that both this court and the Colorado Supreme Court reviewed the prosecutor's arguments as if there had been contemporaneous objections made. *See* Section V(5)(A), *supra; Rodriguez IV,* 794 P.2d at 990.

■ Finally, under both Colorado and federal law, the judge is provided considerable discretion in managing the trial and closing argument. The scope of closing argument rests in the sound discretion of the trial court. *United States v. Hoenscheidt,* 7 F.3d 1528, 1531 (10th Cir.1993); *People v. Coria,* 937 P.2d 386, 391 (Colo. 1997). This includes considerable leeway by the judge in making comments to counsel. As the Colorado Supreme Court stated, "more than mere speculation concerning the possibility of prejudice must be demonstrated." *Coria,* 937 P.2d at 391. "The test is whether the judge's conduct departed from the required impartiality to such an extent as to deny the defendant a fair trial." *Id.* Comments which merely cause disappointment, discomfort or embarrassment to counsel, without more,

rarely constitute a deprivation of a fair trial. *Id.* at 391–92.[57]

■ Here, the trial court here did not improperly attack defense counsel's credibility, nor did the court's comments indicate any belief that the defendant was guilty of the charges. *See United States v. Shelton,* 736 F.2d 1397, 1403–04 (10th Cir. 1984). Further, I find that Petitioner has failed to show that the trial court's comments in any other way denied him a fair trial. Petitioner has also failed to cite any violation of clearly established federal law as determined by the Supreme Court by the trial court or that the court's actions were so prejudicial as to constitute reversible error. Accordingly, I find that Petitioner is not entitled to relief on this ground.

### 6. *Alleged Errors Regarding Voir Dire And The Jury Panel*

### A. *Whether Petitioner Was Denied His Fundamental Rights Because The Trial Court Employed Inconsistent Standards For Excusing Prospective Jurors And/Or Tended To Excuse Those Who Were Opposed to Death More Easily Than Those Prone To Kill.*

Petitioner argues that the trial court applied inconsistent standards when ruling on challenges for cause concerning prospective jurors whose ability to follow the law due to views concerning the death penalty was allegedly impaired. He asserts that the court granted the state's challenges under a very liberal view of the

---

**57.** *See also United States v. Welch,* 745 F.2d 614, 621 (10th Cir.1984) ("[a]lthough the court's comments were brusk and disturbing to counsel, we are convinced that, considering the entire trial, the matters mentioned were but minor incidents which did not affect the substantial rights of the defendant"); *United States v. Shelton,* 736 F.2d 1397, 1403–04 (10th Cir.1984) (finding that a court's comment to counsel that it was not going to take time out of trial to "hold law school" did not deny defendant a fair trial); *Lowther v. United States,* 455 F.2d 657, 666 (10th Cir.1972) (finding that a trial court's statement that it

did not ask for "contemptuous conduct" by defense counsel did not deny the defendants a fair trial); *Cooper v. United States,* 403 F.2d 71, 73 (10th Cir.1968) (holding that trial judge's indications in the presence of the jury that statements of defense counsel were ridiculous were not sufficiently prejudicial as to deny the accused a fair and impartial trial; "that incident and the others ... were no more than displays indicative of a firm control of the proceedings and fall well within the reasonable bounds within which a trial judge may act").

standard articulated in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); namely, whether the person would be substantially impaired in following the law due to his or her own views, but declined to follow this standard in connection with Petitioner's challenges. Thus, Petitioner asserts that the trial court's rulings on challenges indicated a bias in favor of the prosecution and the death penalty and against the accused, with the end result being that a juror had to have been clearly unwilling to ever vote for life in order to be challengeable.

Petitioner cites as examples the alleged improper denial of challenges for cause of prospective jurors who will be identified herein as "Mr. G.", "Mr. M.", "Mrs. M.", and "Mr. R." Further, Petitioner complains that the trial court excluded "Mrs. B.", for expressed reluctance to sign a death verdict. Petitioner also cites the court's excuse of another juror, "Mrs. V." as an example of the standard the court used in excusing jurors who would not consider anything but death as punishment for murder.

I find that the trial court did not violate or unreasonably apply clearly established federal law as determined by the Supreme Court in regard to this argument. I first note that Petitioner fails to state precisely how the trial court's actions were contrary any Supreme Court precedent. I infer from Petitioner's briefs that he is arguing that the trial judge applied the *Wainwright* standard to the jurors who showed support for the death penalty but did not apply the standard to those who were against the death penalty. Petitioner does not appear to be arguing, as he did to the Colorado Supreme Court, that the trial court should have applied the standard of *Witherspoon v. State of Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In any event, I find that the trial court properly concluded that *Wainwright* was the controlling standard, not *Witherspoon*.

In *Wainwright*, the Supreme Court clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment as well as its earlier holding in that regard in *Witherspoon*. First, the Supreme Court held that it was dispensing with *Witherspoon's* reference to "automatic decisionmaking." *See Wainwright*, 469 U.S. at 424, 105 S.Ct. 844. The court in *Witherspoon* had stated in a footnote that the decision therein did not bear "upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear ... that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial...." *Witherspoon*, 391 U.S. at 522 n. 21, 88 S.Ct. 1770. Cases had construed this language to set "the standard for judging the proper exclusion of a juror opposed to capital punishment." *Wainwright*, 469 U.S. at 418, 105 S.Ct. 844.

Second, the Supreme Court stated the correct standard to be "whether the juror's views would 'prevent or substantially impair' the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. 844 (quoting *Adams v. Texas*, 448 U.S. 38, 44, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). The court made clear that this standard "does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* Since "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," the Supreme Court held that "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 425–26, 105 S.Ct. 844. This is because the trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." *Id.* at 429, 105 S.Ct. 844. Accordingly, the Supreme Court held that the "trial court's determination that a prospective capital sentencing juror was properly excluded for cause" is a factual issue which is entitled to a

presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 428–29, 105 S.Ct. 844.[58]

Turning to this case, I first note that as to certain jurors referred to in Petitioner's argument, Petitioner has failed to provide a citation to the record so that the Court can determine whether the trial judge applied the appropriate standard and/or properly excluded the juror for cause. *See* 28 U.S.C. § 2254(f). This includes Mr. "G.", Mrs. "M.", and Mrs. "B." Further, Petitioner's analysis of the trial court's decision regarding these jurors is insufficient for me to determine that the court applied the wrong standard or made improper decisions on challenges for cause. "[W]here the record does not indicate the standard applied by a state trial judge, he [or she] is presumed to have applied the correct one." *Wainwright,* 469 U.S. at 431, 105 S.Ct. 844. However, although I am not obligated to do this, to the extent possible I have attempted to locate in the record the discussion regarding these jurors so that I can address the merits of this argument.

■■■■ Turning to the specific jurors identified by Petitioner, I find that it was reasonable for the trial court to have decided in connection with Mrs. "B." that the expression of her belief in the death penalty and hesitancy in signing a death verdict could " 'prevent or substantially impair the performance of her duties as a juror.' " *Id.* at 424, 105 S.Ct. 844. I must defer to the trial court in making a credibility determination. *Wainwright,* 469 U.S. at 424–26, 105 S.Ct. 844. This is particularly true in light of the record where Mrs. "B." actually expressed considerably more than a mere hesitancy in signing a death verdict. ROA, v. 18, pp. 76–82, 103–07, 119–21; *see also Rodriguez V,* 914 P.2d 230, 265–66 (Colo.1996).

■■■■ With respect to the argument that the trial court failed to make any findings as to prospective juror Mrs. "M" or that it did not make sufficient findings

as to Mr. "G.", the Supreme Court holds that the judge is not required to announce for the record his conclusion regarding the bias of a juror when it is evident from the record. *Wainwright,* 469 U.S. at 430, 105 S.Ct. 844. Here, there is evidence in the record to support the trial judge's decision not to excuse Mrs. "M." and Mr. "G." under the *Wainwright* standard. Mrs. "M." stated that she could follow the law, that she could afford Petitioner his presumption of innocence, and she would hold the prosecution to its obligation to prove the statutory factors in the penalty phase. *See* ROA, v. 16, pp. 41–44, 65–67. As to Mr. "G.", although he stated that he had some prior knowledge of the case through the news and that he leaned towards the death penalty in a case of first-degree murder, he also stated that he understood Petitioner was innocent until proven guilty, that he could be a fair juror, that he could follow the law and would hold the prosecution to its responsibilities, and that he would listen to the evidence and be objective. *See* ROA, v. 15, pp. 44–46, 70–75, 127–29; *see also* pp. 137–38.

For all of these reasons, I find that Petitioner has failed to show that the trial court's decision regarding challenges to cause as to jurors Mr. "G.", Mrs. "M.", Mrs. "B" or any unidentified prospective jurors was contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court or that the trial court's actions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence. Accordingly, Petitioner has failed rebut the presumption of correctness that applies to the trial court's findings regarding these jurors.

■■■■ As to Mr. "M.", I first note that Petitioner has incorrectly stated the name of this person. Assuming that Petitioner means the Mr. "M." referred to in the record at v. 16, p. 82, and whose testimony regarding the challenge for

---

**58.** Although Section 2254(d) was amended after this decision, the presumption of correct-

ness still applies to factual findings. 28 U.S.C. § 2254(d)(2), (e)(1).

cause is found at ROA, v. 16, pp. 8–10 and 60–61, I find that Petitioner has failed to rebut the presumption of correctness that applies to the trial court's denial of the challenge for cause and failed to show that the court's decision was based on an unreasonable determination of the facts in light of the evidence. Mr. "M." stated that, although he supported the death penalty, he could follow the law and return a sentence of life if the state did not prove the aggravating factors required for a sentence of death. *Id.* Thus, there is clearly evidence in the record to support a finding that Mr. "M." did not have to be excused under the *Wainwright* standard. As *Wainwright* emphasized, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Wainwright v. Witt,* 469 U.S. 412, 434, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Further, the trial judge does not have to use the precise language of *Wainwright* in conducting the voir dire or issuing its decision. *Id.* at 433–34, 105 S.Ct. 844.

Next, with respect to Mrs. "V", the Court excused her saying, "I think she was very clear in her position that she did not wish to consider anything but the death penalty." ROA, v. 16, p. 82, II. 19–21. Petitioner argues that this statement by the court "clearly indicated the standard it was applying regarding death-prone jurors when it granted the challenge" as to her. I am not sure what error Petitioner is asserting in this regard. Arguably, Petitioner is implying that the court excused only those jurors who said that they did not wish to consider anything but the death penalty and that it did not follow the standard set out in *Wainwright.* Again, I disagree.

As noted above, the trial judge does not have to use the precise language of *Wainwright* in issuing its decision. *Wainwright,* 469 U.S. at 433–34, 105 S.Ct. 844. Further, the fact that the court believed that a juror could not consider anything but the death penalty supports the conclusion that the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with h[er] instructions and ... oath.' " *Id.* at 424, 105 S.Ct. 844. It also does not mean that the trial court failed to use the correct standard in making this decision. I agree with the Colorado Supreme Court that this statement simply reflected the court's assessment of that particular juror. *Rodriguez V,* 914 P.2d 230, 265 (Colo.1996). Further, I find there was evidence in the record to support the trial court's decision. ROA, v. 16. pp. 38–41, 47–50, 58–60. Accordingly, I find that Petitioner has failed to rebut the presumption of correctness as to the findings regarding Mrs. "V." *Id.* at 58–60.

Finally, as to Mr. "R.", Petitioner argues that the trial court improperly denied the challenge for cause as to him, despite the fact that he "unequivocally asserted his refusal to follow the law and to consider mitigation, and [stated] his firm belief that the death penalty automatically follows a murder conviction." Although Petitioner cites to the Court's decision regarding Mr. "R.", he does not cite to the record of Mr. "R."'s testimony. The Court has, again, conducted its own search and located Mr. "R."s testimony at ROA v. 20, pp. 116–118. Mr. "R." testified that if the mitigating factors that the defense presented outweighed the aggravating factors, he understood, despite his belief in the death penalty under certain circumstances, that he would be obligated to return a life sentence. *Id.* at 117. Further, he stated that he would be able to follow the law. *Id.* There is thus evidence in the record to support the trial court's decision. As explained earlier, a court is not required to explain its findings on the record when there is evidence in the record that the juror was not "substantially impaired" in his or her duties. *Wainwright,* 469 U.S. at 424, 430, 105 S.Ct. 844. Accordingly, I find that Petitioner has not shown that the trial court's decision was unreasonable in light of the evidence or rebutted the presumption of correctness that applies to the trial court's factual findings.

As to the alleged "numerous people who expressed intense support for the death penalty" that the trial court "refused to exclude" (Opening Brief, p. 142) or the conclusory assertion by Petitioner that the record generally reveals that the trial court's rulings on the two classes of jurors were biased, I simply can not determine whether the trial court applied an incorrect or inconsistent standard as to jurors who Petitioner does not identify. However, I will note that I have reviewed in depth the transcripts that were cited by Petitioner as well as many portions of the record that were not specifically cited, and have found nothing to indicate that the trial court applied the wrong standard or applied the correct standard inconsistently or with a bias such that the trial court would have violated or unreasonably applied clearly established federal law as interpreted by the Supreme Court. Further, I have found nothing in the record to indicate that any decision of the trial court regarding challenges for cause was based on an unreasonable determination of the facts in light of the evidence.

Finally, I find that the Colorado Supreme Court correctly noted that Petitioner has failed to show how he was prejudiced by the retention of any of these jurors on the panel. *See Rodriguez V,* 914 P.2d 230, 264–65 (Colo.1996). None of these jurors ended up serving on the jury panel. *Id.* Moreover, Petitioner did not even exhaust all of the peremptory challenges available to him in an attempt to excuse these jurors. Although prejudice is not a requirement of proof under Section 2254(d), and I do not rely on this to deny Petitioner relief, I find it relevant in putting this issue in context.

For all of the above reasons, I find that Petitioner is not entitled to relief under Section 2254(d) on his argument that he was denied his fundamental rights because the trial court employed inconsistent standards for excusing prospective jurors.

**B. *Whether Petitioner's Constitutional Rights Were Violated And Prejudicial Error Occurred By the Trial Court's Preclusion Of Voir Dire By Defense Counsel On Claimed Hardships, The Exclusion Of Defense Counsel From Voir Dire On Publicity And Challenge For Cause Issues, And The Court's Alleged Inadequate Voir Dire***

Petitioner argues that the trial court improperly refused to allow defense counsel to participate in voir dire as to the claimed hardships of panel members which occurred in camera prior to any other questioning and/or to inquire into hardships during general voir dire, such as the jurors' ability to give their full concentration to the case and the possible sentencing proceeding. Petitioner also argues that the trial court improperly excluded defense counsel from participating in the court's voir dire of prospective jurors as to publicity, bias and other challenge for cause issues. Petitioner asserts that the trial court improperly ordered that defense counsel could not object to the court's voir dire as to hardships, and/or could object to publicity and other issues only in writing. Thus, Petitioner contends that whether or not a challenge or objection was made is irrelevant because the court did not make adequate inquiry and counsel could not make intelligent objections or challenges. Finally, Petitioner asserts that the court's voir dire was inadequate as to these issues.

Specifically, as to the hardship issue, Petitioner argues that voir dire was inadequate for at least two reasons: (i) the court failed to make the inquiries necessary to discover whether the jurors could legally serve; and (ii) the court failed to discover the information defense counsel needed in order to intelligently challenge for cause. As to the first panel of jurors questioned by the court, it is alleged that the court failed to inquire whether the claimed hardships would interfere with the ability of each person to serve. As to all of the prospective jurors, the court alleg-

edly failed to make adequate inquiry into the actual feelings induced by the claimed hardship, who the prospective jurors might tend to blame for their situation, or whether the hardship merited excusal. Petitioner cites as his only specific example the questioning of Mrs. "E.", but does not give a reference in the record to such.

As to the publicity, bias and other challenge for cause issues, Petitioner does not cite any specific examples of jurors who were inadequately questioned, nor does he cite to any portion of the record to demonstrate the alleged errors. Instead, he simply states that there are "numerous examples" of such error, and points to the following factors that the court allegedly conducted inadequate voir dire as to: (i) the questioning of jurors about their awareness of or feelings concerning the publicity surrounding the pardon of all death row inmates by the Governor of New Mexico; (ii) the effects and feelings of the jurors about their awareness of the prior conviction of Petitioner's brother; and (iii) Petitioner's criminal record.

Further, Petitioner states that the trial court failed to make an adequate inquiry into the scope and actual nature of the juror's knowledge, opinions and possible bias beyond more than perfunctory, superficial inquiries. Finally, Petitioner argues that the trial court's failure to make adequate inquiry into the statements of the jurors in the questionnaires and the alleged manifest differences between those statements and statements given in person, and the court's failure to address either set of answers in a logical, thorough manner, deprived Petitioner of his constitutional rights.

Petitioner claims that the trial court's refusal to allow him to conduct voir dire and/or to object to these issues, and the alleged inadequacy of the court's voir dire on these issues, denied him the constitutional rights: (i) to a fair trial by impartial jury; (ii) to have a random panel selected without arbitrary and capricious exclusion of jurors; (iii) to discover information necessary for the intelligent exercise of peremptory challenges; (iv) to have effective assistance of counsel; and (v) to make an adequate record for appellate review. He argues that his rights were violated under the Trial by Jury, Due Process, Right to Counsel, and Cruel and Unusual Punishment Clauses, that the trial court's actions regarding voir dire should be presumed to be prejudicial, and that his convictions and death sentence should be vacated because the trial court violated clearly established Supreme Court law.

Turning to the merits of this argument, I first agree with Respondent that many, if not all, of these claims are barred for review in this court. With respect to an argument that the trial court erred in limiting voir dire, the Colorado Supreme Court noted that these issues were not raised on direct appeal but then proceeded to determine whether this rose to the level of constitutional error. *Rodriguez V*, 914 P.2d at 254–55.[59] The court concluded that these issues did not rise to level of a constitutional error and thus did not require postconviction review. *Id.* For the reasons stated in Section V(1), *supra*, these claims are procedurally barred and federal review is not appropriate.

To the extent that these claims are not procedurally barred, I find that Petitioner is not entitled to relief. On review of a trial court's jury selection, there is a distinction between cases tried in federal court, which are subject to the Supreme Court's supervisory powers, versus those

59. The issues that the Colorado Supreme Court considered in this regard that are raised herein include: Issue 65 below (alleging preclusion of counsel from voir dire on hardships and publicity); Issue 80 (alleging undue limitations on defense counsel's voir dire); and Issue 99(a), (d), and (e) (alleging prejudicial limitations on defense counsel's voir dire). *Id.* at 255. Further as to Issue 65, the court held that a portion of that issue alleging inadequacy of the trial court's voir dire on hardship and publicity was unsupported with facts, record cites or case law. Thus, the Colorado Supreme Court affirmed the summary dismissal of that claim. *Id.* at n. 24.

tried in state courts, "with respect to which [the federal court's] power is limited to enforcing the commands of the United States Constitution." *Mu'Min v. Virginia*, 500 U.S. 415, 422, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Since this case was tried in state court, Petitioner must show that the United States Constitution was violated.

In support of his argument regarding constitutional violations, Petitioner cites cases that address the right to a fair and impartial jury generally,[60] the right to peremptory challenges [61], and the right to effective assistance of counsel.[62] I find that Petitioner generally does have the right to a fair and impartial jury, the right to peremptory challenges, and right to effective assistance of counsel under those cases. However, the cited cases do not address the specific argument raised herein, that Petitioner's constitutional rights were violated in connection with the voir dire process regarding hardships, publicity, bias and other challenges for cause.

■ In that regard, Petitioner has not cited, and I have not found, a Supreme Court case holding that defense counsel must be allowed to conduct his or her own voir dire in connection with claimed hardships, publicity or bias. *See Rodriguez V*, 914 P.2d 230, 255 (1996) ("[d]efense counsel does not have a constitutional right to voir dire, so long as the court's examination allowed counsel to determine whether any potential jurors possessed any beliefs that would bias them such as to prevent [the defendant] from receiving a fair trial")

(citation omitted). In fact, in many of the cases the Colorado Supreme Court reviewed on this issue, the trial court conducted all of the voir dire questioning that was challenged. *See, e.g., Mu'Min v. Virginia*, 500 U.S. 415, 417–21, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Ham v. South Carolina*, 409 U.S. 524, 525–26, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

As to the trial court's questioning that Petitioner argues was inadequate, he cites no case holding that clearly established federal law, as interpreted by the Supreme Court, dictates what types of questions should be asked regarding hardship, publicity or bias, and/or that the trial court's questions were inadequate. Instead, the Supreme Court holds that "the court ha[s] a broad discretion as to the questions to be asked ... subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); *see also Turner v. Murray*, 476 U.S. 28, 37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) ("as in other cases involving 'special circumstances' the trial judge retains discretion as to the form and number of question on the subject") (quotation omitted). Nevertheless, I note that the trial court did ask questions of the jurors regarding hardship, publicity and bias.[63]

Further, Petitioner has cited no clearly established Supreme Court case which holds that defense counsel has the right to make contemporaneous oral objections regarding the trial court's decisions on the issue of hardship. Nevertheless, the court usually asked defense counsel's position in

60. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

61. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

62. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

63. As the Colorado Supreme Court explained, the jurors claiming hardships were questioned and dismissed prior to the court's dismissal of the remaining jurors. *Rodriguez V*,

914 P.2d 230, 261 n. 33 (Colo.1996). After hardship voir dire, the court distributed those jurors who did not qualify for hardship excusal among the jury groups already assigned. *Id.* at 261, citing ROA, v. 14 at 11, 72–73, 109–110, 150–51. The jurors were then questioned as to their exposure to publicity and any juror who indicated such exposure was questioned in chambers. *Id.* at 261–62, citing ROA, v. 14, pp. 154–96, v. 15, pp. 8–49, 140–82, v. 17, pp. 190–218, v. 18, pp. 2–54, v. 19, pp. 5–62, v. 20, pp. 6–97; v. 21, pp. 5–75, v. 22, pp. 194–262.

regard to jury selection and whether or not to excuse a particular juror, and allowed Petitioner to make contemporaneous oral objections and/or written objections. *See* ROA, v. 14, pp. 2–9, 15–31; v. 3 at 489–92, 497–505. Also, Petitioner was provided the opportunity during the voir dire process to determine whether prospective jurors were biased. *See, generally*, vv. 14–22. Accordingly, I agree with the Colorado Supreme Court that Petitioner has not shown that the trial court impermissibly impeded his ability to make a record or to preserve the issues for appeal. I further find that Petitioner has failed to show that the essential demands of fairness were not met with respect to the questioning of the jurors.

 Finally in this regard, the Supreme Court holds that "[t]he constitutional standard that a juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court is a question of federal law ...; whether a juror can in fact do that is a determination to which habeas courts owe special deference." *Patton v. Yount,* 467 U.S. 1025, 1037 n. 12, 104 S.Ct. 2885, 81 L.Ed.2d 847. (1984). In other words, the decision of the trial judge as to whether the individual jurors should be disqualified is a factual finding entitled to a presumption of correctness under Section 2254(d). *Id.* at 1037–38, 104 S.Ct. 2885.

The inquiry for this court on such factual findings according to *Patton* is "whether there was fair support in the record for the state courts' conclusion that the jurors here would be impartial." *Id.* at 1038, 104 S.Ct. 2885. The Supreme Court explained that this presumption of correctness applies for a number of "good reasons", as follows:

> First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on

since the beginning ... usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference."

*Id.*

In the case at hand, Petitioner argues only in generalities that the jurors were not properly questioned as to hardships, publicity, or bias and that this resulted in the lack of a fair and impartial jury. Petitioner has cited no specific prejudice that he suffered from the trial court's questioning, how the trial court's questioning as to any particular juror was "manifestly inadequate", and/or how any particular juror that was retained on the panel as a prospective juror was not impartial.

The only specific juror that Petitioner points to as being inadequately questioned is Mrs. "E." in connection with hardship. However, Petitioner fails to refer the court to any reference in the record, and fails to describe Mrs. "E."'s particular alleged hardship or why the trial judge abused her discretion as to these jurors.[64] I have reviewed the record and, although locating two Mrs. E's (ROA, v.15, pp. 107–10, 129–31), did not find any discussion with respect to either of these jurors regarding hardship. Since I have not found anything in the record to support Petitioner's argument, and since Petitioner has failed to provide an actual record cite for this argument, I find that Petitioner has failed to rebut the presumption of correctness that attaches to the trial court's factual findings regarding either Mrs. "E." or any other juror on these issues.

 As to the jury questionnaires, I reject Petitioner's argument that the destruction of these questionnaires deprives him of the ability to preserve and protect

---

**64.** In fact, Petitioner fails to cite any portion of the record to the Court in regard to these arguments about voir dire.

his fundamental rights, including the right to appeal. Petitioner has cited no Supreme Court or other federal case that requires the court to preserve these records or holding that the destruction of same constitutes a violation of clearly established federal law so as to entitle him to relief under Section 2254(d).[65] I also agree with the Colorado Supreme Court that Petitioner has not demonstrated that the record before the Court is insufficient for the resolution of these issues or that the absence of the questionnaires has in any way prejudiced him. *See Rodriguez V,* 914 P.2d at 259–60.

As to the argument that the trial court erred in failing to make adequate inquiry into the statements of the jurors in the questionnaires and the differences between those statements and the statements given in person, Petitioner has failed to provide even one example to the Court of this alleged error or how it affected the impartiality of any juror. Further, as the Supreme Court correctly noted, Petitioner can not show prejudice since he did not exhaust his peremptory challenges. *Id.* at 260, 263. Finally, federal habeas review is not appropriate as to this issue since the Colorado Supreme Court summarily dismissed this issue as inadequately supported with facts, record cites or case law (*see id.* at 260) and Petitioner has not shown cause or manifest error for consideration of the issue by this Court.

Based upon the foregoing, I find that Petitioner has failed to show that he is entitled to habeas relief as to this argument. Specifically, he has not shown any violation or unreasonable application of federal law. He also has not shown that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

### 7. *The Trial Court's Alleged Improper Exclusion Of Evidence*

### A. *Whether The Exclusion Of Relevant And Exculpatory Evidence Of David Martinez' Physical Condition After His Arrest Violated The Due Process, Compulsory Process, Confrontation And Cruel And Unusual Punishment Clauses*

Petitioner argues that the trial court erred in excluding relevant, material and exculpatory evidence of the physical condition of David Martinez ("Martinez") shortly after his arrest. That evidence consisted of a videotape of the bruises and marks on Martinez' body, allegedly caused by his struggles with the deceased. Petitioner asserts that this evidence would have significantly contradicted the testimony of Patricia Thomas, the only witness for most of the State's case. He asserts that his inability to present this mitigation evidence in rebuttal to the State's arguments in favor of death denied him his rights to due process, confrontation, compulsory process, and the Cruel and Unusual Punishment Clause.

I first find that this issue is not subject to review by this Court. First, I note that the Colorado Supreme Court held that several issues regarding Martinez would not be considered by it because of procedural defaults. *Rodriguez V,* 914 P.2d at 250–52. These included Issue 43 raised below challenging the admissibility of the prosecution's evidence concerning the cuts on Martinez' hands and Issue 86 alleging error in the exclusion of evidence of Martinez' physical condition after arrest. It does not appear that Petitioner raised this precise argument below. Further, it appears that Petitioner acquiesced to the exclusion of the videotape during trial when the prosecution asserted that Peti-

---

**65.** Further, the Colorado Supreme Court correctly notes that under Colorado law it is the Petitioner's responsibility to designate the record on appeal and where there is no available record, "the appellant may prepare a statement of the evidence of proceedings from the best available means, including his recollection." C.A.R. 10(c); *Rodriguez V,* 914 P.2d 230, 260 (Colo.1996). Petitioner failed to prepare such a statement or to provide the court with specific assertions of fact or error. *Id.*

tioner could, instead, rely on police testimony to establish that Martinez had a bruise on his elbow and a discolored bicep. *See* ROA, v. 30, p. 108–10. Thus, Petitioner did not properly object and exhaust state remedies before raising this issue here. Finally, Petitioner has not shown cause for consideration of this issue or that the Court's failure to consider the issue will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 749–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

 However, even if I review the merits of this argument, I agree with the Colorado Supreme Court that Petitioner is not entitled to relief. Certainly, the accused has a right to present evidence under the Compulsory Process and Due Process Clauses of the United States Constitution. *Taylor v. Illinois,* 484 U.S. 400, 408–09, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). This includes the right to put before the jury evidence that might influence the determination of guilt. *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). Further, the Cruel and Unusual Punishment Clause requires that the accused be permitted to present all mitigating evidence for imposition of a sentence other than death, including evidence concerning the "nature of the offense." *Penry v. Lynaugh,* 492 U.S. 302, 327–28, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

What Petitioner fails to recognize is the fact that it is up to the accused to make sure that such evidence is presented. *See Taylor,* 484 U.S. at 410, 108 S.Ct. 646 ("[t]here is a significant difference between the Compulsory Process Clause weapon and other rights that are protected by the Sixth Amendment—its availability is dependent entirely on the defendant's initiative."). Although *Taylor* was addressing the right to call witnesses, this holding, in my opinion, would apply in equal force to evidence that is in the possession of the accused and available for presentation at trial. In this case, counsel chose not to present the evidence because there was other comparable evidence in the form of live police testimony. ROA, v. 30, pp. 108–110. Where the defendant can present "comparable evidence by other reasonably available means", there is no constitutional violation. *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

Based upon the above, I find that Petitioner has not shown that the trial court violated or unreasonably applied clearly established federal law. Further, he has not shown that the trial court unreasonably determined the facts in light of the evidence. Accordingly, Petitioner is not entitled to relief on this ground.

**B. *Whether The Trial Court's Refusal To Allow The Jail Psychiatrist To Testify Concerning Psychotropic Drugs Petitioner Was Taking During Trial, Without A Total Waiver Of The Doctor–Patient Privilege And Without Allowing The State To Inquire Into Those Privileged Matters, Violated The Due Process And Cruel And Unusual Punishment Clauses of the United States Constitution***

Petitioner argues in this section that the trial court erred in ruling that he could not call at the penalty phase Dr. Kathy Morall, a psychiatrist who had been treating him while he was in jail. Petitioner wished to call Dr. Morall for the sole purpose of explaining his demeanor at trial and how it was affected by the powerful psychotropic drugs, including Stelazine, she had prescribed for him. Petitioner explains that the drugs made him appear to be an emotionless, cold, lethargic, disinterested person, which he was not.

The trial court ruled that Dr. Morall could not testify on this issue unless there was a complete waiver of the physician-patient privilege. Petitioner argues that was erroneous since it was apparent that the purpose, nature and scope of the proffered testimony did not involve or require any waiver of the privilege. This is be-

cause the testimony allegedly did not relate to the substance of any communications between Petitioner and Dr. Morall, which Petitioner argues the trial court itself recognized in earlier hearings.[66] Petitioner concludes that the effect of the court's ruling was to preclude the introduction of mitigation evidence and/or rebuttal of the aggravating circumstance of Petitioner's appearance and affect in violation of the Due Process, Cruel and Unusual Punishment, Confrontation and Compulsory Process Clauses of the Colorado and United States Constitutions.[67]

■ I find that Petitioner's argument is without merit. Petitioner requested guidance from the trial court as to whether he could call Dr. Morall for the limited purpose of testifying that Petitioner was on medication. ROA, v. 34, p. 145. The prosecution argued that if this testimony was allowed, it should be allowed to cross-examine concerning the "real reasons" the drug was prescribed. *Id.* at 147. The judge ruled that if Dr. Morall was called as a defense witness, the prosecution had a right to cross-examine her and that right would "very possibly" include the reasons why the medications were prescribed. *Id.* at II. 12–20. The judge made it clear that cross-examination would be limited—it stated that while the physician-client privilege might not be waived entirely, it would be waived regarding the testimony presented on direct examination and cross-examination would be allowed regarding same. *Id.* at II. 22–25.

Petitioner then made a tactical and informed decision not to call Dr. Morall in light of the court's ruling. I must assume that defense counsel decided that

the purported "mitigation" testimony of Dr. Morall could, with cross examination, constitute "more harm than good." *See Rodriguez V,* 914 P.2d 230, 297 (Colo. 1996); *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The facts above demonstrate, as the Colorado Supreme Court correctly recognized, that Petitioner was not precluded from presenting this alleged mitigation evidence. *See Rodriguez V,* 914 P.2d at 267. Instead, the trial court quite properly held that if the testimony was introduced, the prosecution could cross-examine within the scope of the testimony opened on direct. *See Brown v. United States,* 356 U.S. 148, 154–155, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (holding that a witness who voluntarily takes the stand and offers testimony in his own behalf lays himself open to cross-examination upon those matters to which he has testified).

Petitioner has not cited, nor do I believe there exists, any clearly established federal law which establishes that such a ruling by a trial court is erroneous. In fact, I note parenthetically that if the court had not allowed cross examination, it may have a been a violation of the prosecution's constitutional rights. *See, e.g., Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). I agree with Respondent that Petitioner cannot convert a tactical decision not to introduce evidence subject to cross examination into a constitutional violation of the right to present evidence generally. Accordingly, I find that Petitioner is not entitled to habeas relief on this ground.

---

**66.** Petitioner does not state what earlier hearings he is referring to nor does not he give this Court any reference in the record to such hearings.

**67.** Petitioner cites, among other cases, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Gardner v. Florida,* 430 U.S. 349, 97

S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) and *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). To the extent that Petitioner argues a violation of the state constitution, federal habeas review is barred. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

**8. Other Alleged Errors By The State Courts**

**A. Whether The Illegality Of The First–Degree Murder And Two Conspiracy Convictions Requires That The Death Sentence Based Upon Them Be Vacated And Whether The Motor Vehicle Theft And "Crime of Violence" Convictions, And The Death Sentence Based On Them, Are Illegal Since They Are Based On The Murder Conviction**

Petitioner argues that it was error for the Colorado Supreme Court not to vacate the death sentence based on the trial court's finding that the convictions for first-degree murder (felony murder), conspiracy to commit second-degree kidnapping and conspiracy to commit aggravated motor vehicle theft were illegal. In connection with the felony murder count, Petitioner argues that the trial court violated *People v. Lowe*, 660 P.2d 1261, 1271 (Colo. 1983) in instructing the jury that Petitioner was charged with two separate crimes of first-degree murder.

Petitioner asserts that conclusive proof that the court intended to so instruct the jury is its imposition of a life sentence on one count and the death sentence on the other. *See* ROA, v. 4, p. 804. The jury returned a general verdict of death for both counts of murder in the first degree.[68]

Petitioner argues that the death verdict was " 'preemptively' based on the illegal felony-murder conviction." Opening Brief, p. 136 (citing *People v. Lowe*, 660 P.2d 1261 (1983), *Crespin v. People*, 721 P.2d 688 (Colo.1986), *James v. People*, 727 P.2d 850 (Colo.1986)). Petitioner also asserts that even if it the jury did not sentence him to the felony murder conviction, the court allowed it to consider the three "illegal" convictions at the penalty phase as reasons to impose the death sentence. Thus, he asserts that the death verdict is tainted, illegal and unreliable.

Petitioner also argues that a conspiracy conviction is so inherently prejudicial that the death sentence must be vacated, even if it had no effect on the accused's sentence, citing *Villafranca v. People*, 194 Colo. 472, 573 P.2d 540 (1978). He argues that the jury improperly considered two non-existent conspiracy convictions, conspiracy to commit second-degree kidnapping and conspiracy to commit first-degree motor vehicle theft, as well as the illegal conviction for first-degree murder.[69] Petitioner concludes that the state court violated clearly established federal law, including *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), and *Zant v. Stephens*, 462 U.S. 862, 884–87, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

 I find that Petitioner has not established the violation of, or unreasonable

---

**68.** Petitioner also asserts that the court instructed the jury that it would decide the punishment in the 'case if the accused were convicted of murder, citing ROA v. 3, p. 560. This is not accurate. The court clarified that the jury, not the court, would decide the punishment if Rodriguez was convicted of Counts 1 and 2 (murder in the first degree as defined by Colo.Rev.Stat. § 18–3–102). *Id.* Count 1 charged that Petitioner "unlawfully and feloniously, after deliberation, and with the intent to cause the death of a person other than [himself], caused the death of LORRAINE MARTELLI" in violation of § 18–3–102(a). *Id.* at v. 1, p. 1; AROA, v. 1, p. 1. Count 2 charged that Petitioner "unlawfully and feloniously, acting alone and with one or more persons, commit[ted] and attempt[ed] to commit SECOND DEGREE KIDNAPPING (Class 2 Felony), FIRST DEGREE SEXUAL ASSAULT (Class 2 Felony), AGGRAVATED ROBBERY (Class 3 Felony) and in the course of, and in furtherance of the above crime that he was committing, attempting to commit, and in immediate flight therefrom, caused the death of a person other than one of the participants, namely, LORRAINE MARTELLI" in violation of § 18–3–102(b). *Id.*

**69.** Petitioner also argues that no limitations were placed on what aggravating factors the jury could consider at the penalty phase. This argument is addressed by the Court in Section V(4)(C), *supra*.

application of, clearly established federal law. The Colorado Supreme Court noted that the felony murder conviction and two minor conspiracy convictions were vacated under Colorado law because they were duplicative with other judgments for deliberated murder and conspiracy to commit murder. *Rodriguez V*, 914 P.2d 230, 283–86 (Colo.1996) (citing ROA, v. 1, pp. 216–19; AROA v. 9, pp. 2235–36). Specifically, the felony murder conviction was vacated under Colorado law because "[t]he rule of lenity permits a conviction for only one first-degree murder when there is a single victim." *People v. Glover*, 893 P.2d 1311, 1314 (Colo.1995). The two conspiracy convictions (conspiracy to commit second-degree kidnapping and conspiracy to commit aggravated motor vehicle theft) were vacated because the conspiracy violated only a single statute and Rodriguez can constitutionally receive only a single penalty for a single crime. *See Rodriguez V*, 914 P.2d at 283; Colo.Rev.Stat. § 18–2–201(4) (1991).

In other words, these counts were not vacated because of any constitutional infirmities, but only because of state law which requires that duplicative convictions be vacated. Petitioner has not shown to the contrary. I have no authority under federal habeas review to overturn decisions based on state law. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Further, the Colorado Supreme Court found that evidence supporting the vacated convictions also supported the following aggravating factors found by the jury: (1) intentionally killing a person in furtherance of an agreement to kill, Colo.Rev. Stat. § 16–11–103(6)(e); and (2) intentionally causing the death of a person in the course of and in furtherance of a felony or in the immediate flight therefrom, Colo. Rev.Stat. § 16–11–103(6)(g). *Rodriguez V*, 914 P.2d at 284. The court further found

that § 16–11–103 does not require a conviction for either felony murder or conspiracy to commit murder before those aggravating factors are found. *Id.* Since the aggravating factor is broader than the felony murder statute, the jury could appropriately find this factor to exist even where it cannot convict the defendant of felony murder. *Id.* at n. 55. This is a reasonable analysis and Petitioner has shown no violation of clearly established federal law in connection with this ruling.

Moreover, the trial court gave an instruction to the jury telling it not to consider Petitioner's convictions as aggravating factors.[70] *Id.* (citing ROA, v. 4, p. 777). I must presume, as did the Colorado Supreme Court, that the jury followed this instruction. *See Harris v. Rivera*, 454 U.S. 339, 345–46, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981).

The Colorado Supreme Court also found under Colorado law that even though these convictions were vacated, the jury could appropriately find the existence of these two aggravating factors. With respect to 16–11–103(g), when the jury convicted Rodriguez of first-degree felony murder it necessarily found that he intentionally caused his victim's death in the course of, in furtherance of, or in flight from one of the felonies for first-degree sexual assault, second-degree kidnapping or aggravated robbery. *Rodriguez V*, 914 P.2d at 284 n. 55. As stated earlier, both the felony murder and murder after deliberation counts were constitutionally obtained. There is no Supreme Court case which requires that, in a situation where a felony murder charge must be vacated as duplicative of a murder with deliberation charge, the jury's findings which support the felony murder conviction and the aggravating factor must also be vacated.

Further, the Colorado Supreme Court found that the jury could appropriately

**70.** Specifically, Instruction 19 stated:
The fact that you have found Mr. Rodriguez guilty of the crime of murder in the first degree is not an aggravating factor. Except

as required by the [aggravating factor of section 16–11–103(6)(g) ], the fact that you have found Mr. Rodriguez guilty of other crimes is not an aggravating factor.

consider the aggravating factor found in § 16–11–103(6)(d). Pursuant to § 16–11–103(6), the conspiracy to commit murder conviction is the only conspiracy conviction relevant to the determination of the aggravating factors. The Colorado Supreme Court held that, under Colorado law, the district court appropriately upheld Rodriguez' conviction for conspiracy to commit murder while vacating the other two conspiracy convictions.[71] Petitioner has cited no clearly established federal law as determined by the Supreme Court that was violated by the jury's consideration of this aggravating factor.

The cases cited by Petitioner do not require that his death sentence be vacated. *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), and *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) all involved situations where the sentencer considered convictions that were later overturned as constitutionally defective. In this case, the convictions were vacated under state law only because they were duplicative of other counts that the jury convicted Petitioner of. The convictions were not constitutionally defective in and of themselves and there is no claim herein that the evidence did not support these counts. As the Colorado Supreme Court reasonably found, the convictions "would stand had [Petitioner] not been convicted of murder after deliberation [or conspiracy to commit murder] for the same crime." *Rodriguez V,* 914 P.2d at 285.

I also agree with the Colorado Supreme Court that *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) does not support Petitioner's argument. *Rodriguez V,* 914 P.2d at 285. In *Zant,* the Supreme Court held that the jury's decision must not be predicated on mere "caprice" or on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant,* 462 U.S. at

885, 103 S.Ct. 2733. In that case, however, the aggravating factor itself was found to be unconstitutional. *Id.* at 886, 103 S.Ct. 2733. The Supreme Court made clear that the invalidation of a statutory aggravating factor does not automatically require reversal of the death penalty. *Id.* at 889–90, 103 S.Ct. 2733. So long as the aggravating factor is not constitutionally impermissible or totally irrelevant to the sentencing process, which these factors were not, and the evidence underlying the aggravating factor is fully admissible at the sentencing process, as here, the death sentence can be upheld.

Petitioner argues that the charges and convictions for aggravated motor vehicle theft and "crime of violence" were presumably based on the illegal and non-existence felony murder conviction because the information alleges that the underlying felony for these crimes was "first-degree murder," citing AROA, v. 1, pp. 3, 7. He further argues that in the absence of any delineation as to whether the verdict was based on the "after deliberation" murder charge or the felony murder charge, the conviction and sentence must be reversed. I do not agree.

First, as Respondent points out, it does not appear that this issue was raised below in the state courts. Thus, it has probably been procedurally defaulted. However, even considering the merits of this argument, I do not find that Petitioner is entitled to relief on this ground. Both the aggravated motor vehicle theft and "crime of violence" crime were properly submitted to the jury in connection with a "first-degree" murder charge. The jury found that both counts of murder were proved. Thus, even if the felony murder count had not been found, these convictions were appropriate under the "after deliberation charge." Further, the conviction was appropriate on this ground since these charges were also submitted to the jury in connection with the second degree kidnap-

---

71. As stated previously, this state law issue is not appropriate for resolution by this Court.

*Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

ping charge, the first degree sexual assault charge, and/or the aggravated robbery charge, all of which were found to exist by the jury. *See* AROA, v. 1, pp. 3 and 7; v. 3, pp. 555, 557–58, 578; ROA, v. 52, p. 805–06.

Finally, as stated above, the felony murder charge was not vacated as unconstitutional, only because it was duplicative under state law. In other words, the charge would stand but for the duplicative "after deliberation" charge. Plaintiff has cited no clearly established federal law as determined by the Supreme Court that was violated in allowing the aggravated motor vehicle theft and "crime of violence" counts to stand when the duplicative charge they were based on was vacated.

For all of these reasons, I find that Petitioner has failed to show the violation of, or unreasonable application of, clearly established federal law as determined by the Supreme Court. Thus, he is not entitled to federal habeas relief on this ground.

**B. *Whether The Trial Court's Actions Resulting In Petitioner Not Being Represented By Counsel At The First Day Of Trial Denied Petitioner Due Process of Law, a Fair Trial By Impartial Jury, And His Rights To Counsel, Equal Protection Of The Laws, And The Prohibitions Of Cruel And Unusual Punishment***

Petitioner argues that, in violation of the Colorado Supreme Court's order of the proceeding day and in the face of Petitioner's express and valid waiver of his right to be present in the presence of the jury, the judge forced Petitioner to face the entire jury panel on the first day of trial. Petitioner claims the result of this was that he was left with an attorney who had no experience in such matters and who did not know what to do in order to protect his fundamental rights, violating his constitutional rights.

My review of this argument first reveals that Petitioner has forfeited the right to assert this claim. The Colorado Supreme Court found that the issue of inadequate representation on the first day of jury selection and the trial court's failure to comply with a Supreme Court order regarding same were procedurally defaulted and would be summarily dismissed since they had been inadequately asserted both in the postconviction review and in the appeal of same. *Rodriguez V,* 914 P.2d at 250–51. Petitioner has not shown cause or prejudice as to why this issue should be considered in federal court, nor has he shown that the "fundamental miscarriage of justice" exception is available. *Coleman v. Thompson,* 501 U.S. 722, 749–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

However, even assuming that this issue was not procedurally defaulted, I find that it is without merit. First, as to whether the trial court violated an order of the Colorado Supreme Court, Petitioner has failed to identify what the Colorado Supreme Court ruled, let alone how the trial court's decision violated that ruling. Further, Petitioner has failed to provide this Court with a reference in the record to the Supreme Court's order to enable the Court to make this determination. Accordingly, Petitioner is not entitled to relief on this argument.

 Second, on the issue of inadequate counsel on the first day, it is undisputed that Petitioner's lead counsel, Mr. Eisner, was not present at trial the first day during jury selection. Further, it is undisputed that counsel Ms. Desmond left the courtroom in front of the prospective jurors in the morning for surgery, and that the trial court was aware that she needed to leave like this. However, it is also undisputed that Petitioner was represented by counsel on this date, including Ms. Desmond for at least some of the time and Mr. Heher throughout the day. Although Petitioner complains that Mr. Heher was inexperienced and that this violated his constitutional rights, I agree with Respondent that Petitioner has failed to show any particular instance of substandard perfor-

mance or how his counsel's alleged inexperience violated his constitutional rights.

In fact, it would be difficult for Petitioner to show that his counsel's alleged inexperience violated any of his rights when it is clear from the record that the attorneys did not participate in the proceedings that day in connection with jury selection. *See* ROA, v. 14, p. 3, II. 18–20. The jurors were simply filling out questionnaires and being divided into groups to come back at another time. *Id.* at 3, II. 11–17; 10, II. 2–6. Further, Ms. Desmond was present and participated in the proceedings that morning and made numerous arguments on Petitioner's behalf. *See id.* at 2–9. Finally, Mr. Heher did attempt to protect the Petitioner's rights after the jury left for the day by making a record as to issues that he deemed objectionable or inappropriate. *Id.* at 15–21.

For the reasons stated above, I find that Petitioner has not cited any clearly established federal law as determined by the Supreme Court that was violated or unreasonably applied by the state courts' ruling. Further, I find that Petitioner has not showed that the trial court's decision was based on an unreasonable determination of the facts in light of the evidence. Accordingly, I deny Petitioner relief on this ground

**C. *Whether Petitioner Was Denied His Rights To Due Process, Compulsory Process, Confrontation, And The Prohibition Of Cruel And Unusual Punishment By the Court's Refusal To Allow A Continuance So That Petitioner Could Obtain The Presence And Testimony Of A Critical, Subpoenaed Witness***

Petitioner argues that the trial court denied his constitutional rights by its refusal to continue the trial so that the testimony of Sam Cruz ("Cruz") could be obtained and/or to assist him in connection with obtaining the testimony of David Martinez ("Martinez"). He asserts that their testimony could have provided critical exculpatory and mitigating evidence. Cruz would have allegedly testified that he

had personally given Patricia Thomas ("Thomas") the knife which she said was the murder weapon, and which Thomas denied ever having seen before the homicide.

Rodriguez wanted to call Martinez to testify about statements he allegedly made to another person (referred to herein as "J.H.") that he, not Rodriguez, had stabbed Martelli to death. He states that the trial court denied these rulings without justification. Further, Petitioner asserts that the court's assistance was required in getting Martinez to trial to testify because he was a prison inmate. Rodriguez argues that the trial court erred in denying this assistance and in denying a request by Petitioner to call the person to whom Martinez had allegedly admitted responsibility for stabbing Martelli.

Petitioner argues that the trial court's rulings which denied him the right to present such mitigating and exculpatory evidence denied him his rights under the Due Process, Confrontation, Compulsory Process, and Cruel and Unusual Punishment Clauses of the Constitution under *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), *Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and their progeny. Finally, he argues that the district court erred in ruling that these claims were "forfeited," thus not allowing him a hearing on this issue.

I find that Petitioner is not entitled to relief on this claim. First, I note that under clearly established Supreme Court law, trial courts have "broad discretion . . . on matters of continuances." *Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *see also Rodriguez V,* 914 P.2d 230, 268 (Colo.1996). In addition, the standard of review applicable to evidentiary rulings of the district

court is generally an abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); *Old Chief v. United States*, 519 U.S. 172, 174, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). However, I agree with Petitioner that the right to call witnesses in one's behalf to defend against the state's accusations is essential to due process. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). Further, I agree that the Cruel and Unusual Punishment and Due Process Clauses require that the accused be permitted to present to the jury reasons for imposing a sentence less than death. *Mills*, 486 U.S. at 375, 108 S.Ct. 1860.

▉ Nonetheless, in the case at hand, I find that Petitioner has failed to show that due process or his other constitutional rights were violated by the trial court's rulings regarding these two witnesses. The facts regarding these witnesses are as follows. Sam Cruz failed to appear at trial on a subpoena. ROA, v. 28, p. 13. Rodriguez requested a continuance to secure his attendance.[72] The prosecution objected to the continuance, arguing that it should not be granted since Cruz' testimony was cumulative to the previous testimony of Mary Compos. ROA, v. 30, p. 100, II. 17–24. Compos testified that Thomas was previously in possession of the knife at issue. *Id.* at 57–59. The trial court denied the motion for continuance. *Id.* at 101.

I find that Petitioner has failed to show a violation or unreasonable application of federal law regarding the court's ruling denying a continuance or that his constitutional rights were violated. First, as stated above, the Colorado Supreme Court correctly recognized that the grant of a continuance is addressed to the trial

court's discretion. *Rodriguez V*, 914 P.2d at 268. Second, it is clear from my review of Compos' testimony that the testimony of Cruz that Petitioner wished to elicit was cumulative to her testimony. *See* ROA, v. 30, pp. 58 II. 11–17, p. 59 II. 2–14. In fact, Petitioner's counsel admitted that this testimony was cumulative. *Id.* at 101, II. 1–2.

Accordingly, I agree with the Colorado Supreme Court that Petitioner has failed to show that the trial court's denial of the continuance as to Cruz prevented him from effectively impeaching Thomas. *See Rodriguez V*, 914 P.2d at 268–69. Further, I find that Petitioner has failed to show that his constitutional rights were violated by a ruling that simply precluded cumulative testimony. In other words, Petitioner has failed to provide any Supreme Court holding that a trial must be continued to allow an accused to present testimony that has effectively been presented by another witness.

As to Martinez, the facts are as follows. On December 9, 1986, Petitioner called Martinez *in camera* wherein he asserted his Fifth Amendment privilege against self-incrimination. ROA, v. 29, pp. 109–112. At this time, the trial judge noted that the witness was taking the Fifth Amendment privilege in connection with his testimony and appeared to make a finding that the witness had the right to take such privilege. *Id.* at 112, II. 4–9. Rodriguez' counsel then asked that Martinez be discharged and returned to prison but the court declined on the possibility that he might be recalled tomorrow. *Id.* at 113. However, although it is somewhat unclear from the record, it appears that Martinez was eventually released either that day or the next at the request of defense counsel, presumably since Martinez would not talk to them. ROA, v. 30, pp. 107–08.

---

**72.** In the alternative, Rodriguez requested a ruling allowing him to resent testimony through one or both of the investigators who had knowledge of Cruz's alleged statements. *Id.*, v. 30, pp. 98–99. This request was denied

by the trial court (*id* at 101), which ruling has not been contested by Petitioner herein. Thus, I address only the trial court's ruling regarding Cruz.

On the following day, defense counsel Desmond informed the court that she had been in contact with J.H., a state prisoner who indicated that Martinez had admitted stabbing Martelli as well as committing other homicides. *Id.* at 3–8. Counsel requested a 24 hour continuance to further investigate the matter. *Id.* at 10, 13–14. The trial court ruled that it would go ahead with the trial that day but that "[i]f something comes of this and you're near the end of your case, or closed your case and we haven't done instructions or closing argument, I will allow you to reopen if something substantial or admissible comes as a result of this." *Id.* at 14, II. 17–22. No objection was made to this ruling. *Id.*

Later that day, defense counsel Eisner indicated that he considered Martinez "unavailable" because Martinez refused to talk to him. *Id.* at 107, 111, 112–13. Eisner also indicated that he wanted to introduce Martinez' statement to "J.H." *Id.* at 106. The court indicated that the Fifth Amendment privilege which had been found to exist the day before as to Martinez did not apply that day. *Id.* at 107, II. 22–24. Counsel then asked if he could find out if Martinez would invoke the privilege that day to which the court responded that he could find that out if he wanted but that Martinez had been released at counsel's request. *Id.* at 107–08. Accordingly, it appears that Martinez was released at defense counsel's request before it could be established that he would refuse to testify as to this new issue. *Id.*

From the foregoing, it is apparent that the trial court did not abuse its discretion in connection with granting a continuance to obtain the testimony of Martinez. In fact, as the Colorado Supreme Court acknowledged in *Rodriguez V,* 914 P.2d 230, 268 (Colo.1996), it does not even appear from the record that Petitioner ever asked for a continuance. Further, it does not appear that he specifically asked for some type of assistance which was denied. Instead, Martinez was released at defense counsel's request after which counsel wanted the court to find him "unavailable."[73] Accordingly, I find that Petitioner has failed to show that the state court violated or unreasonably applied any clearly established federal law as determined by the Supreme Court.

I also do not find any merit to the argument that the trial court "refused to allow Mr. Rodriguez to call the person to whom Martinez had admitted responsibility." The trial court made it clear on the record that, although it was denying a 24 hour continuance, it would allow Petitioner to present this testimony, even if counsel needed to reopen the case, if "something substantial or admissible" came from the investigation. There is no evidence that Petitioner ever sought to call this witness or that he was unjustifiably precluded by the trial court from doing so.[74] Accordingly, I find that Petitioner is not entitled to relief on this ground. Finally, as to the argument that the district court improperly ruled that this claim was forfeited and that the court's findings are thus unreliable, Petitioner has failed to show in any regard how the ruling regarding forfeiture was erroneous, unreasonable or contrary to law.

For all of the reasons above, I find that Petitioner has failed to show that clearly established federal law was violated or unreasonably applied in connection with this argument. Further, I find that Petitioner has not shown that the trial court's deci-

---

**73.** Further, it is apparent that Martinez did later testify at a state postconviction proceeding and indicated that Petitioner was the primary participant who unilaterally stabbed Martelli to death. ROA, v. 67, pp. 96–102. An unsworn statement by Martinez clearly also identified Petitioner as the only person to stab this victim. *Id.* at 142–148. Accordingly, the testimony of Martinez was ultimately presented and was extremely prejudicial to Petitioner.

**74.** Further, I agree with Respondent that Petitioner has not shown that this issue as to "J.H." was even properly raised in the state court and I have found no discussion in the state court as to same. Accordingly, this issue may have also been forfeited by Petitioner.

sions as to these issues were based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to relief as to this argument.

### D. *Whether The Trial Court's Refusal To Require That The State Provide Discovery Regarding Joseph Council Violated The Due Process Clause Of The United States Constitution*

 Petitioner's final argument is that the trial court erroneously refused, without any explanation, to require that the State provide discovery regarding statements of witness Joseph Council. Further, Petitioner asserts that at the this ruling was made, the State had already violated the court's orders by failing to provide discovery regarding this witness. He argues that the trial court's ruling and its refusal to allow a hearing on this issue violated his due process rights. He also asserts that his rights to exculpatory discovery material were violated (citing *Rodriguez II* ). Finally, Petitioner argues that the trial court's ruling that this claim was "forfeited", and that disallowed him a hearing, rendered the court's ruling unreliable.

I find that this claim has been forfeited. The Colorado Supreme Court held that the issues raised therein regarding discovery violations in connection with the trial court's refusal to provide discovery regarding Joseph Council (Issue 24 below) and discovery violations which allegedly resulted in the denial of due process (Issue 32 below) were forfeited and would be dismissed because Petitioner did not adequately support and specify this claim in the postconviction motion to the district court. *Rodriguez V*, 914 P.2d at 250–52. Petitioner does not show this to be erroneous. Further, he does not show cause and prejudice regarding this default or that the failure of this Court to consider the issue would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 749–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

However, even if this issue were not procedurally defaulted, I find that Petitioner can not prevail on the merits. In *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), the Supreme Court held, "[t]here is no general constitutional right to discovery in a criminal case, and Brady [v. Maryland] did not create one; as the Court wrote recently 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded....' " *Id.* at 559, 97 S.Ct. 837 (quotation omitted); *see also United States v. Price*, 75 F.3d 1440, 1445 (10th Cir.1996). "[T]he holding in Brady ... requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or punishment.' " *United States v. Bagley*, 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) quoting *Brady*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

 In the case at hand, Petitioner has not shown that the discovery regarding Joseph Council was required to be turned over under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), since he has not established that the discovery was either favorable to him or material to guilt or punishment. Further, Petitioner has not shown that the discovery was required to be turned over pursuant to any other clearly established federal law as determined by the Supreme Court. Petitioner has also not shown that he satisfied these requirements in the state court such that due process would have been implicated. Finally, as to the argument that the district court improperly ruled that this claim was forfeited and denied a hearing on this issue, Petitioner has also failed to show how this ruling was erroneous, unreasonable or contrary to law.

Accordingly, for all of the reasons stated above, I find that Petitioner has failed to show that he is entitled to relief under Section 2254(d) as to this argument.

## VI. *CONCLUSION*

For the reasons stated herein, it is

ORDERED that the Petition for Writ of Habeas Corpus is DENIED and this case is DISMISSED. It is

FURTHER ORDERED that the Stay of Execution entered by the Court on November 18, 1996, remains in full force and effect for fifteen (15) days from the date of this Order.